### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

JUSTIN E. FAIRFAX )
8106 Guinevere Drive )
Annandale, Virginia 22003, )
)
    *Plaintiff,* )
)
     v. )     Civil Action No._____
)
CBS CORPORATION )
51 West 52nd Street )
New York, New York 10019, )
)
CBS BROADCASTING INC. )
51 West 52nd Street )
New York, New York 10019, )
)
    *Defendants.* )

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Justin E. Fairfax ("Justin Fairfax" or "Fairfax") files this Complaint against

Defendants CBS Corporation and CBS Broadcasting Inc. (together "CBS") and states as follows:

## NATURE OF THE ACTION

1.    This defamation suit arises from intentionally fabricated, false, and politically-

motivated statements made by Meredith Watson ("Watson") and Vanessa Tyson ("Tyson")

alleging that they were sexually assaulted by Justin Fairfax. CBS published, promoted, and

amplified these false statements during separate interviews with *CBS This Morning*'s Gayle King

broadcast by CBS to a national audience on April 1, 2019 (Tyson) and April 2, 2019 (Watson).

CBS heavily promoted the interviews in the time leading up to the broadcasts. Fairfax brings this

action to restore his reputation and clear his name, ensure the truth prevails, stop the

weaponization of false allegations of sexual assault against him, and vindicate his rights under civil law.

2.      Following the heavy promotion of the interviews on the CBS network and their airing of the interviews on *CBS This Morning*, CBS published videos of both interviews and selected clips from each on the CBS News website, cbsnews.com, where the interviews and clips have received millions of views and where they remain, available to be republished, as of the date of this filing. Both interviews also have been published and republished by CBS on their social media platforms, including Twitter, Facebook, and YouTube where they continue to be shared and viewed as of the date of this filing. CBS authorizes and consents to the republication of these interviews, without correction, to this day. As a result of CBS' actions, these defamatory statements have been repeatedly and foreseeably republished by media outlets and other third parties throughout the country.

3.      Watson's encounter with Fairfax took place in the Spring of 2000 at Duke University ("Duke") when both were undergraduate students. Fairfax was a 21-year-old college senior and Watson was an approximately 20-year-old college junior. Tyson's encounter with Fairfax occurred during the Democratic National Convention in Boston in July 2004 when Tyson was 27 years old and Fairfax was 25 years old. Both encounters were entirely consensual. Yet, 19 and 15 years later, respectively, Watson and Tyson falsely and publicly claimed they had been sexually assaulted by Fairfax, just as Fairfax was poised to ascend to the Governorship of Virginia following a blackface photo scandal affecting current Governor Ralph Northam. The timing and circumstances of these false and salacious allegations demonstrate that it was a

political hit job—a deliberate and calculated effort to permanently harm Fairfax's political and professional career and to attempt to prevent him from becoming Governor of Virginia.

4.     Tyson's fabrications against Fairfax were politically-motivated. Her communications with a well-connected friend involved in Virginia politics reveal that she instigated and fostered a deliberate plan on the same weekend that a scandal broke that led to calls for Governor Northam's resignation. In reality, Tyson knew that Fairfax did not assault her. Indeed, after their entirely consensual sexual encounter 15 years ago, Tyson reached out to Fairfax on multiple occasions to maintain contact. At one point during that period of time, Tyson called Fairfax and asked if she could visit him socially in New York City – where he was then a law student at Columbia Law School – and introduce him to her mother. Fairfax never responded to that request and has not seen or spoken with Tyson since.

5.     Tyson, a California resident, has stated that she does not want an independent law enforcement investigation into her allegation, and instead has pushed for Fairfax to resign his public office as Lieutenant Governor of Virginia.

6.     Watson's motive also appears politically motivated in that she sought to air her false allegation in the Virginia General Assembly and continues to avoid any independent law enforcement investigation of her claim. Watson also has alleged that she was raped by a Duke University athlete ("Duke Athlete") a year before she alleges she was raped and sexually assaulted by Fairfax. Watson, a Maryland resident, likewise has not sought an independent law enforcement investigation into either her allegation against the Duke Athlete or against Fairfax and instead has also pushed to have Fairfax resign his public office as Lieutenant Governor of Virginia.

7.      In April 2019, nearly two months after Watson and Tyson first went public with their false allegations in February 2019, CBS aired their interviews despite having ample opportunity and resources to investigate the veracity of their stories. CBS also had information both before and after publishing these defamatory interviews indicating that both allegations had not been corroborated by any independent investigation. Yet, CBS recklessly disregarded whether what Watson and Tyson were saying was, in fact, true.

8.      That CBS chose to air these false claims of sexual assault is not surprising. Since 2017, CBS had been publicly excoriated with its own #MeToo scandals involving several high-ranking figures at the network, including *CBS This Morning* Co-Anchor Charlie Rose, former *CBS News* Chairman and former Executive Producer of *60 Minutes* Jeff Fager and former CBS CEO Les Moonves. Upon information and belief, in the immediate aftermath of those high-profile #MeToo scandals, the network sought to visibly align itself on the side of perceived victims to improve its public image. Consequently, Gayle King and her *CBS This Morning* team intentionally failed to investigate leads—some provided directly to CBS by Fairfax's team prior to the stories being aired on the network—that would have placed the truthfulness of Watson's and Tyson's stories in serious doubt. CBS also made sure that Watson's story was not seriously challenged during the on-air interview by agreeing to a pre-interview of Watson in the presence of Watson's lawyer. Once aired, CBS refused to correct the accusations made against Fairfax, despite numerous specific requests to update its reporting and despite having exculpatory information in the public record and elsewhere.

9.      Before and after airing the interviews, CBS had information that these accusations were false. In particular, a current CBS legal officer, who was a Duke classmate of Watson's and Fairfax's, had information all along that Fairfax did not rape or sexually assault Watson.

10.     Given its own significant problems with #MeToo scandals, CBS had a clear agenda and media bias in seeking to support #MeToo accusers in its reporting on the sexual assault and rape allegations made by Watson and Tyson against Fairfax. As a result of that bias, CBS abandoned sound, standard journalistic practices that would have revealed fabrications, inconsistencies, and provably false statements made by Watson and Tyson and undermined the credibility of their stories. CBS intentionally did not ask Watson and Tyson basic factual questions meant to "pressure-test" the veracity of their allegations. Instead, it went into the stories with a preconceived narrative in mind—that Fairfax was guilty—and did everything possible to make sure the aired interviews were consistent with that narrative.

11.     For example, despite being urged by Fairfax's spokesperson prior to the taping of the interview, CBS never asked Watson on-air (a) the date of the alleged assault, (b) in which room the alleged assault occurred, (c) who resided in that room, or (d) whether Watson encountered anyone other than Fairfax upon entering or exiting the room or building. This was a crucially important line of questioning since Fairfax did not live in that building during that academic year, and it was later revealed that there was an eyewitness present during the consensual encounter between Watson and Fairfax. That eyewitness has stated to multiple people that he was in the room and that Fairfax did not rape or sexually assault Watson. Watson did not mention an eyewitness in her interview with King or at any other time.

5

12.     Exacerbating CBS' reckless disregard for the truth and failure to follow even basic journalistic standards were the wholly uninformed on-air comments by CBS on-air personnel during the segments in which CBS aired Watson's and Tyson's defamatory statements. On April 1 and 2, various CBS reporting staff, including King, Norah O'Donnell, John Dickerson and Bianna Golodryga made comments on-air accepting as fact and vouching for the credibility of the stories told by Watson and Tyson without *any* independent investigation or objective basis in fact. Their commentary is further evidence that CBS acted with actual malice against Fairfax and that CBS was more interested in appearing to take the side of alleged #MeToo victims than in reporting objectively on the facts and establishing the truth or falsity of the allegations made by Watson and Tyson.

13.     As a result of CBS' reckless airing of the false and defamatory statements, Justin Fairfax is now falsely labeled a "rapist," "predator" and "sexual abuser." CBS' actions have exposed millions of people to lies that have done extraordinary damage to his reputation and his ability to earn a living. His once-promising career – a lawyer at top firms, former federal prosecutor, Lieutenant Governor of Virginia, candidate for Governor of Virginia for 2021 – has been severely damaged. Fairfax had little choice but to relinquish his partnership at Morrison & Foerster, a top international law firm at which he would have earned millions of dollars over the years. His wife and two young children cannot escape having to hear these vicious false stories and taunts about their husband and father whom they love dearly. This harm is a direct and proximate result of the intentional and reckless publishing and propagation by CBS of patently false allegations by Watson and Tyson of rape and sexual assault.

6

14.     Fairfax seeks compensatory and punitive damages for the extreme harm that the Defendants have jointly and severally caused. He also seeks to enjoin CBS from continuing to publish these defamatory interviews and statements.

## PARTIES

15.     Plaintiff Justin Fairfax is an individual and resident of the Commonwealth of Virginia, who lives in Fairfax County. He has been married since 2006 to his wife Cerina, a dentist with her own practice in Fairfax County. Together they have a son and a daughter, ages nine and eight, respectively. Since his 2005 graduation from Columbia Law School where he was selected to the prestigious *Columbia Law Review*, Justin has enjoyed an extraordinarily successful career in law and public service. Fairfax clerked for the Honorable Gerald Bruce Lee in the Eastern District of Virginia ("EDVA"). He worked at prestigious firms such as WilmerHale LLP, Venable LLP and Morrison & Foerster LLP, the latter of which he served as a partner. In 2013, Fairfax was named as one of the "Nation's 40 Best Advocates Under 40 Years Old" by the National Bar Association. From 2010 to 2012, Fairfax served as an Assistant United States Attorney for EDVA in the Major Crimes & Narcotics Unit in the Alexandria Division. He also was appointed Deputy of the Northern Virginia Human Trafficking Task Force. Fairfax passed two separate FBI background checks in 2005 and 2010, respectively, and he was granted a "Top Secret" security clearance by the federal government. Fairfax left his position as an AUSA in 2012 to run for Attorney General of Virginia—a race in which he won more than 48% of the statewide primary vote and was endorsed by *The Washington Post* in his first-ever election. In 2017, he was elected as Lieutenant Governor of Virginia with 1.36 million votes— the most ever for that position in the history of the Commonwealth of Virginia. Fairfax continues

to serve as Lieutenant Governor of Virginia—a part-time position for which he is paid approximately $36,000 per year. Prior to the false and defamatory allegations against him, Fairfax had served as a member of the Duke University Board of Trustees, the Duke University Sanford School of Public Policy Board of Visitors, and as Chair of the Democratic Lieutenant Governors Association ("DLGA").

16.     Defendant CBS Corporation is a Delaware corporation with its principal place of business at 51 West 52nd Street, New York, New York 10019.

17.     Defendant CBS Broadcasting Inc. is a New York corporation with its principal place of business at 51 West 52nd Street, New York, New York 10019. CBS Broadcasting Inc. is a wholly owned subsidiary of Defendant CBS Corporation. CBS Broadcasting Inc. is among the largest and most successful producers and distributors of television programming in the United States and the world. *CBS This Morning* is a news show broadcast on the CBS Network and produced by *CBS News*, a division of CBS Broadcasting Inc.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a) as there exists complete diversity of citizenship between the Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

19.     This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1 et seq.

20.     CBS is subject to personal jurisdiction in Virginia because it transacts business in Virginia, knowingly, and with reckless disregard for the truth, published and republished false and defamatory statements concerning a Virginia resident who was harmed by the Defendants in

Virginia and published and republished the false and defamatory statements in Virginia and to residents of Virginia. Upon information and belief, CBS has contracted to supply goods or services in Virginia, has five affiliate television stations in Virginia, and generates income from its business in Virginia.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the harms suffered by Plaintiff occurred primarily in the Eastern District of Virginia and because all Defendants are subject to personal jurisdiction in this District.

## FACTS

### *Watson and Fairfax Had an Entirely Consensual Sexual Encounter as College Students in the Spring of 2000*

22.     In the Spring of 2000, Watson and Fairfax were both undergraduate students at Duke and had been friends for some time.

23.     Fairfax was a 21-year-old senior at the time. Watson was an approximately 20-year-old junior at the time.

24.     One evening that spring, Watson, Fairfax and a third person (the "eyewitness") had gathered in the eyewitness' fraternity house dorm room. Watson had visited that building and that specific room many times during her years at Duke.

25.     Fairfax did not reside in the eyewitness' building that academic year. At the time, Fairfax was a residential advisor and living in a dormitory on Duke's campus.

26.     With the eyewitness still in the room, Watson initiated a sexual encounter with Fairfax.

27.     Throughout the entire sexual encounter, Watson unambiguously manifested her consent.

9

28.     The eyewitness remained in the room throughout the entire sexual encounter.

29.     After the encounter, Fairfax left the room and Watson remained in the room with the eyewitness.

30.     Watson never indicated to Fairfax or the eyewitness that the sexual encounter with Fairfax was not consensual during or after the encounter with Fairfax.

31.     Watson has never mentioned that there was an eyewitness present during her encounter with Fairfax, including during her April 2 interview with King on *CBS This Morning*, nor has she ever suggested that someone else participated in the assault she alleged.

32.     Watson also has never specified in whose room her encounter with Fairfax took place.

33.     As recently as February 2019, Fairfax and the eyewitness discussed this encounter and their recollections of it were identical: Watson and Fairfax had a consensual sexual encounter in the eyewitness' room with the eyewitness present the entire time.

34.     Since February, the eyewitness has discussed this encounter with several of the eyewitness' friends on numerous occasions, including a lawyer for CBS. The account has not changed: Watson and Fairfax had an entirely consensual sexual encounter initiated by Watson in the eyewitness' room 19 years ago as college students.

### Tyson and Fairfax Had an Entirely Consensual Sexual Encounter at the Democratic National Convention in July 2004

35.     For several weeks during the summer of the 2004 presidential election, Fairfax served as the personal aide or "body man" to then-Democratic vice-presidential candidate Senator John Edwards of North Carolina. This included the week of the Democratic National Convention that took place in Boston in late July 2004.

36.     Fairfax traveled on the same airplane with Edwards to the Democratic National Convention in Boston.

37.     Fairfax arrived in Boston from Raleigh, North Carolina, with Senator Edwards on Tuesday, July 27, 2004.

38.     On July 28, 2004, after only knowing each other for less than 24 hours, Tyson agreed to join Fairfax in his hotel room. Many who attend such conventions regularly are aware that such personal connections are not uncommon.

39.     Upon information and belief, a fellow campaign staffer shared Fairfax's room, and the room was on a secure floor accessible only to properly-credentialed staff and their guests. The roommate was not present during this sexual encounter, but always had a key to the room.

40.     Tyson and Fairfax engaged in completely consensual sexual activity in Fairfax's hotel room.

41.     Throughout the encounter in Fairfax's hotel room, Tyson unambiguously manifested her consent to engage in the consensual activity.

42.     At no time during or after the encounter did Fairfax force Tyson to do anything and at no time during or after the encounter did Tyson indicate that Fairfax forced her to do anything.

43.     At no time did Tyson cry, gag, or choke while in Fairfax's hotel room.

44.     Tyson stayed in Fairfax's hotel room following the sexual encounter, made no effort to leave the hotel room although she was free at any time to do so, and engaged in friendly conversation with him.

45.     Tyson and Fairfax left the hotel room together. Upon information and belief, Fairfax and Tyson would have had to pass campaign staff and security personnel on the secure hotel floor before departing each other's company and such staff and personnel would have been attuned to any distress on the part of any person they encountered.

46.     In the weeks following their completely consensual sexual encounter on July 28, 2004, Tyson and Fairfax remained in touch.

47.     At one point, Tyson left a voice message for Fairfax asking if he would like her to visit him in New York City—where he was then attending Columbia Law School—and meet her mother. Fairfax never responded to that message and never saw or spoke with Tyson again.

48.     During the time they were in contact, Tyson never indicated to Fairfax that she believed their encounter to be anything other than entirely consensual. She has never contacted Fairfax about any issue in the previous 14 years, except as alleged above.

### *Fairfax Becomes Lieutenant Governor and the Northam Scandal Breaks*

49.     Fairfax graduated Columbia Law School in 2005 and has enjoyed a highly-successful legal and political career to date.

50.     In early May 2016, Fairfax announced his candidacy for Lieutenant Governor of Virginia. On November 7, 2017, he was elected Lieutenant Governor of Virginia, becoming the second African American ever elected to statewide office in Virginia's history. His candidacy and subsequent election received widespread national media coverage.

51.     Fairfax assumed office as Lieutenant Governor on January 13, 2018. As Lieutenant Governor, he is first-in-line to become Governor of Virginia should current Governor Ralph Northam no longer serve in office.

52.     Because Virginia Governors are prohibited by the Virginia Constitution from serving consecutive terms, Governor Northam could not run for re-election in 2021. Therefore, as a statewide office holder, Fairfax is naturally considered a top contender for Governor of Virginia in the 2021 gubernatorial election.

53.     In September 2018, Fairfax joined the law firm Morrison & Foerster as a partner in its Northern Virginia office in Tysons Corner. As partner, he earned a substantial salary, commensurate with his unique legal skill set, experience, and business development acumen.

54.     On Friday, February 1, 2019, a photo from Governor Northam's medical school yearbook surfaced purportedly showing Governor Northam either in blackface or in a Ku Klux Klan hood. Calls for Governor Northam to resign came almost immediately.

55.     Had Governor Northam resigned as a result of this scandal in February 2019, Fairfax would automatically have become Governor of Virginia by operation of the Virginia Constitution, becoming the only African American Governor in the entire United States of America. Also pursuant to the Virginia Constitution, Fairfax would have been eligible to run for a full term as Governor in the 2021 gubernatorial election.

***Tyson Makes Her False and Defamatory Allegation Against Fairfax Through Political Rivals to Try to Stop Him from Becoming Governor of Virginia***

56.     On the Sunday following the breaking of the scandal involving Governor Northam (February 3, 2019), a conservative website called "Big League Politics" published a supposedly private Facebook message from Tyson stating that she was assaulted at the 2004 Democratic Convention in Boston by someone who was about to receive a "VERY BIG promotion" in Virginia.

57.     On Monday, February 4, 2019, Tyson's allegation was first reported by national mainstream media outlets, including *The Washington Post*, which wrote in its initial piece that it "could not find anyone who could corroborate" her version of the allegation and did not have "the ability to corroborate [Tyson's] account—in part because she had not told anyone what happened."

58.     Tyson's private message had been captured and forwarded on by Adria Scharf. Scharf's message forwarding Tyson's message appears to have used an encrypted messaging app and was titled, "Monday Action." A screenshot of that communication appears below.



59.     Upon information and belief, Tyson and Scharf communicated about the Facebook post in the immediate aftermath of the Governor Northam scandal breaking. Tyson

agreed to allow Scharf to share the post with a group of progressive activists in Virginia. After Scharf did so, Tyson thanked her for spreading the post. Scharf encouraged Tyson to make her story public immediately in light of the revelations about Governor Northam and the potential that he might imminently resign, thus elevating Fairfax to Virginia's governorship. Tyson agreed to allow Scharf to share her post with reporters and stated that if reporters wanted to contact her, Scharf could provide the reporters with Tyson's email address. Tyson provided Scharf with an email address for reporters to reach her.

60.     Scharf is no stranger to Virginia politics. She is the wife of Thad Williamson, who is currently running for a City Council seat in Richmond, Virginia. Williamson was an advisor to current Richmond Mayor Levar Stoney and the two remain close friends. As a candidate, Williamson is supporting a major redevelopment project in downtown Richmond that is being promoted heavily by Stoney. Upon information and belief, Williamson is also a longtime friend and former schoolmate of Tyson. Stoney, who publicly expressed interest in running for Lieutenant Governor of Virginia in 2017 and Governor of Virginia in 2021, views Fairfax as a political rival who has been positioned to delay Stoney's desired run for Governor. Fairfax had indeed been warned in the fall of 2018 that should Fairfax announce his intention to run for Governor in 2021, Stoney, Williamson, and Scharf intended to promote a supposedly damaging, uncorroborated accusation against Fairfax involving Tyson in an attempt to harm Fairfax personally and professionally and to derail his political future.

61.     Stoney previously served as Deputy Campaign Manager and later Secretary of the Commonwealth to former Virginia Governor Terry McAuliffe. Both Stoney and McAuliffe are rumored to be potential candidates for Virginia Governor in 2021 and thus have reasons to

attempt to thwart Fairfax's political career. Upon information and belief, McAuliffe was the first major elected official in Virginia to call for Fairfax's resignation as Lt. Governor.

62.     In addition to publishing Tyson's Facebook message, the conservative website suggested Fairfax as her alleged assailant, titling its post: *Stanford Fellow Hints at Possible Justin Fairfax Sex Assault* (https://bigleaguepolitics.com/stanford-fellow-hints-at-possible-justin-fairfax-sex-assault/).

63.     On February 6, Tyson publicly confirmed that she had authored the "private" Facebook message in question. In a statement published through her lawyer on that date, Tyson wrote that the encounter involved "consensual kissing" and that Fairfax's advances were "not unwelcome."

64.     She also stated that:

> What began as consensual kissing quickly turned into a sexual assault. Mr. Fairfax put his hand behind my neck and forcefully pushed my head towards his crotch. Only then did I realize that he had unbuckled his belt, unzipped his pants, and taken out his penis. He then forced his penis into my mouth. Utterly shocked and terrified, I tried to move my head away, but could not because his hand was holding down my neck and he was much stronger than me. As I cried and gagged, Mr. Fairfax forced me to perform oral sex on him. I cannot believe, given my obvious distress, that Mr. Fairfax thought this forced sexual act was consensual. To be very clear, I did not want to engage in oral sex with Mr. Fairfax and I never gave any form of consent.

65.     Once she went public in February 2019, Tyson called for hearings against Fairfax in the Virginia General Assembly and demanded his resignation as the duly-elected Lieutenant Governor of Virginia. Unlike Fairfax, she has not called for any criminal investigation.

66.     Tyson has long been a public and outspoken advocate regarding issues of sexual violence and sexual assault. She has spoken publicly on this topic on numerous occasions over the years both before and after her consensual encounter with Fairfax in 2004.

67.     Even after Fairfax became a well-known public figure running for Attorney General of Virginia in 2013, announcing his candidacy for Virginia Lieutenant Governor in May 2016 and then winning the June 2017 primary and November 2017 general election to be Virginia's Lieutenant Governor, Tyson never mentioned this supposed assault in repeated public appearances and interviews.

68.     For example, during an October 20, 2016 Facebook live video, Tyson says she "loved her many years in Boston" and mentions "recent accounts of sexual assault" and (likely referring to Donald Trump) "grabbing people" but says nothing about a supposed personal experience related to the topic. As of August 19, 2019, that Facebook live video was available at: https://www.facebook.com/TNRStudio/videos/1684938978488626/ and the relevant statements start at 24:36 in the video.

69.     During a podcast posted on YouTube on April 14, 2017, Tyson stated, "I started a program teaching self-esteem for girls in lockup. I started it because I had been working—I was one of the founding members of the Survivors Speaker's Bureau for the Boston Area Rape Crisis Center and I toured all over New England—my father was a convicted pedophile…I toured all over New England talking about what had happened to me as a child and how it affected me as a kid and how it affected me as an adult." Tyson never mentions being sexually assaulted as an adult. As of August 19, 2019, that podcast was available on YouTube at: https://www.youtube.com/watch?v=0m3mQIzfCqg&app= desktop and the relevant statements start at 42:11 in the video.

70.     On December 12, 2017, Tyson appeared on an NPR Wisconsin Public Radio broadcast to speak about "sexual misconduct in Washington." During that lengthy interview, she

17

never once stated that she had been sexually assaulted at the 2004 Democratic National Convention in Boston. As of August 19, 2019, that interview was available at: https://www.wpr.org/trump-accusers-hold-press-conference-asking-investigation.

71.     On October 6, 2018, Tyson moderated a public roundtable discussion titled "#MeToo" at her alma mater, Princeton University, during the school's "She Roars" Women's Conference. Tyson said nothing during the roundtable discussion about her allegation or about having been sexually assaulted by Fairfax at the 2004 Democratic National Convention in Boston.

72.     Upon information and belief, Tyson took her false allegation against Fairfax to *The Washington Post* in the fall of 2017, after the November 7, 2017 general election won by Fairfax for Virginia Lieutenant Governor and before his inauguration in January 2018.

73.     *The Washington Post* investigated Tyson's story for several months and made the decision in March 2018 not to publish her story.

74.     After failing in her late-2017 effort to harm Fairfax's political career, Tyson picked a second politically-opportune time to air her false allegations. This time, she emerged in early February 2019, the very same weekend that the media was reporting that Fairfax would be elevated to the governorship of Virginia if Governor Northam stepped down in light of the blackface scandal.

75.     Although Tyson's false allegation against Fairfax generated significant publicity in February 2019, it was Tyson's April 2019 interview with CBS that reached a massive national audience, which was different and far larger than the audience than had been reached through her February 2019 written statement made through her lawyer.

76.     Tyson's statement in February 2019 and interview with CBS in April 2019

contained several falsehoods, all of which were intentionally fabricated, including the following:

a.      In her February 6, 2019 statement, Tyson falsely claimed that she met
Fairfax on "July 26, 2004" "the first day of the Convention" apparently in
an attempt to convey the impression that she knew Fairfax for a longer
period of time than she actually did before joining him in his hotel room.
In fact, Fairfax was in North Carolina with Senator Edwards on July 26,
2004, and did not arrive to Boston until the following day.

b.      In her February 6, 2019 statement, Tyson falsely claimed that Mr. Fairfax
committed "sexual assault," he "forcibly pushed my head towards his
crotch," he "forced his penis into my mouth," and he "forced me to
perform oral sex on him." These statements are all false. The sexual
encounter was entirely consensual. Fairfax at no time used any force on
Tyson whatsoever.

c.      In her February 6, 2019 statement, Tyson falsely claimed that she "cried"
and "gagged" during the encounter. This is false. She did not cry, gag or
give any indication during or after the encounter that it was not
consensual.

d.      In her April 1 interview with King, Tyson said, "my neck didn't work"
and "I couldn't feel my neck" in describing how she went from consensual
kissing on the hotel bed to engaging in oral sex. This claim is false and
indeed is contradicted by prior statements and accounts given by Tyson.

e.      In that interview, Tyson was asked if she had told Fairfax that she was a
survivor of incest to which she replied, "Um…yes, actually…yes." This
statement is false. In the less than 24 hours that Fairfax knew Tyson, she
never stated or relayed in any way that she was a survivor of incest or of
any form of sexual assault.

f.      In that interview, Tyson stated that she never contacted Fairfax again after
their encounter in Boston. That is false. Fairfax and Tyson remained in
touch in the weeks and months following their encounter, and Tyson, at
one point, left a voice message for Fairfax stating that she wanted to visit
him socially in New York City—where he was then a third-year student at
Columbia Law School—and that she wanted to introduce Fairfax to her
mother. Fairfax never replied to that message and has not spoken to or
seen Tyson in person since.

g.      In that interview, Tyson also said that Fairfax "was grabbing my neck" and "pushing down and pushing down until my head was literally in his crotch." This claim is false. At no time did Fairfax grab Tyson's neck or push her head in any way. Tyson initiated the act of oral sex and willingly and voluntarily performed it.

h.      Tyson's and Fairfax's entire sexual encounter was consensual. Her express and implied uncorroborated statements to the contrary are false.

### *Watson Makes Her False and Defamatory Allegation Against Fairfax Just Two Days After Tyson Reveals Her False and Defamatory Allegation*

77.      Shortly after 1 p.m. on February 8, 2019, Watson's attorney, Nancy Erika Smith, sent a letter to Fairfax's legal counsel alleging that Fairfax raped Watson in 2000 when they were both undergraduate students at Duke University. Smith and Watson called for Fairfax's resignation as Lieutenant Governor of Virginia and demanded a response by 3 p.m. that same day—less than two hours later—implying clearly that the information would not be made public if Fairfax resigned within less than two hours.

78.      Faced with what was an inappropriate threat, Fairfax's counsel did not respond to the letter. Later that afternoon, Watson, through Smith and a professional public relations firm, announced publicly that she had been raped by Fairfax at Duke in the Spring of 2000.

79.      Watson alleged that the alleged assault occurred in a room at the Alpha Phi Alpha fraternity house on Duke's campus.

80.      Watson did not state that anyone else was in the room, nor did she say in whose room the alleged assault occurred.

81.      Watson also later stated that she had been raped by the Duke Athlete during the 1998-1999 academic year. Watson claims she told an "official" at Duke that the Duke Athlete had raped her and that the official discouraged her from reporting the rape. To this date, Watson

20

and her attorney have refused to give the name of the official at Duke to whom Watson claims to
have reported a rape by the Duke Athlete.

82.     Duke has stated publicly that the university first became aware of Watson's claim
that the Duke Athlete raped her when she went public with that allegation in February 2019.

83.     Upon information and belief, the Duke Athlete has never been prosecuted for this
supposed assault and has repeatedly and categorically denied the accusation. Upon information
and belief, there is no evidence corroborating Watson's claim that she was raped by the Duke
Athlete.

84.     In a statement issued by her attorney, Watson later supplemented her initial
allegation by claiming that Fairfax used the alleged rape by the Duke Athlete against her and
allegedly stated the following in a conversation during an unspecified campus party at Duke in
2000:

> [Watson] left a campus party when [Fairfax] arrived, and he followed her out. She
> turned and asked: "Why did you do it?" Mr. Fairfax answered: "I knew that because
> of what happened to you last year, you'd be too afraid to say anything."

85.     Watson's statements in February 2019 contained several falsehoods, all of which
were intentionally fabricated. At a minimum:

a.  Watson and Fairfax's sexual encounter in the spring of 2000 was completely
    consensual. Her statements to the contrary—including that she "was raped by
    Justin Fairfax," that his "attack was premeditated and aggressive," and that
    "Mr. Fairfax raped at least one other woman after he attacked her"—are false.

b.  There was an eyewitness in the room during the entire encounter. Watson lied
    by omission in telling a narrative in which only she and Fairfax were present.

c.  The alleged conversation outside of an alleged, yet unspecified, campus party
    at Duke in 2000 never occurred. Her statements recounting this alleged
    conversation and implying that Fairfax admitted to raping and sexually
    assaulting her are false.

21

86.     Watson, too, has called for hearings in the Virginia General Assembly. She has not called for any criminal investigation and has resisted all efforts to have an independent law enforcement investigation into her allegations against either Fairfax or the Duke Athlete.

87.     On June 13, 2019, Watson's lawyer, Nancy Erika Smith, repeatedly and personally accused Fairfax of raping Watson without stating the basis on which Smith was asserting factual information about Fairfax given that she had no personal knowledge on which to base her assertions. Smith went on to state that Watson had "told others about the rape," that there was no time between "Fairfax's rape of Ms. Meredith Watson" and her telling others, and that Watson had sent an email that "revealed the rape."

### *A CBS Lawyer with Responsibility for Defamation Litigation at the Network Has Knowledge that there is Evidence that Directly Contradicts the Watson Allegations Aired by CBS*

88.     Since 2010, CBS has employed as its associate general counsel a mutual friend of Watson, Fairfax and the eyewitness (the "AGC").

89.     At CBS, the AGC focuses on litigation matters, including defamation.

90.     The AGC is a 1999 graduate of Duke University. He is also a fraternity brother of Fairfax and of the eyewitness to the encounter between Fairfax and Watson.

91.     The AGC dated Watson during the 1998-1999 academic year.

92.     During the 1998-1999 academic year, the AGC also lived in the same fraternity house dorm room that the eyewitness later lived in during the 1999-2000 academic year.

93.     Upon information and belief, Watson visited that fraternity house dorm room numerous times during both academic years.

94.     The AGC learned about Fairfax's and Watson's consensual sexual encounter after it occurred though the AGC was not present during the encounter.

22

95.    The AGC remains friends with Fairfax and the eyewitness.

96.    Fairfax and the AGC exchanged numerous text messages and had several conversations since Watson went public with her false accusation against Fairfax in February 2019. Most of these communications occurred *before* the April 2019 interviews were aired by the AGC's employer and client, CBS.

97.    In all their conversations, Fairfax and the AGC knew from both Fairfax and the eyewitness that the eyewitness was in the room throughout the encounter and that the encounter between Fairfax and Watson was completely consensual.

98.    Since February 2019, the AGC has discussed the allegations with Fairfax, the eyewitness and other individuals.

99.    CBS widely promoted its interview of Watson before it aired on April 2, 2019.

100.    Upon information and belief, either the AGC was unable to prevent CBS from airing the Watson interview, or the AGC did not take steps to prevent CBS from airing the Watson interview, despite this knowledge from the eyewitness and from Fairfax that Watson's story was false and that there was an eyewitness corroborating that Watson's story was false.

101.    The AGC is not a low-level employee of CBS with a minimal role in the organization. He is a lawyer for CBS who has specialized knowledge of defamation law and the expertise to understand the importance of reporting truthful stories and the legal liability CBS could face if it aired a demonstrably false interview. Any reasonable journalistic investigation by CBS would have established that an AGC at CBS attended Duke at the same time as Watson and Fairfax. From there, CBS would have been able to establish that Watson had a relationship with the AGC, that the AGC knew the accused and was aware of a witness that refuted Watson's

allegations. It is beyond any reasonable belief that an explosive allegation being prepared within CBS and promoted aggressively on CBS that an elected public official committed a rape would not attract the attention of every lawyer in the CBS General Counsel's office.

### *CBS This Morning Acted with Actual Malice When It Aired Watson's and Tyson's Defamatory Interviews to Improve Its Own Public Image in Light of Recent High-Profile #MeToo Scandals*

102.    Since the #MeToo movement began in 2017, CBS has had one embarrassing workplace sexual misconduct scandal after another, including many women alleging sexual assault or harassment against one of *CBS This Morning's* main anchors, Charlie Rose. This pattern culminated with the firing of CBS' CEO in December 2018.

103.    In light of its need to improve its public image and put these incidents in its rearview mirror by currying favor as a media outlet for accusations against public figures, the network sought to visibly align itself with alleged victims of sexual misconduct and, therefore, had a strong incentive to hype and air the false allegations by Watson and Tyson against Fairfax. The extensive promotion of the Watson and Tyson interviews before they were aired serve as clear evidence of CBS' intent to establish its #MeToo bona fides and to derive corporate profits at Fairfax's expense.

104.    Upon information and belief, *CBS This Morning* decided to interview Tyson and Watson sometime in March 2019.

105.    CBS was the only major network to air interviews with Tyson and Watson. Co-Host Gayle King introduced on-air interview segments of Tyson and Watson by first stating, "Only on *CBS This Morning*…" These were their first television interviews since each made their allegations public in February.

24

106.    Their interviews were taped in late March with King and aired on April 1 (Tyson) and April 2 (Watson).

107.    CBS did not alert Fairfax that it was conducting the interviews of Watson and Tyson in late March. Fairfax's staff only learned about the taping of the interviews through sources outside of CBS.

108.    CBS heavily promoted the interviews of Tyson and Watson on their broadcast, social media, and other platforms in the days leading up to the interviews' airing on April 1 and 2, respectively—the two days preceding the one-day April 3 reconvened session of the Virginia General Assembly during which Fairfax would publicly preside over the Senate as Lieutenant Governor.

109.    The *CBS This Morning* team that worked on these interviews included Co-host King, Correspondent Ed O'Keefe, and Producers Kaci Sokoloff and Adam Verdugo. Upon information and belief, other individuals within CBS were involved in publishing the Watson and Tyson interviews.

### *CBS This Morning Acted with Actual Malice by Taking Steps to Ensure that the Aired Interviews Met CBS' Preconceived Narrative that Fairfax Had Assaulted Tyson and Watson*

110.    Upon information and belief, the CBS team had a preconceived narrative of the story it wanted to tell with respect to these allegations: that Fairfax had sexually assaulted Tyson and Watson. Also upon information and belief, the CBS team took steps to ensure that the interviews that were aired fit that preconceived narrative in several ways.

111.    First, King failed to ask basic questions of Watson and Tyson that would establish the facts of the encounters.

112.    Second, the CBS team failed to separately investigate the allegations in advance of the airing date, and instead only spoke to Watson, Tyson and their representatives. For example, upon information and belief, CBS failed to interview other individuals who may have been able to confirm or contradict the allegations.

113.    Third, CBS ensured that the final, aired stories fit its preconceived narrative by conducting an unusual "pre-interview" of Watson, and perhaps of Tyson as well. This pre-interview gave Watson an advance view of what questions would be asked so that she could prepare her answers and avoid being surprised by questions for which she did not have the answer or which her answers would not fit CBS' preconceived narrative.

114.    Fourth, the final interviews aired by CBS are edited and there are several breaks in the questioning. It is not yet known if the editing process used by CBS was also part of its effort to ensure that the final interviews fit CBS' preconceived narrative that Watson's and Tyson's claims were truthful.

115.    CBS promised Fairfax's spokesperson that CBS "will continue to report on both sides" and that it would "continue to get both sides of the story out." Yet, CBS conspicuously broke that promise by not reporting on both sides of the story when it failed to update the interviews, including with the new information from July 2019 about the exculpatory eyewitness to Watson's encounter with Fairfax.

116.    CBS' state of mind is also evidenced by its communications with Fairfax's counsel following a demand letter to retract the stories after the July 9 revelation that there was an exculpatory eyewitness who knew Watson's allegation to be false. CBS defensively said that Fairfax's demand that CBS retract the interviews was a request to "brand Ms. Watson as a liar."

CBS also stated that Fairfax's demand to CBS to retract the interviews was "an attempt to strong arm CBS and to intimidate Ms. Watson and, possibly, Dr. Tyson as well, into silence." First, Fairfax's request was merely for CBS to take its objective reporting role seriously and determine the basic facts underlying Watson's and Tyson's claims to ascertain whether their allegations were true or false. If there was information and reporting available that an exculpatory eyewitness was present during the encounter and that Watson did not mention that eyewitness in her story, then CBS has an obligation to report that information, as many other major news outlets already have. CBS' role is to objectively report facts and not to defend the credibility of either the accuser or the accused. Second, CBS is well aware that Watson and Tyson have not been "silenced," nor could they be, since the network aired their interviews to a national audience of millions of people and profited off those interviews.

117.    There is further evidence that CBS intentionally and improperly took the accusers' side not only in believing the allegations by Tyson and Watson, but also by publicly asserting that the allegations *alone* were sufficient grounds for Fairfax to resign his office as Lieutenant Governor of Virginia.

118.    On April 3, 2019, Fairfax spoke at a press conference in Richmond in which he (a) publicly released to the media the results of his voluntary polygraph test examinations refuting the allegations, (b) informed the media that his attorney had contacted the District Attorneys in both Boston, Massachusetts, and Durham, North Carolina, at Fairfax's direction to request that they initiate investigations into the allegations by Tyson and Watson and pledged his full cooperation with any such investigations, and (c) again specifically refuted key factual

allegations made by Tyson and Watson bearing on their credibility and declared his innocence and intention to continue to take measures to prove that innocence.

119. Upon information and belief, neither Tyson nor Watson has taken a polygraph test and released those results to the public to support the veracity of their allegations.

120. Upon information and belief, neither Tyson nor Watson has formally requested a criminal investigation into their allegations by the District Attorneys in Boston or Durham.

121. Even with that knowledge, CBS Correspondent Jeff Pegues shouted out to Fairfax at the conclusion of the April 3 press conference, "These allegations are not going away. At what point do you just resign?"

122. This unprompted question is further evidence that CBS (a) was unconcerned about determining whether the allegations were true or false and (b) believed that Fairfax should resign merely because the allegations had been made.

123. CBS' actions, taken together, demonstrate reckless disregard for the truth of the allegations, a corporate determination to demonstrate the network's #MeToo bona fides at the expense of the truth in its reporting, and a preconceived and deliberate narrative that CBS brought to the allegations made by Tyson and Watson against Fairfax.

### CBS Acted with Actual Malice by Failing to Adequately Investigate the Watson Allegations Using Appropriate Journalistic Standards

124. Considering the sensational and highly damaging accusations made by Tyson and Watson against Fairfax, basic journalistic standards required CBS to investigate these serious allegations before airing them.

125. Upon information and belief, nobody at *CBS This Morning* or CBS Broadcasting Inc. investigated or adequately fact-checked Tyson's or Watson's allegations before airing them,

even though they knew that airing these allegations to a nationwide television audience would seriously harm or possibly even destroy Fairfax's career.

126.    Had CBS investigated the allegations, they would have learned each woman's account was false and motivated by political and personal animus against Fairfax.

127.    They also would have learned that CBS' own lawyer personally knew Watson and Fairfax and had learned information from the eyewitness that their encounter had been completely consensual.

128.    CBS refused to ask—or did not air—basic questions to establish what supposedly happened during these two encounters, particularly during Watson's encounter with Fairfax. This was an affirmative choice by CBS, because Fairfax's spokesperson had requested prior to the airing of the interviews that CBS ask certain questions meant to "pressure-test" the truth of her allegation.

129.    On March 28 after learning about the upcoming interviews though a non-CBS source, a spokesperson for Fairfax texted with Gayle King, urging her to ask Watson "what exactly happen[ed] that day, where, when, **did you see anyone else on your way in or out?**" A screenshot of the text exchange is below:



130.     Despite the specific interview request by Fairfax's spokesperson, King did not ask Watson a basic question: "where did the encounter occur?" More specifically, King did not ask Watson to identify whose fraternity house dorm room it was.

131.     This was a crucial question and line of inquiry that would have tested the veracity of Watson's claims. Fairfax did not live in that building during the 1999-2000 academic year. Thus, the encounter took place in someone else's room, which made it much more likely there was an eyewitness. By not asking this basic question (or not airing the answer given by Watson if the question was asked), King allowed Watson to tell a sensational and fabricated story of a rape and sexual assault that never occurred to a nationwide audience.

132.    Also, despite the specific pre-interview request by Fairfax's spokesperson, King did not ask Watson another incredibly basic question: "Who was there?" More specifically, King did not ask Watson, "did you see anyone else on your way in or out [of the dorm room]?"

133.    This was another crucial question, especially since there was an eyewitness present before, during, and after the encounter. By ignoring the request to ask Watson this basic question (or not airing the answer if the question was asked), King recklessly permitted Watson to defame Fairfax to millions of viewers in Virginia and nationwide with a demonstrably false, fabricated, and vicious allegation.

134.    The failure to ask these basic questions that any reputable journalist would ask, and that Fairfax's spokesperson specifically requested be asked, was an extreme departure from accepted journalistic standards.

135.    CBS knew that Watson claimed the encounter took place in the Alpha Phi Alpha fraternity house at Duke. Alpha Phi Alpha was the only African American fraternity with a fraternity house at Duke. CBS could have easily discovered the names of the members of the fraternity during that school year, including the ones who lived in that fraternity house, by checking a Duke yearbook or contacting Duke.

136.    Upon information and belief, as part of its effort to avoid learning the truth of what happened during the encounter, CBS did not interview any of the other Alpha Phi Alpha fraternity brothers at Duke during the 1999-2000 school year, did not interview the person in whose room at the fraternity house the encounter took place and did not interview anyone who was an eyewitness to the encounter.

137.     Upon information and belief, CBS deliberately disregarded information that contradicted Watson's story. It did not press her with standard questions about where the event occurred and who was there, or it selectively edited the interview so as not to air her answers to those questions.

138.     Upon information and belief, CBS had reason to doubt Watson's story based on its pre-interview of her, and for other reasons, and yet aired it anyway. Watson had previously accused the Duke Athlete of rape during the prior school year and claimed during the interview that she had reported that rape "to an official at the university." Watson claimed that she did not report the alleged assault by Fairfax to Duke because this "official" had not acted when she supposedly reported the assault by the Duke Athlete the year before. CBS knew that Duke had denied knowing about the supposed rape by the Duke Athlete, as it aired during the segment that "As for Watson's claim that she had been assaulted by a Duke basketball player, the university also said this in February: that it first learned of the allegation when it appeared in the press that month." Even though CBS knew that Watson's story about reporting the other assault to a Duke "official" was likely not true, and thus having information that called Watson's credibility into serious doubt, CBS aired her story about Fairfax anyway, once again with reckless disregard for the truth.

139.     CBS could have required that Watson waive the restrictions of the Family Educational Rights and Privacy Act ("FERPA"), which would have given CBS access to Watson's Duke educational records that could have proven or disproven Watson's story that she reported the supposed rape by the Duke Athlete to a Duke "official." It is not yet known whether

CBS asked Watson for this waiver or instead made a calculated decision not to ask her for a

FERPA waiver to purposefully avoid the facts they would learn from receiving the records.

140.    *CBS This Morning* aired Watson's interview with King on April 2.

141.    In her interview, Watson again recounted the same false allegation of rape and

sexual assault against Fairfax. She also described a later uncorroborated conversation in which

she alleges that Fairfax revealed his purported motive by citing her alleged rape by the Duke

Athlete – a conversation that never happened and was separately defamatory.

> [H]e did things that you shouldn't do to someone without their permission. And I
> tried several times to get up and leave and was pushed back down. . .. He forcibly
> sexually assaulted and raped me. . .. I was not on the bed, initially. There was a
> couch. And he pulled me over and I tried several times to get up and was pushed
> back down, held down. . .. It was very clear.

142.    Watson did not mention during the interview that the sexual encounter occurred in

the eyewitness' room, that the eyewitness was there throughout, and that she remained in the

room with the eyewitness after Fairfax left.

143.    Indeed since the July 9 revelation that there was an eyewitness to the entirely

consensual encounter, Watson's lawyer, through a spokesperson, has stated that she is unwilling

to address whether there was a third person present during Watson's alleged rape by Fairfax.

### CBS Showed Actual Malice when its Reporters Made Numerous Contemporaneous Comments Vouching for the Truthfulness of Watson's Story

144.    In the introductory segment preceding Watson's interview, King called the details

that were about to be shared "disturbing," thus vouching for the truthfulness of them.

145.    Immediately following one of the segments airing Watson's interview, King,

O'Donnell, and Dickerson made erroneous factual statements and improperly vouched for the

credibility of Watson's story—with no independent investigation or objective basis in fact—and

made it clear to the audience that the *CBS reporters were intending to corroborate the truth* of

Watson's allegation against Fairfax:

| | |
|---|---|
| Co-Host Norah O'Donnell: | **There's an incredible amount of pain there.** (referring to Watson's tearful interview) |
| King: | **Yes. All these years later.** |
| O'Donnell: | All these years later, **that pain has stuck with them about how they felt in that moment, and how it has affected them for decades.** |
| Co-Host John Dickerson: | Think about the learning we've done. **There was a period, half a year ago**, when people said, "You know these people are coming forward after so many years. |
| King: | Why? |
| Dickerson: | Why are they coming forward? **How can it really be so real?** And, **we have now seen example after example of how it is as real (snaps fingers) as if it happened yesterday**. |
| King: | **Exactly right, John**. |

146.    Upon information and belief, O'Donnell and Dickerson did not investigate the

allegations by Watson under accepted journalistic standards, or at all, before vouching for the

truthfulness of them. The reporters' statements and assertions demonstrate the severe bias and

slant by CBS toward accusers in covering the allegations against Fairfax.

***CBS Acted with Actual Malice by Failing to Adequately Investigate the Tyson Allegation
Using Appropriate Journalistic Standards and by Failing to Report that Tyson's Allegation
Had Been Carefully Investigated by The Post and Was Found to Be Uncorroborated***

147.    CBS This Morning aired Tyson's interview with King on April 1.

148.    In her interview, Tyson recounted the same false allegations of sexual assault

similar to those that she first made in February. Specifically, she said:

> I couldn't feel my neck. I couldn't hold my head up. . .. He's using his hand on the
> back of my neck. And I still didn't know what was going wrong. I thought there
> was something wrong with my neck… And he's pushing down and pushing down.
> And I couldn't hold my neck up. And I didn't know what was going on. I honestly
> didn't know what was going on. And then the next thing I know, like, my head is,
> like, literally in his crotch… And I'm choking and gagging. And, you know, I
> couldn't say anything 'cause I'm choking and gagging. And so, you know, it
> continues for-- and he's holding my head. So I can't lift-- like, I'm trying to lift my
> head, but I can't.

149.    Neither the interview nor King's additional reporting on the story suggests that

anyone at CBS made any attempt to confirm Tyson's account.

150.    Upon information and belief, this was a departure from journalistic standards.

151.    Upon information and belief, CBS did not seek to interview relevant witnesses

about the encounter between Tyson and Fairfax, including interviews that would have revealed

facts that were inconsistent with Tyson's story.

152.    Upon information and belief, CBS was aware prior to airing Tyson's interview in

April 2019 that *The Washington Post* had investigated her claim for several months beginning in

the fall of 2017 and made the decision in March 2018 not to publish her story because, according

to *The Washington Post*, it "could not find anyone who could corroborate" her version of the

allegation and did not have "the ability to corroborate [Tyson's] account – in part because she

had not told anyone what happened." Even when *The Washington Post* ultimately did publish the

story about Tyson's allegation, it had to acknowledge that despite an extensive investigation it still had no corroboration for the story and no established pattern of misconduct by Fairfax.

153.    Given that CBS knew that *The Washington Post*, a major national media organization with significant reporting resources, had carefully investigated Tyson's allegation for several months and still could not corroborate it, the network acted with reckless disregard for the truth of her allegation by publishing and televising her uncorroborated allegation to millions of viewers in Virginia and nationwide without any additional independent investigation, with no new evidence to support the veracity of her story, and without mentioning to CBS' viewing audience that *The Washington Post* had conducted a months-long investigation into Tyson's story and found no corroboration to support it.

**CBS Showed Actual Malice when its Reporters Made Numerous Contemporaneous Comments Vouching for the Truthfulness of Tyson's Story**

154.    During the Tyson interview segment, King and other members of the CBS reporting team repeatedly made inaccurate factual assertions and vouched for the credibility of Tyson's allegations with no independent investigation or objective basis in fact:

| | |
|---|---|
| King: | It was fascinating talking to her [Tyson] because I felt at some point it's almost like she was going back to the moment that she believed. |
| Co-Host Norah O'Donnell: | Yeah. |
| Bianna Golodryga: | Yeah, you could see that. |
| King: | You could really see that in her eyes. |
| King: | And, people would say, "Yeah, but she went to the hotel room. Yeah, she agreed to the kissing.   Isn't that on her?" But, I could see as a young person, you have a mutual friend |

36

|  | and **you think this guy is safe**, and the kissing doesn't necessarily have to lead to what she said happened after that. |
|---|---|
| Golodryga: | Something clearly changed when she was walking **through what transpired**. And, you could see where she got very emotional and **went to that dark place**. |
| Co-Host Norah O'Donnell: | **It feels like she was forced.** |
| King: | **Yeah.** |

155.    Upon information and belief, O'Donnell, King and Golodryga did not investigate the allegations by Tyson under accepted journalistic standards, or at all, before asserting facts about what occurred and vouching for the truthfulness of Tyson's false allegations.

156.    Later that day, Fairfax's spokesperson texted with King and Sokoloff, asking them to "take note of the differences between Tyson's previously released statement and the interview broadcast this morning."

157.    In fact, CBS ignored important inconsistencies between Tyson's taped interview and her February 6, 2019 statements.

158.    For example, in her statement, Tyson said that after they began kissing consensually Fairfax "*pulled* [her] towards the bed." By contrast, in her interview with King, Tyson said that Fairfax "kind of *gently takes my hands*, um, and *guides me towards the bed*. We're still kissing, and it's completely consensual. *He guides me to the bed* and, you know, he sits down on the bed. And, what happens from there, is we start kissing lying down." Tyson's written statement falsely implies that Fairfax used physical force ("pulled") to move Tyson without her consent to the bed in order to dramatize the encounter and create the false impression

that Fairfax was making Tyson do something she did not want to do. King did not ask Tyson about this discrepancy in her accounts.

159.     Also, in describing how she came to perform oral sex on Fairfax allegedly against her will, Tyson wrote in her statement that "I tried to move my head away, but could not *because* his hand was holding down my neck and he was much stronger than me." However in her interview, Tyson states for the first time publicly that she allegedly did not pull away because "[her] neck didn't work" and she "couldn't feel [her] neck." Tyson's statement again dramatizes the encounter by stating that the only reason she did not move her head away was because of force allegedly applied by Fairfax and because of his strength. By contrast in her interview, Tyson later claims that she could not pull away because, at that precise moment, she began to experience some unspecified physical problem with her neck that she could not explain. King does not ask about that discrepancy. She also did not ask whether Tyson had ever experienced her neck not working on any other occasion or if she had ever sought treatment for any physical issues involving her neck.

160.     At an even more fundamental level, there were clear indications that Tyson's motivations for telling her story were evolving and, accordingly, subject to question. In that regard, Tyson initially wrote that her February 6 statement detailing her version of the alleged assault "is the only statement I and my legal team will be making." The fact that Tyson was being interviewed by King on national television less than two months later, and had made numerous statements in the media through her legal team after February 6, shows that this assertion was plainly false and called into question Tyson's veracity and motives. King did not ask Tyson about that discrepancy either.

***CBS Acted with Actual Malice by Airing These Defamatory Interviews at a Time that Would Maximize CBS' Ratings and Profit by Damaging Fairfax's Reputation, Rather than Waiting Until It Had Investigated the Allegations***

161.    The timing of the airings of these interviews on April 1-2 was calculated to maximize ratings for CBS in light of the ongoing scandal involving Governor Northam and speculation that Fairfax might still become the next Governor of Virginia. The timing also ensured that the damage to Fairfax would be considerable. Fairfax was set to preside over a reconvened session of the Virginia Senate on April 3 and CBS' hyping of the allegations against Fairfax at that time both assured greater media coverage of the reconvened session and supported the publicly-announced tactics of the accusers to maximize political pressure on the General Assembly to conduct a highly political public hearing and to maximize pressure on the Lieutenant Governor to resign.

162.    Upon information and belief, *CBS This Morning* totaled over 3 million viewers during the week of April 1, 2019. Over one million viewers watched either or both of the King interviews of Tyson and Watson.

163.    CBS actively promoted the interviews in advance of the air date. Upon information and belief, this permitted CBS to profit on its advertising revenue in Virginia and across the nation during the airing of these interviews.

164.    CBS aired these interviews, knowing that they had not been fully vetted under accepted journalistic standards and instead aired them to maximize its own profit by damaging Fairfax's reputation.

165.    Upon information and belief, CBS had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore was

39

required to investigate their veracity before publishing them. Its doubts are shown in part by

King's failure to ask Watson and Tyson basic questions about their encounters with Fairfax and

the CBS team's failure to conduct any independent investigation, even within its own

organization where an AGC was in a position to provide notice of compelling evidence that

Watson's allegations were false. CBS' failure to do so amounts to actual malice. It purposefully

avoided the truth by failing to follow standard journalistic practices.

### *CBS Acted with Actual Malice as Shown by Its Failure to Correct the Stories After Evidence Contradicting the Stories Emerged*

166.    On June 12, 2019, Fairfax, through his lawyer, sent a letter to an Assistant District

Attorney in Suffolk County, Massachusetts, urging the office to investigate Tyson's allegations.

On that day, Fairfax's counsel also sent a letter to the District Attorney in Durham County, North

Carolina, urging her to investigate Watson's allegations.

167.    On July 9, Fairfax, through his counsel, sent another letter to the Durham County

District Attorney urging her to investigate Watson's allegation and indicating that an eyewitness

to the encounter could testify to its entirely consensual nature.

168.    Fairfax's letters received widespread news coverage, and, upon information and

belief, multiple local stations affiliated with CBS updated their stories concerning both Watson's

and Tyson's allegations, including with the crucial new development of the exculpatory

eyewitness who could debunk Watson's allegation.

169.    CBS, however, did not update the videos of interviews on its website, social

media accounts or in its television coverage of Fairfax to indicate the presence of an eyewitness,

or that Fairfax had called for criminal investigations of each allegation, both of which are strong

evidence that the initial stories aired by CBS were false.

170.     On July 10, one day after the revelation of the exculpatory eyewitness was made

public, Fairfax's spokesperson texted King, Sokoloff and Verdugo with follow-up questions for

Watson. CBS again ignored Fairfax's requests to correct its reporting to reflect that an

eyewitness was present during his encounter with Watson.



171.     CBS ignored these requests despite having the ability to verify Fairfax's account

by simply speaking to the AGC or by reaching out to Tyson's and Watson's representatives to

ask additional questions.

172.     Upon information and belief, CBS never asked Watson any follow-up questions

after hearing of these new critically material facts. CBS' failure to report on these new facts is

further evidence of its actual malice and motive to ensure that the Tyson and Watson stories fit

its preconceived narrative and assisted in CBS' efforts to repair its own damaged reputation in

the #MeToo environment. Alternatively, if CBS did ask Watson these follow-up questions, it did

not air her answers or report on her refusal to answer them.

41

173.     Prior to the July 9, 2019 public revelation that an eyewitness had stated that Watson's allegation against Fairfax was false, CBS reporting staff, including King, Sokoloff, Verdugo, and O'Keefe were in regular touch with Fairfax's spokesperson and were highly responsive to her outreach. After that revelation, the reporting staff was almost completely unresponsive to outreach by the spokesperson, with one exception being an August 16, 2019 reply email from Sokoloff that broke more than a month of conspicuous and unusual silence from CBS' reporting team. In an August 17 response to that email, Fairfax's spokesperson again provided information about the exculpatory eyewitness, including how to contact him, and requested that CBS update its reporting to reflect the new, contradictory information. CBS never responded that that email or to that request.

174.     CBS has continued to refuse to update its reporting to reflect the existence of the exculpatory eyewitness in the Watson story revealed on July 9, 2019 and has consciously avoided verifying this crucial information with the AGC, Watson, or Smith.

175.     Other news outlets, including *The Washington Post*, have updated their stories to reflect the new, contradictory information but CBS has refused to do so. CBS has refused to do so even though its own affiliates located in Virginia have updated their own stories to reflect the new, contradictory information. This further clearly demonstrates CBS' goal to ensure that the Watson and Tyson interviews are not fact-checked and fit CBS' preconceived narrative.

***CBS Expressly Consented to Republications of Its Defamatory Interviews without Correction***

176.     Even though it knows of at least one witness who would disprove Watson's story, CBS continues to publish her interview on its website, without correction and without any

42

updates. Anyone viewing the interview would believe that CBS has no information contradicting the interview's allegations.

177.    On the webpage for the Watson interview, CBS includes several standard "sharing" buttons, including a button to share the webpage through Twitter, through Facebook and through email. CBS also permits sharing of the video through what is known as an "embed code." The embed code is a small icon depicted as: </>. It is located directly next to the other "sharing" buttons. A screenshot is below with the sharing buttons enlarged:



178.    On CBS' webpage for the Tyson interview, CBS includes the same sharing icons, including the embed code.

179.     An embed code is a link that allows a third party to "embed" or include a line of computer code on the third-party's website. This line of code embeds the content from the first website into the second website.

180.     Media organizations use embed codes to allow for easy sharing and republication of their video content.

181.     CBS is a prolific user of embed codes. In fact, it uses a third-party company called Embed.ly to manage its embed codes and to make it easier to share CBS videos. Embed.ly "offers a suite of tools, APIs, and libraries to help you embed content from media providers into your own websites and apps."

182.     There is a unique URL for third parties to obtain embed codes for CBS stories: https://embed.ly/provider/cbsnews.

183.     That website states at the top: "Embed CBS News: Add Video Embeds from CBS News to Your Site." It also provides a box into which any CBS story's URL may be entered to obtain a unique embed code.

184.     By making embed codes available on its website, CBS explicitly authorizes the republication of its stories on third-party websites. The republication of its stories by third parties is a natural and probable consequence of making these embed codes available.

185.     Upon information and belief, third parties have used the embed code for the Watson and Tyson stories to republish these interviews even after the contradictory information about the stories was known to CBS but was not yet included on the CBS website that airs the interviews, including the existence of an eyewitness and the knowledge of the AGC within CBS who had spoken to the eyewitness.

### *Extreme Harm to Fairfax, His Family, and His Career*

186.    As a direct result of Tyson's and Watson's false and defamatory allegations of sexual assault and rape against him, and CBS' airing of same, Fairfax has suffered severe professional, personal, economic and emotional harm.

187.    As a direct result of Tyson's and Watson's false and defamatory allegations of sexual assault and rape against Fairfax, and CBS' airing of same, many other media outlets have reported on portions of their interviews, including the false statements published therein.

188.    As soon as Tyson made her accusation, Fairfax began to receive demands for his resignation as Lieutenant Governor of Virginia.

189.    Once Watson added her false accusation, Duke asked that Fairfax step down from the Sanford School of Public Policy Board of Visitors.

190.    Following CBS' airing of the dramatic interviews and posting the videos on its website and social media platforms, Fairfax had virtually no choice but to step down from the partnership of Morrison & Foerster.

191.    Additionally, Fairfax was forced to resign as Chair of the Democratic Lieutenant Governors Association.

192.    Fairfax's wife and his children, ages nine and eight, have suffered emotional trauma, public ridicule, threats to their safety, and invasions of privacy.

193.    Most importantly, Fairfax has been falsely branded a "rapist," "predator" and "sexual abuser." This circumstance all but forecloses his ability to earn a living and provide for his family. His once promising career and political prospects have been severely harmed by the reckless airing of these false allegations.

## COUNT ONE – DEFAMATION

194.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

195.    Fairfax is a public figure.

196.    CBS published Tyson's and Watson's interviews on its network, to millions of viewers, on April 1 and 2. Gayle King and other members of the CBS reporting team also repeatedly and improperly vouched for the truthfulness facts asserted in those interviews -- without any independent investigation or objective basis in fact – demonstrating severe media bias and slanted reporting in favor of Tyson and Watson and against Fairfax. The interviews were published and republished, with knowledge of their falsity or with reckless disregard for the truth, to massive numbers of CBS viewers in Virginia and across the country.

197.    CBS was the only major television network to publish interviews with Tyson and Watson.

198.    CBS had additional incentive to broadcast interviews with Tyson and Watson, having had numerous #MeToo scandals in its recent past.

199.    CBS also published and republished the videos of the interviews on its website, CBSNews.com, and on its various social media platforms, including Twitter, Facebook and YouTube, where the videos have received tens of thousands, if not millions, of views. Virginia residents are among the many viewers of these videos.

200.    CBS has also encouraged and consented to the republication of its interviews of Tyson and Watson by making those interviews available through embed codes. CBS continues to make the uncorrected interviews available through embed codes, even after knowing of

contradictory information that undermines the truthfulness of those interviews. The republication of those uncorrected interviews by any source is the natural and probable consequence of CBS' actions, and CBS is therefore liable for those publications as well, whenever they are made.

201.    CBS published the interviews with Tyson and Watson despite knowing or recklessly disregarding that they contained false statements and despite knowing key facts and key lines of questioning that would have debunked each story. CBS also acted with actual malice by airing stories that had not been properly vetted under accepted journalistic standards, by seeking to fit the allegations of Tyson and Watson into its preconceived narrative that the allegations were true, and by airing politically explosive and false stories at a time that would deliberately maximize the financial and reputational damage to Fairfax.

202.    Even after learning about an exculpatory eyewitness to the encounter, CBS has refused, on at least two occasions, to update or correct its reporting concerning Watson and Fairfax's encounter in the Spring of 2000, demonstrating CBS' continued malice.

203.    CBS, through Gayle King and the *CBS This Morning* team, acted with actual malice by knowingly or intentionally disregarding the truth in publishing false and defamatory accusations by Watson and Tyson against Fairfax.

204.    CBS' airing of the accusations have falsely portrayed Fairfax as a rapist, sexual abuser, and a predator.

205.    CBS' airing of the accusations are defamatory *per se* as to Fairfax. They impute that Fairfax committed sexual assault and rape – crimes involving moral turpitude. They also were intended to injure Fairfax in his profession as a public servant and lawyer.

206.    As a direct and proximate result of CBS' actions, Fairfax has lost significant income, his reputation has been damaged, and his professional prospects have been significantly diminished.

207.    CBS' actions were malicious, willful, and wanton, and evidence a conscious disregard for the rights of Fairfax. Accordingly, punitive damages are appropriate.

## COUNT TWO – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

208.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

209.    CBS aired King's interviews with Tyson and Watson while intentionally or recklessly failing to investigate and consciously avoided lines of inquiry and learning facts that would have disproved or called into question each woman's false statements.

210.    CBS also has refused to update or correct its reporting, even after learning that there was an eyewitness to the encounter with Watson and even though CBS knows (or could easily learn) the name of that eyewitness from the AGC, Watson, or Smith.

211.    Defendants' conduct resulted in Fairfax being labeled a rapist, sexual abuser and predator – effectively a criminal. Such allegations are extreme, outrageous and intolerable to a person, such as Fairfax, who did not commit any crimes.

212.    As a result of Defendants' making and airing false allegations, Fairfax has suffered severe emotional distress. Fairfax's distress comes from the invasion of his and his family's privacy, threats to his safety and that of his family, extreme embarrassment at being called a criminal, a rapist, and a sexual predator, watching his wife and young children face questions and verbal abuse about his sexual encounters, and the extreme loss of financial

resources and his highly-positive professional reputation—a reputation that he has spent his entire lifetime building.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Justin Fairfax demands judgment against the Defendants, jointly and severally, as follows:

(a)   awarding compensatory damages of not less than four hundred million dollars ($400,000,000.00);

(b)   awarding punitive damages;

(c)   awarding all expenses and costs, including attorneys' fees;

(d)   an injunction prohibiting the Defendants from disseminating, distributing, or publishing any footage or statements that are judicially determined to be defamatory; and

(e)   such other and further relief as the Court deems appropriate.

A JURY TRIAL IS DEMANDED

Dated: September 12, 2019

Respectfully Submitted,

By: /s/ Sara E. Kropf
      Sara E. Kropf (VSB #84931)
      Daniel M. Portnov (*pro hac vice* application to be filed)
      KROPF MOSELEY PLLC
      1100 H Street NW, Suite 1220
      Washington, DC 20005
      (202) 627-6900
      sara@kmlawfirm.com
      dan@kmlawfirm.com

Jane M. Reynolds (VSB #71394)
Law Offices of J.M. Reynolds, PLLC
9238B Mosby Street
Manassas, VA 20110
(703) 680-2358
lawoffices@jmreynoldspllc.com

Kiah Spinks (VSB #83111)
Spinks Law PLLC
P.O. Box 393
Occoquan, VA 22125
(571) 247-6495
kspinks@spinkslawpllc.com

*Attorneys for Plaintiff*