# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **JUSTIN E. FAIRFAX,**<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**CBS CORPORATION and CBS BROADCASTING INC.,**<br><br>        **Defendants.** | Case No. 1:19-cv-01176-AJT-MSN |

## MEMORANDUM OF POINTS AND AUTHORITIES
## <u>IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

Jay Ward Brown, Va. Bar No. 34355
Matthew E. Kelley, Va. Bar No. 84045
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Phone: 202-661-2200
Fax: 202-661-2299
kelleym@ballardspahr.com
brownjay@ballardspahr.com

*Counsel for Defendants CBS Corporation
and CBS Broadcasting Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND ...........................................................................................1

    The Northam Blackface Scandal ...............................................................................1

    Sexual Assault Allegations Against Fairfax .............................................................2

    Initial Coverage of the Assault Allegations by CBS .................................................5

    Vanessa Tyson's Allegations and the CBS Broadcast of Her Interview .................6

    Meredith Watson's Allegations and the CBS Broadcast of Her Interview ...............8

    The Aftermath .........................................................................................................13

    Fairfax's Pre-Suit Demand Regarding Watson's Allegations ................................14

    The Lawsuit .............................................................................................................15

ARGUMENT ..................................................................................................................15

I.      THE BROADCASTS DO NOT REASONABLY CONVEY A
       DEFAMATORY MEANING ...............................................................................17

II.    FAIRFAX HAS NOT, AND CANNOT, ADEQUATELY PLEAD ACTUAL
       MALICE ...............................................................................................................22

       A.     CBS's Alleged Duty to Investigate ..............................................................24

            1.    Allegations specific to Tyson .............................................................25

            2.    Allegations specific to Watson ...........................................................27

            3.    The effect of having two sources ........................................................29

       B.     Other Alleged Indicia Of Actual Malice ......................................................30

            1.    CBS's purported violation of journalistic standards ..........................30

            2.    CBS's alleged political or economic motives .....................................32

            3.    CBS's alleged preconceived narrative ...............................................33

            4.    CBS's alleged post-broadcast conduct ..............................................35

III.    CBS IS IMMUNE FROM LIABILITY FOR DEFAMATION FOR THE
        BROADCASTS UNDER VIRGINIA'S IMMUNITY STATUTE...................................37

IV.     FAIRFAX'S IIED CLAIM ALSO FAILS AS A MATTER OF LAW............................38

V.      CBS CORPORATION IS NOT A PROPER DEFENDANT IN ANY EVENT...............40

CONCLUSION......................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Advanfort Co. v. Int'l Registries, Inc.*,
   No. 1:15-cv-220, 2015 U.S. Dist. LEXIS 62125 (E.D. Va. May 12, 2015) .............................2

*AdvanFort Co. v. Mar. Exec., LLC*,
   No. 1:15-cv-220, 2015 U.S. Dist. LEXIS 99208 (E.D. Va. July 28, 2015) ......................23, 40

*Alvarado v. KOB-TV, L.L.C.*,
   493 F.3d 1210 (10th Cir. 2007) ............................................................................................39

*Am. Chem. Soc'y v. Leadscope, Inc.*,
   978 N.E.2d 832 (Ohio 2012) ................................................................................................19

*Arthur v. Offit*,
   No. 01:09-CV-1398, 2010 U.S. Dist. LEXIS 21946 (E.D. Va. Mar. 10, 2010) ...............18, 19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................................... *passim*

*Atkins Nuclear Secured, LLC v. Aptim Fed. Servs., LLC*,
   No. 1:18-cv-1112, 2019 U.S. Dist. LEXIS 69920 (E.D. Va. Apr. 24, 2019) .........................23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................................... *passim*

*CACI Premier Tech., Inc. v. Rhodes*,
   536 F.3d 280 (4th Cir. 2008) ...............................................................................................29

*Carr v. Forbes, Inc.*,
   259 F.3d 273 (4th Cir. 2001) .........................................................................................17, 22

*Croce v. N.Y. Times Co.*,
   930 F.3d 787 (6th Cir. 2019) ...............................................................................................19

*Edwards v. Schwartz*,
   378 F. Supp. 3d 468 (W.D. Va. 2019) ............................................................................17, 18

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
   575 F.3d 1312 (Fed. Cir. 2009) ...........................................................................................23

*Fields v. Sprint Corp.*,
   No. 3:16cv905 (MHL), 2017 U.S. Dist. LEXIS 147654 (E.D. Va. May 11,
   2017) ...................................................................................................................................39

*Flava Works, Inc. v. Gunter*,
   689 F.3d 754 (7th Cir. 2012) ...............................................................................................36

*Flores v. Ethicon, Inc.*,
   563 F. App'x 266 (4th Cir. 2014) ...................................................................16

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
   194 F.3d 505 (4th Cir. 1999) .......................................................................39

*Fox Entm't Grp., Inc. v. Abdel-Hafiz*,
   240 S.W.3d 524 (Tex. App. 2007)............................................................34, 35

*Garrison v. Louisiana*,
   379 U.S. 64 (1964)......................................................................................22

*Glob. Relief Found., Inc. v. N.Y. Times Co.*,
   390 F.3d 973 (7th Cir. 2004) .................................................................19, 20

*Hamilton v. Boddie-Noell Enters.*,
   88 F. Supp. 3d 588 (W.D. Va. 2015) ...........................................................40

*Harris v. Kreutzer*,
   271 Va. 188, 624 S.E.2d 24 (2006)........................................................39, 40

*Harrison v. Addington*,
   955 N.E.2d 700 (Ill. App. Ct. 2011) ...........................................................20

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989)................................................................22, 30, 31, 32

*Hatfill v. N.Y. Times Co.*,
   488 F. Supp. 2d 522 (E.D.Va. 2007) ...........................................................24

*Horne v. WTVR, LLC*,
   893 F.3d 201 (4th Cir. 2018) ................................................................23, 35

*Hugger v. Rutherford Inst.*,
   94 F. App'x 162 (4th Cir. 2004) .................................................................27

*Hustler Magazine v. Falwell*,
   485 U.S. 46 (1988)......................................................................................39

*Jackson v. Hartig*,
   274 Va. 219, 645 S.E.2d 303 (2007)............................................................24

*Janklow v. Newsweek, Inc.*,
   759 F.2d 644 (8th Cir. 1985) .......................................................................20

*Jankovic v. Int'l Crisis Grp.*,
   72 F. Supp. 3d 284 (D.D.C. 2014) .........................................................33, 34

*Jordan v. Kollman,*
    269 Va. 569, 612 S.E.2d 203 (2005)........................................................19

*Klayman v. City Pages,*
    650 F. App'x 744 (11th Cir. 2016) ......................................................35

*Liberty Counsel Inc. v. GuideStar USA, Inc.,*
    737 F. App'x 171 (4th Cir. 2018) ........................................................16

*MacFarlane v. Sheridan Square Press, Inc.,*
    91 F.3d 1501 (D.C. Cir. 1996).............................................................31

*Masson v. New Yorker Magazine,*
    501 U.S. 496 (1991)..................................................................22, 34

*Mayfield v. NASCAR,*
    674 F.3d 369 (4th Cir. 2012) ...............................................................23

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964)............................................................28, 33, 35, 38

*In re Phila. Newspapers, LLC,*
    690 F.3d 161 (3d Cir. 2012)................................................................36

*Phillips v. LCI Int'l, Inc.,*
    190 F.3d 609 (4th Cir. 1999) .................................................................7

*Pippen v. NBCUniversal Media, LLC,*
    734, F.3d 610 (7th Cir. 2013) ..............................................................35

*Reuber v. Food Chem. News, Inc.,*
    925 F.2d 703 (4th Cir. 1991) .......................................................... *passim*

*Richmond Newspapers, Inc. v. Lipscomb,*
    234 Va. 277, 362 S.E.2d 32 (1987)........................................................22

*Ryan v. Brooks,*
    634 F.2d 726 (4th Cir. 1980) ..........................................................26, 27

*Schaecher v. Bouffault,*
    290 Va. 83, 772 S.E.2d 589 (2015)........................................................18

*Semida v. Rice,*
    863 F.2d 1156 (4th Cir. 1988) .............................................................35

*Smith v. City of Sumiton,*
    578 F. App'x 933 (11th Cir. 2014) .......................................................23

*Snyder v. Phelps*,
  580 F.3d 206 (4th Cir. 2009) ..................................................................18

*Southprint, Inc. v. H3, Inc.*,
  No. 4:02-CV-00038, 2005 U.S. Dist. LEXIS 15518 (W.D. Va. July 29, 2005)......................19

*Spirito v. Peninsula Airport Comm'n*,
  350 F. Supp. 3d 471 (E.D. Va. 2018) ..................................................2, 16, 22, 23

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)........................................................................22, 24

*Tucker v. Fischbein*,
  237 F.3d 275 (3d Cir. 2001)................................................................22, 23

*United States v. Alvarez*,
  567 U.S. 709 (2012)............................................................................17

*Va. Citizens Def. League v. Couric*,
  910 F.3d 780 (4th Cir. 2018) ..................................................................18

## Statutes & Other Authorities

Va. Code § 8.01-223.2 ..........................................................................38

Va. Const. art. V, § 16 ..........................................................................2

Defendants CBS Broadcasting Inc. and CBS Corporation (together, "CBS") respectfully submit this memorandum in support of their Motion to Dismiss the Amended Complaint ("Am. Comp.").

## INTRODUCTION

In this lawsuit, Lieutenant Governor Justin Fairfax ("Fairfax") seeks to hold CBS liable for broadcasting interviews with two women who have accused him of sexual assault—broadcasts that include Fairfax's own vigorous denials.  He targets CBS, alone among the scores of national and local news outlets that had reported on the allegations for two months prior to the CBS broadcasts at issue, apparently because CBS chose to present interviews of the women themselves describing their allegations.  And Fairfax has openly and deliberately used copies of his pleading in this case to encourage news reporting of his own allegations—allegations that disparage the accusers as well as his political opponents, and that tout the existence of a never identified "eyewitness" to one of the incidents—with regard to which he enjoys the protection of the litigation and fair report privileges to prevent his targets from bringing claims against him. This is a classic "SLAPP suit" (Strategic Lawsuit Against Public Participation) and it should be dismissed for multiple reasons, including that the broadcasts do not reasonably convey the defamatory meaning he alleges, he is required to but has not and cannot adequately plead "actual malice," and because Virginia's anti-SLAPP statute immunizes CBS from liability for his claims.

## FACTUAL BACKGROUND

### The Northam Blackface Scandal

On February 1, 2019, media outlets began to report about a photograph on Governor Ralph Northam's medical school yearbook page that showed a white man in blackface and another person dressed as a Ku Klux Klansman.  Am. Comp. ¶ 54; *see also* Declaration of

Matthew E. Kelley ("Kelley Decl.") Exs. 14-20 (copies of news reports).[1]  Although Northam ultimately denied he was depicted in the photo, he conceded that he had worn blackface in the past.  Kelley Decl. Exs. 15-17.  Calls for Northam to resign came swiftly.  For example, the *Richmond Times-Dispatch* published an editorial the day the news broke stating that the photo showed "poor judgment" and had irreparably damaged Northam's reputation, and called for him to step down.  Am. Comp. ¶¶ 55-58; *see also* Kelley Decl. Exs. 18-20.

At that juncture, public attention naturally turned to Fairfax.  Am. Comp. ¶¶ 15, 50-51. Under Virginia law, the lieutenant governor replaces a sitting governor who dies or resigns. Va. Const. art. V, § 16; *see also* Am. Comp. ¶ 59.  Fairfax alleges that he was "poised to ascend to the Governorship of Virginia" in the immediate wake of the Northam photo scandal.  *Id.* ¶ 3.

### Sexual Assault Allegations Against Fairfax

Days after the Northam controversy arose, the same on-line publication that had brought the Northam yearbook photo to light reported that Fairfax had been accused of sexually assaulting a woman at the Democratic National Convention in Boston in 2004, Kelley Decl.

---

[1] For purposes of this motion only, CBS accepts as true the well-pleaded factual allegations in the Complaint.  Where a published news report or other document is quoted, referred to or otherwise incorporated by reference into the Amended Complaint, the Court may consider the full document on CBS's motion to dismiss, and copies of such documents cited herein are attached as exhibits to the Kelley Declaration.  *E.g.*, *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 486 (E.D. Va. 2018) (court on motion to dismiss may consider "documents quoted, relied upon, or incorporated by reference in the complaint" (citations omitted)).  In addition, even where certain publicly available documents, such as news reports, are not incorporated into the Complaint, the Court is entitled on this motion to take judicial notice of them, not for the truth of their contents, but for the fact that the cited reports were published, without converting this motion into one for summary judgment.  *E.g.*, *Advanfort Co. v. Int'l Registries, Inc.*, No. 1:15-cv-220, 2015 U.S. Dist. LEXIS 62125, at *27-28 n.10 (E.D. Va. May 12, 2015) ("A court may take judicial notice of newspaper articles at the motion to dismiss stage when the articles discuss the subject matter of the case.").  Copies of such news reports cited herein also are included as exhibits to the Kelley Declaration.  The existence of these previously published materials is relevant to, *inter alia*, whether, as a matter of law, Fairfax can adequately plead actual malice, an essential element of his claim.  *See* Section II *infra*.

Ex. 21, prompting Fairfax to issue a statement, distributed via Twitter, which threatened to "take appropriate legal action against those attempting to spread this defamatory and false allegation." *See* Am. Comp. ¶¶ 80-81 (referring to statement); Kelley Decl. Ex. 22 (copy of statement).  The statement said Fairfax's accuser had made the same allegations to the *Washington Post*:

> After being presented with facts consistent with the Lt. Governor's denial of the allegation, the absence of any evidence corroborating the allegation, and significant red flags and inconsistencies within the allegation, the Post made the considered decision not to publish the story.

Kelley Decl. Ex. 22.  Hours later, the *Post* published an article reporting the allegation of sexual assault and disputing Fairfax's account of the *Post's* reason for not having previously published the story.  Am. Comp. ¶¶ 61, 80-81, 167-168 (referring to article); Kelley Decl. Ex. 23 (copy of article).  The article stated, in relevant part:

> The Post *did not* find "significant red flags and inconsistencies" within the allegations, as the Fairfax statement incorrectly said. . . . The Post, in phone calls to people who knew Fairfax from college, law school and through political circles, found no similar complaints of sexual misconduct against him.  Without that, or the ability to corroborate the woman's account – in part because she had not told anyone what happened – the Post did not run a story.

Kelley Decl. Ex. 23 at 3-4 (emphasis added).

Fairfax also spoke directly to journalists that day.  The *Richmond Times-Dispatch*, for example, reported that Fairfax called the woman's allegations an "uncorroborated smear" and "a totally fabricated story out of the blue that's meant to attack me because of where I am in politics."  *Id.* Ex. 24.  Fairfax's office also released a statement attacking the *Post*, saying that it "just smeared an elected official," and again threatening to sue "people who continue to spread these false allegations."  *Id.* Ex. 26 (copy of statement).[2]

---

[2] In his pleading, Fairfax lays out a convoluted theory of a conspiracy by his political rivals to bring the sexual assault allegations to light.  Am. Comp. ¶¶ 62-69.  This particular chapter of his narrative is legally irrelevant to both this motion and to this lawsuit because Fairfax does not –

On February 6, Vanessa Tyson, a professor at Scripps College, came forward to identify herself as the accuser and released a statement that was widely reported upon. Am. Comp. ¶¶ 71-72, 83-84, 173-176 (quoting from and referring to statement); Kelley Decl. Ex. 27 (copy of statement as published by *New York Times*). Tyson said that she had made the Facebook post on which the original news reports of her accusation were based after learning about the Northam controversy and the possibility that Fairfax could become governor. Kelley Decl. Ex. 27.

Denying any political motive and calling herself a "proud Democrat," Tyson said that her "only motive in speaking now is to refute Mr. Fairfax's falsehoods and aspersions of my character, and to provide what I believe is important information for Virginians to have as they make critical decisions that involve Mr. Fairfax." *Id.* at 3. Fairfax also released a public statement that day, in which he again denied the allegation, but further emphasized "how important it is for us to listen to women when they come forward with allegations of sexual assault or harassment," urged the public to give such women "the space and support to voice their stories," encouraged "the media, my supporters and others to treat both the woman who made this allegation and my family with respect," but concluded that he "cannot agree with a description of events that I know is not true." *Id.* Ex. 28.

Then, on February 8, a second woman came forward. Am. Comp. ¶¶ 85-88. In a statement released through her attorney, Meredith Watson said that Fairfax had raped her in 2000 when both were students at Duke University. Am. Comp. ¶¶ 86-88, 93 (referring to statement); Kelley Decl. Ex. 29 (copy of statement). Watson said she had told friends about the alleged rape

---

and cannot – allege that anyone at CBS was involved in this purported plot. As CBS explains in its accompanying motion for attorney's fees, however, Fairfax has affirmatively used his pleading in this action as a press release, providing it to news organizations which could then report his derogatory allegations about his accusers and political opponents to the public without fear of liability. *See* Mem. Supp. Defs' Mot. For Att'y Fees at 8-11.

"immediately" after it occurred.  Kelley Decl. Ex. 29.  The *Washington Post* subsequently quoted one of the friends, attorney Kaneedreck Adams, as recalling that, in the spring of 2000, Watson came to her in tears:  "She told me she had been raped, and she named Justin.  She said she couldn't speak, but she was trying to get up and he kept pushing her down."  *Id.* Ex. 32 at 7.

In response, Fairfax issued a statement denying this allegation as well, refusing to resign, and adding, "[i]t is obvious that a vicious and coordinated smear campaign is being orchestrated against me."  *Id.* Ex. 31.  Significantly, despite asserting that Watson's allegation was "demonstrably false," Fairfax did not mention in that February statement his central contention in this lawsuit, *e.g.*, Am. Comp. ¶ 11, *i.e.*, that a third person was present in the room during the sexual encounter and could corroborate his version of events.

Amid calls for legislative hearings into the women's allegations, Fairfax took the floor of the Senate on February 24 and compared himself to lynching victims:

> [W]e talk about hundreds, at least 100, terror lynchings that happened in the Commonwealth of Virginia . . .  and yet we stand here, in a rush to judgment, with nothing but accusations, and no facts. And we decide that we are willing to do the same thing.

Kelley Decl. Ex. 34 (AP article quoting floor speech).  Once again, Fairfax failed to mention the existence of an eyewitness who allegedly could corroborate his version of events.

**Initial Coverage of the Assault Allegations by CBS**

On February 4, like most news organizations across the country, CBS reported on Tyson's allegation, Fairfax's denial and his assertion that the *Post's* investigation had found "red flags" and inconsistencies in her story, as well as the *Post's* rebuttal of Fairfax's claim it had found "red flags."  Kelley Decl. Ex. 35 (copy of CBS report).

On February 8, the day Watson's allegation became public, a spokeswoman for Fairfax exchanged text messages with Ed O'Keefe, a CBS reporter covering the story.  Am. Comp. ¶¶ 9,

107.   The spokeswoman provided to O'Keefe a list of four friends whom she suggested O'Keefe contact for additional information about Watson's allegations, including the CBS Corporation employee to whom Fairfax refers as the "Associate General Counsel," or "AGC" (hereafter, "CBS Corporation lawyer").  *Id.* ¶¶ 9, 107.  In a text message reproduced in the Amended Complaint, O'Keefe responds to Fairfax's spokeswoman:  "We are calling the friends and nobody is answering. Urge them to call back."  *See id.* ¶ 107.  Despite having incorporated this exchange into his Amended Complaint, Fairfax nevertheless alleges that "[i]t is not known if O'Keefe, or anyone else from the team of people at CBS who worked on the Watson interview contacted the AGC."  *Id.* ¶¶ 111, 138.  Fairfax is silent in his pleading as to whether he or his spokeswoman in fact urged the CBS Corporation lawyer or anyone else to return the CBS reporter's calls, as O'Keefe had requested.  Notably, the spokeswoman made no mention in these texts of a supposed eyewitness to the sexual encounter with Watson.

Fairfax does not allege that these February reports defamed him.

### Vanessa Tyson's Allegations and the CBS Broadcast of Her Interview

Tyson and Fairfax met at the 2004 Democratic National Convention in Boston.  Am. Comp. ¶ 3; Kelley Decl. Ex. 27 at 1.  While at the convention, Fairfax asked Tyson to accompany him to his hotel room, and she agreed.  Am. Comp. ¶ 38; Kelley Decl. Ex 27 at 1.  Their accounts then diverge.

Tyson wrote in her February statement that Fairfax kissed her, which she found surprising but "not unwelcome," and she kissed him back.  Kelley Decl. Ex. 27 at 1.  Tyson wrote that, after they ended up on the bed,

> Mr. Fairfax put his hand behind my neck and forcefully pushed my head towards his crotch. . . . As I cried and gagged, Mr. Fairfax forced me to perform oral sex on him. I cannot believe, given my obvious distress, that Mr. Fairfax thought this forced sexual act was consensual.

*Id.* at 1-2.  Tyson recounted the same story to the *Post*, according to the newspaper's February report:

> The woman described a sexual encounter that began with consensual kissing and ended with a forced act that left her crying and shaken.  She said Fairfax guided her to the bed, where they continued kissing, and then at one point she realized she could not move her neck.  She said Fairfax used his strength to force her to perform oral sex.

*Id.* Ex. 23 at 3.  According to Fairfax, however, he and Tyson "engaged in completely consensual sexual activity."  Am. Comp. ¶ 40.  He asserts Tyson "unambiguously manifested her consent" during the incident, *id.* ¶ 41, although he did not specify how that consent was "manifested."  Fairfax claims he did not force Tyson to do anything; that she did not "cry, gag, or choke;" and that she "did not indicate that Fairfax forced her to do anything."  *Id.* ¶¶ 42-44.

Two months after the avalanche of national news coverage surrounding the allegations, Gayle King, co-host of *CBS This Morning*, interviewed Tyson.  As noted in the broadcasts, Fairfax *declined* CBS's requests for a similar interview.  *E.g.*, Kelley Decl. Ex. 6 at 3.  Segments of King's interview with Tyson were broadcast on *CBS This Morning* on April 1.  *Id.* Exs. 3, 5, & 7 (copies of broadcasts).[3]  In the broadcasts, Tyson tearfully recounts what she says happened in Fairfax's hotel room in 2004.  *Id.*  After describing how Fairfax unexpectedly kissed her, which Tyson says "wasn't unwelcome per se," and the pair ended up on the bed, she continues:

> Tyson:  We're kissing lying down. And we're kissing, like, so our heads are level with each other. And then it was like my neck didn't work.
>
> King: What do you mean?
>
> Tyson: It was like I couldn't – I couldn't feel my neck. I couldn't hold my head up. He's using his hand on the back of my neck. [Tyson puts her right hand on the back of her neck and leans forward.] And I still didn't know what was going wrong. I thought there was something wrong with

---

[3] Because they form the basis of the claim, all of the CBS reports that include portions of Tyson's and/or Watson's interviews are properly considered as incorporated by reference into the Amended Complaint.  *E.g.*, *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

> my neck and he's pushing down and pushing down and I couldn't hold my
> neck up. . . .  And then the next thing I know, like, my head is like literally
> in his crotch.  And I'm choking and gagging. . . .

*Id.* Ex. 4 at 4.  After this segment of the recorded interview, King says from the studio:

> Now, Lt. Gov. Fairfax responded to the accusations.  In a statement to
> CBS News, he says this: "I feel so strongly regarding my innocence that I
> submitted myself to polygraph tests for each of the accusations against me.
> I passed these tests because, as I have maintained from the very beginning,
> I did not assault either of my accusers."

*Id.* at 7.  King and her *CBS This Morning* co-hosts then share their reactions:

> King:  It was fascinating talking to her because I felt, at some point, it's
> almost like she's going back to the moment that she believed –
>
> Co-host Norah O'Donnell: Yeah, of course.
>
> Co-host Bianna Golodryga:  You could see that.
>
> King:  You could really see that in her eyes.  And people would say,
> "Yeah, but she went to the hotel room, yeah, she agreed to the kissing,
> isn't that on her?"  But I could see, as a young person, you have a mutual
> friend, and you think this guy is safe, and kissing doesn't necessarily have
> to lead to what she says happened after that. So –
>
> Golodryga:  Something clearly changed when she was walking –
>
> King: Yes.
>
> Golodryga:  – through what transpired, and you could see where she got
> very emotional and went to that dark place.
>
> O'Donnell:  Feels like she was forced.
>
> King: Yeah.

*Id.* at 7-8.

### Meredith Watson's Allegations and the CBS Broadcast of Her Interview

The incident that Watson alleges constituted rape occurred in the spring of 2000 at Duke,

when Fairfax was a senior and Watson was a junior.  Am. Comp. ¶¶ 3, 22, 23.  Watson did not

provide many details about the alleged rape in her initial public statements in February.  The first

8

statement, by her legal team, said that "Mr. Fairfax's attack was premeditated and aggressive," and that she "immediately told friends that Mr. Fairfax had raped her."  Kelley Decl. Ex. 29. Later that day, Watson's lawyers released another statement, accusing Fairfax of "smearing her with the typical 'she's nuts' defense."  Am. Comp. ¶¶ 92-93 (referencing statement); Kelley Decl. Ex. 30 (copy of statement).  That statement confirmed that Watson had told Fairfax she "was raped by a basketball player during her sophomore year" and asserted that, after the first incident, she "went to the Dean, who provided no help and discouraged her from pursuing the claim further."  Kelley Decl. Ex. 30.  The statement (cited by Fairfax in his Amended Complaint) continued:

> Mr. Fairfax then used this prior assault against Ms. Watson, as he explained to her during the only encounter she had with him after the rape. She left a campus party when he arrived, and he followed her out.  She turned and asked, "Why did you do it?"  Mr. Fairfax answered:  "I knew that because of what happened to you last year, you'd be too afraid to say anything."

*Id.*  Fairfax's own February 8 statement also was devoid of details about the incident with Watson.  He termed her suggestion of "rape" an "unsubstantiated allegation" that was "demonstrably false."  *Id.* Ex. 31.  Again, Fairfax did not mention an eyewitness.

The following day, Fairfax released another statement, this one calling for an FBI investigation and asserting that he had had consensual sexual encounters with both Tyson and Watson.  *Id.* Ex. 36.  Here as well, Fairfax failed to mention any eyewitness.

In the Amended Complaint, however, Fairfax alleges that he, Watson, and an unidentified "eyewitness" were in the "eyewitness's" room at the Alpha Phi Alpha fraternity house on Duke's campus.  Am. Comp. ¶¶ 24, 87.  Fairfax alleges that "Watson initiated a sexual encounter" while the "eyewitness" was still in the room.  *Id.* ¶ 26.  Fairfax claims the interaction was "entirely consensual," *id.* ¶ 3, and asserts that Watson "unambiguously manifested her consent," *id.* ¶ 27,

although, as with Tyson, he fails to allege specifically how her consent was "manifested."

Fairfax claims that the "eyewitness" remained in the room, and implies that the "eyewitness" may have "participated in the assault [Watson] alleged." *Id.* ¶¶ 28, 31. Fairfax alleges that, after the "sexual encounter," he left Watson and the "eyewitness" in the room together. *Id.* ¶¶ 29, 30. He alleges that Watson "never indicated to Fairfax or the eyewitness that the sexual encounter with Fairfax was not consensual during or after" the incident. *Id.* ¶ 30.

Fairfax alleges that, before King interviewed Watson in April, his spokeswoman urged CBS journalists to ask her certain questions, including the date of the alleged assault, in which room it occurred, and whether Watson "encountered anyone other than Fairfax upon entering or exiting the room or building." *Id.* ¶ 11. But Fairfax does not allege (nor could he) that his spokeswoman explained to CBS journalists *why* they considered these questions important— neither Fairfax nor his spokeswoman ever mentioned the purported "eyewitness" to the CBS journalists, despite what he describes as the extensive contacts between the spokeswoman and CBS reporters before and after Watson's interview was broadcast. *See id.* ¶ 189 (pleading that, through July 2019, "CBS reporting staff . . . were in regular touch with Fairfax's spokesperson and were highly responsive to her outreach."). Fairfax asserts in his Amended Complaint that Watson "lied by omission" in her interview by failing to mention the alleged presence of the "eyewitness." *Id.* ¶ 93. If that is so, then Fairfax himself is responsible for the same "lie" in his public statements, and in his pre-broadcast communications with CBS.

Segments of King's interview of Watson were broadcast on April 1 and 2. Kelley Decl. Exs. 5, 10, & 12. Watson told King that she had met Fairfax at the end of her freshman year, and the two became "very good friends." Kelley Decl. Ex. 11 at 1. She said that, on a spring night, Fairfax invited her to "hang out." *Id.* Watson said that at one point Fairfax left the room, and when he returned the door shut with a "click like locking the door," and "the light went off":

> Watson:  And he did things that you shouldn't do to someone without their permission.  And I tried several times to get up and leave, and was pushed back down.
>
> King:  And what happened?
>
> Watson:  He forcibly sexually assaulted and raped me.  I was not on the bed initially.  There was a couch and he pulled me over, and I tried several times to get up, and was pushed back down, held down.
>
> King:  And you made it clear, "This is not what I want."
>
> Watson:  It was very clear.
>
> King:  Because, you know, he is saying this night was consensual.
>
> Watson:  If you have to hold someone down, it's not consensual.

*Id.* at 2-3.  King asked Watson about her allegation that she had previously been raped during her

sophomore year; Watson said that she had, and that she had told Fairfax about it.

> Watson:  One night after it happened, I was at a party on campus, and he came, and so I went to leave, like I left, and he followed me out, and was sort of following after me, calling after me, and I was just running, trying to get away.  And then I finally stopped, and I turned around, and all I said to him was, "Why?  Why would you do that to me?"  And he said, "I knew, because of what happened to you last year, that if I got you in the right situation you would be too afraid to say or do anything about it."
>
> King:  Meredith, you hear that, and you think what?
>
> Watson:  [crying]  He knew what he was going to do that night when he asked me to come over.

*Id.* at 5.  King, in the studio, emphasized that Fairfax denied wrongdoing:

> In response to Watson's allegations, a spokesperson says Fairfax took a polygraph test, and it supports his denials. . . .  His spokesperson says the tests show that Fairfax was truthful when he answered that he never had that conversation with Meredith Watson where she implied his sexual contact with her was non-consensual.  This spokesperson also says that Fairfax denies ever holding her down or preventing her from getting up during the alleged incident.

*Id*. at 6

11

In connection with the broadcast of the Tyson interview on April 1, *CBS This Morning* also broadcast a portion of King's interview with Watson in which she said she felt guilty for not having come forward sooner:

> King:  Why do you feel guilty?
>
> Watson:  [crying] It happened to her after it happened to me.  And had I had the strength or the courage to say something in 2000, maybe it never would have happened to her.

*Id.* Ex. 6 at 2.  King, in the studio, then explained again that Fairfax denied the allegations and added that "[w]e are hoping that Lieutenant Governor Fairfax will speak to us at some point."

*Id.* at 3.  King reported that both women were calling for legislative hearings in which they and Fairfax could testify under oath.  King's co-hosts then voiced their reactions to Watson's interview:

> Co-host Norah O'Donnell:  [T]here's an incredible amount of pain there.
>
> King:  Yes, all these years later.
>
> O'Donnell:  All these years later that pain has stuck with them about how they felt in that moment and how it has affected them now for decades.
>
> Co-host John Dickerson:  You know, and think about the learning we have done.  There was a period, half a year ago where people said, "You know, these people are coming forward after so many years."
>
> King:  Why?
>
> Dickerson:  "Why are they coming forward?  How can it really be so real?"  And we have now seen example after example of how it is as real as if it happened yesterday.
>
> King:  Exactly right, John.

*Id.* at 3-4.  The same day, CBS promptly published in full the statement that Fairfax provided to CBS.  *Id.* Ex. 9.

**The Aftermath**

The day after CBS broadcast King's interview with Watson, Fairfax read a prepared statement to journalists at the Capitol.  Am. Comp. ¶ 129 (referencing statement); Kelley Decl. Ex. 37 (video of statement).  CBS provided live coverage of this statement in its entirety, and a recording of it remains available on the CBS News website: https://www.cbsnews.com/video/justin-fairfax-on-assault-allegations-i-am-telling-the-truth/.  In it, Fairfax confirmed that, as CBS had reported, he had taken a polygraph test regarding the women's allegations, which Fairfax claimed he passed "on the very first try."  Kelley Decl. Ex. 37 at 1:36-2:01.  He also said:

> I believe that anyone willing to come forward with allegations of sexual misconduct should be heard fairly and fully, taken seriously, and treated respectfully.

*Id.* at 00:44-00:54.  Fairfax said he spoke "to make sure that people hear about what actually occurred," and proceeded to give what he described as a detailed account of all of the relevant facts and circumstances surrounding his encounters with both of his accusers.  *Id.* at 4:10-8:03. In that account, however, there was, once again, no mention of any eyewitness to the sexual encounter with Watson, either in Fairfax's statement or in the polygraph report.

On June 12, ten weeks *after* the challenged broadcasts, Fairfax's then-attorney sent and publicly released copies of letters to prosecutors in Massachusetts and North Carolina regarding Tyson's and Watson's allegations.  Am. Comp. ¶¶ 182-183.  Both letters urged the prosecutors to investigate the allegations and proclaimed Fairfax's innocence.  Kelley Decl. Exs. 38-39 (copies of letters).  The letter asking the North Carolina prosecutor to investigate Watson's allegations did not mention an eyewitness.

It was not until July 9 – the day of a special session of the Virginia General Assembly at which some Republicans had called for hearings into the allegations against Fairfax – that Fairfax's then-attorney released another letter to the District Attorney in North Carolina.  Am. Comp. ¶ 183.  In it, he alleged for the first time that "[t]here was an eyewitness to the events

13

underlying Ms. Watson's allegation."  Kelley Decl. Ex. 42 (copy of letter).  The letter did not

identify the purported "eyewitness" or any of the people to whom the "eyewitness" had allegedly

spoken about the events.  *Id.*

Fairfax alleges in his Amended Complaint that he discussed his "encounter" with Watson

with the "eyewitness" "[a]s recently as February 2019."  Am. Comp. ¶ 33.  Yet Fairfax does not

explain in his Amended Complaint why he waited until July 9 – five months after Watson first

made her allegations public and the resulting flood of February news coverage, and three months

after the April CBS broadcasts at issue here – to disclose this purportedly crucial exculpatory

evidence.  Fairfax also alleges that the "eyewitness" told the same story to "several of the

eyewitness's friends on numerous occasions."  *Id.* ¶ 34.  Other than the CBS Corporation lawyer,

however, Fairfax does not identify anyone to whom the "eyewitness" allegedly spoke.

### Fairfax's Pre-Suit Demand Regarding Watson's Allegations

A month after Fairfax's then-attorney first alleged the existence of an eyewitness to

Fairfax's sexual encounter with Watson, Fairfax's current counsel wrote to CBS, demanding that

CBS "cease and desist from publishing Ms. Watson's interview and defamatory statements

involving her false allegations that she was raped and sexually assaulted by Mr. Fairfax."  Kelley

Decl. Ex. 43 (copy of letter); *see also* Am. Comp. ¶ 127 (referring to letter).  Fairfax's counsel

demanded that CBS "issue an official on-air apology and retraction of its publication of Ms.

Watson's allegations, remove any and all content publishing those allegations across all of

CBS's media platforms and outlets, and broadcast the fact that Ms. Watson's allegations are false

with the same vigor and reach with which CBS has published and promoted those false

allegations to tens of millions of viewers."  Kelley Decl. Ex. 43.  The letter also demanded that

CBS pay to Fairfax $300 million.  *Id.*  CBS responded with a detailed explanation of why there

was no basis in law for the relief he demanded.  Am. Comp. ¶ 127 (referring to CBS response);

Kelley Decl. Ex. 44 (copy of CBS response).[4]

**This Lawsuit**

Fairfax's Amended Complaint purports to state causes of action for defamation (Count One) and intentional infliction of emotional distress (Count Two), both based on CBS's broadcasts of King's interviews with Tyson and Watson.  Am. Comp. ¶¶ 210-228.  Fairfax alleges that CBS (alone among all of the news organizations reporting on the two women's allegations beginning months earlier) is responsible for "extraordinary damage to his reputation and his ability to earn a living" and damaging his chances of successfully becoming governor. *Id.* ¶ 13.[5]  Fairfax seeks $400 million plus punitive damages, and an injunction against publishing any material determined to be defamatory.  *Id.* at 56 (prayer for relief).

## ARGUMENT

Fairfax alleges that CBS defamed and inflicted emotional distress on him by broadcasting on April 1 and 2 what he calls "intentionally fabricated, false, and politically-motivated statements made by Meredith Watson . . . and Vanessa Tyson . . . alleging that they were sexually assaulted by [him]."  *Id.* ¶ 1.  CBS now moves to dismiss both claims.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In other words, the "complaint must contain sufficient

---

[4] Despite the written demand by Fairfax that CBS publicly take his side and pay him hundreds of millions of dollars, in his Amended Complaint, Fairfax asserts that his demand "was merely for CBS to take its objective reporting role seriously and determine the basic facts underlying Watson's and Tyson's claims to ascertain whether their allegations were true or false."  Am. Comp. ¶ 127.

[5] Even so, Fairfax acknowledges, as he must, that "[a]s soon as Tyson made her accusation [two months before the CBS broadcasts], Fairfax began to receive demands for his resignation as Lieutenant Governor of Virginia."  Am. Comp. ¶ 204.

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *see also Liberty Counsel Inc. v. GuideStar USA, Inc.*, 737 F. App'x 171, 171 (4th Cir. 2018) (per curiam) (same).

The *Twombly/Iqbal* analysis requires courts to undertake a two-step process when reviewing motions to dismiss. First, courts should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679; *accord Spirito*, 350 F. Supp. 3d at 479. The Court also must ignore any pleaded "facts" prefaced with "it is not known," as they are by their terms speculation, not factual allegations. *Flores v. Ethicon, Inc.*, 563 F. App'x 266, 270 & n.5 (4th Cir. 2014).

Second, courts must address the remaining well-pleaded allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679. This step requires facts showing "more than a sheer possibility that a defendant acted unlawfully," and it is not enough for a complaint to plead facts that are "merely consistent" with liability. *Id.* at 678. Moreover, the court must not credit unreasonable inferences drawn by the plaintiff from pleaded facts. *Id.* Such a complaint "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal marks and citation omitted).

At this step, courts also must consider whether the inference of plausibility is "more likely explained by[] lawful . . . behavior." *See Iqbal*, 556 U.S. at 680 (citing *Twombly* 550 U.S. at 567). If there is an obvious alternative, lawful explanation, the complaint fails to establish a plausible entitlement to relief. *See, e.g.*, *Twombly*, 550 U.S. at 567, 570 (holding that, while some alleged facts suggested illegal agreement between competitors, such conduct was also subject to an "obvious alternative explanation," and plaintiffs had thus failed to "nudge[] their claims across the line from conceivable to plausible").

There are strong First Amendment and public policy rationales underpinning the application of the plausibility standard to defamation complaints filed by public officials.  In such cases, "because the defense of baseless defamation claims imposes an additional cost, in the form of potentially deterred speech, federal courts have historically given close scrutiny to pleadings in libel actions."  *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 500 (W.D. Va. 2019).  As the Fourth Circuit has explained, "[w]ere the press subject to suit every time it erred, it would decline to speak out without resorting to the sort of cumbersome due diligence common in security offerings.  For this reason, the Constitution provides the press with a shield whereby it may be wrong when commenting on acts of a public figure, as long as it is not intentionally or recklessly so."  *Carr v. Forbes, Inc.*, 259 F.3d 273, 283 (4th Cir. 2001).

In this case, based on the Amended Complaint and the related materials the Court may properly consider, it is apparent that Fairfax has not stated and cannot state any plausible claim for relief.  Accordingly, his claims should be dismissed with prejudice.

## I.     THE BROADCASTS DO NOT REASONABLY CONVEY A DEFAMATORY MEANING

Count I of the Amended Complaint should be dismissed for the straightforward reason that reasonable viewers would not understand the broadcasts to be an assertion *by CBS* that Fairfax is guilty of the alleged sexual assaults.  The law recognizes "the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation."  *United States v. Alvarez*, 567 U.S. 709, 718 (2012).  Particularly where, as here, there is an existing, heated public controversy regarding allegations of misconduct against an elected official, including debate within the Legislature, a news organization "cannot be made to warrant that every allegation that it [publishes] is true."  *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 717 (4th Cir. 1991).  Fairfax's position effectively is

that CBS cannot, on pain of defamation liability, broadcast reports that show his accusers being

questioned about their already widely-reported allegations even where those reports provide his

vehement denials of those allegations (and in which he could have spoken for himself if he had

so chosen), thereby enabling viewers to better judge for themselves where the truth lies.  This

common and fundamental form of journalism is protected by the First Amendment and by

Virginia law.

In Virginia, whether a challenged publication is reasonably capable of conveying the

defamatory meaning alleged by the plaintiff is a threshold question of law for the Court.  *Va.

Citizens Def. League v. Couric*, 910 F.3d 780, 784 (4th Cir. 2018).  In "all evaluations of

defamatory statements . . . context is of the utmost importance."  *Schaecher v. Bouffault*, 290 Va.

83, 101, 772 S.E.2d 589, 599 (2015).  The Court must assess the publication "as a whole, and in

the sense in which it would be understood by the [audience] to whom it was addressed."  *Id.* at

94, 772 S.E.2d at 595 (citation omitted); *see also Snyder v. Phelps*, 580 F.3d 206, 219 (4th Cir.

2009) (courts evaluating whether statement is actionable "are obliged to assess how an objective,

reasonable reader would understand a challenged statement by focusing on the plain language of

the statement and the context and general tenor of its message"), *aff'd*, 562 U.S. 443 (2011).

Virginia courts recognize that, during contentious public debates, the "controversy

informs the way in which a reasonable reader would interpret any given claim" made by the

"opposing partisans" in the controversy.  *Edwards*, 378 F. Supp. 3d at 509-10 (citation omitted).

Thus, defamation actions premised on the statements of one side in the context of such a

controversy have been rejected.  For example, Judge Hilton dismissed a defamation claim arising

from a magazine article about the controversy over the safety of vaccines, in which a pro-vaccine

doctor said of an anti-vaccine activist, "she lies."  *Arthur v. Offit*, No. 01:09-CV-1398, 2010 U.S.

Dist. LEXIS 21946, at *2 (E.D. Va. Mar. 10, 2010).  Judge Hilton explained that

> the context of the remark – in a lengthy article describing an emotional
> and highly charged debate about an important public issue over which
> Defendant Offit and Plaintiff have diametrically opposed views – plainly
> signals to readers that they should . . . understand that the magazine is
> merely reporting Defendant Offit's personal opinion of Ms. Arthur's
> views.

*Id.* at \*14-15; *see also, e.g.*, *Jordan v. Kollman*, 269 Va. 569, 581-82, 612 S.E.2d 203, 209-10

(2005) (reversing defamation verdict for public-official plaintiff over advertisements accusing

official of misconduct); *Southprint, Inc. v. H3, Inc.*, No. 4:02-CV-00038, 2005 U.S. Dist. LEXIS

15518, at \*44-45 (W.D. Va. July 29, 2005) (comments by business about competitor were not

actionable because recipients "took these typical competitive comments with a grain of salt"),

*aff'd*, 208 F. App'x 249 (4th Cir. 2006).

Unlike some other jurisdictions, the Virginia Supreme Court has not to date adopted

particular nomenclature to describe this principle, *i.e.*, that news reports recounting the positions

of both sides to a public controversy should not be actionable as defamation precisely because it

is important that the public be informed about such disputes.  In Ohio, for example, that state's

high court has described it succinctly as the "balanced report" principle, holding that, where a

news report presents both sides of a dispute on a matter of public concern, the report is not

reasonably understood in a defamatory sense.  *Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d

832, 853-54 (Ohio 2012); *see also Croce v. N.Y. Times Co.*, 930 F.3d 787, 793 (6th Cir. 2019)

(affirming dismissal of defamation claims based on newspaper article that presented allegation of

wrongdoing and denials that was "a standard piece of investigative journalism that presents

newsworthy allegations made by others, with appropriate qualifying language"); *Glob. Relief

Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004) (affirming dismissal of

defamation claims over news reports that plaintiff nonprofit was being investigated for terrorism

links and rejecting plaintiff's "argument that these media defendants must be able to prove the

truth of the government's charges before reporting on the investigation itself").

Indeed, several courts have rejected defamation claims premised on news reports about sexual assault allegations, reasoning either that reporting the existence of such allegations is not defamatory in context or that accurate reports of the fact that allegations have been made are not materially false.  For example, the Eighth Circuit affirmed dismissal of a defamation action by the then-governor of South Dakota, holding that a magazine's report of the "historical fact" of a past rape allegation did not mean that the magazine "espoused the validity" of the accusation. *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 649 (8th Cir. 1985), *on reh'g en banc*, 788 F.2d 1300, 1301 n.2 (1986) (noting panel's holding in this regard was undisturbed).  *See also, e.g.*, *Harrison v. Addington*, 955 N.E.2d 700, 707-08 (Ill. App. Ct. 2011) (defendants were not liable for defamation for truthfully reporting to plaintiff's supervisors that co-worker's daughter had accused plaintiff of raping her).

Here, viewed in whole and in context, the challenged broadcasts are objective accounts of the competing allegations of Tyson and Watson on the one hand, and of Fairfax's version of those same events on the other.  CBS presents both the accusers' descriptions of what they say happened and (despite his decision not to be interviewed) Fairfax's assertions of his innocence, including what he says are the results of polygraph examinations.  King presses the accusers on their backgrounds and motivations, and asks them to respond to criticisms.[6]  Tyson's and

---

[6] *See, e.g.*, Kelley Decl. Ex. 13 at 1-2 (King:  "[T]here have been published reports about an ex-boyfriend who took out a peace order, which is a form of a restraining order in the state of Maryland.  He claims you damaged his car, that you threatened to commit suicide, that you held him hostage. . .  How do you respond to those allegations?"  Watson:  "What does that have to do with what happened to me in 2000?  I don't, I don't want to give breath to the smears that were put out, whether they're truth or lies.  I don't want to give power to Justin and what he's done, and act like I have to defend myself.  I don't have to defend myself.").

Watson's allegations are expressly presented as allegations, not as established facts.[7]  No reasonable viewer would believe that the broadcasts convey, as a definitive factual assertion *by CBS*, that Fairfax is "a rapist, sexual abuser, and a predator."  Am. Comp. ¶ 220.  The discussion among King and her co-hosts immediately following the emotional interviews to which Fairfax points, *id.* ¶¶ 159-61, 169-70, does not change this analysis, both because King explicitly frames the allegations as allegations in that discussion, and because the journalists are reacting to the pain the women express – pain that Fairfax himself acknowledged in his own public statements and that he has insisted must be respected.[8]

In cases such as this one—where a public official admits to engaging in sexual conduct with two women but the women claim the conduct was non-consensual, and where both the allegations and the official's response have already been widely reported—it is crucial for the public to be able to hear directly from both accuser and accused in news coverage such as the broadcasts at issue here.  The law correctly assumes that reasonable viewers of such a news report can and should make up their own minds when presented with competing narratives, and that reasonable people understand that, just because an allegation is made does not make it true, and just because an allegation is denied does not make it false.  Fairfax's defamation claim

---

[7] *See, e.g.*, Kelley Decl. Ex. 4 at 7 (King: "[K]issing doesn't necessarily have to lead to *what she says happened* after that." (emphasis added)); *id.* Ex. 13 at 1 (King: "We have more now of our interview with Meredith Watson telling *the story she revealed after Vanessa Tyson publicly alleged* that Virginia Lt. Gov. Justin Fairfax sexually assaulted her.  Watson *claims* that Fairfax raped her in 2000 when they were both students at Duke University . . . *Justin Fairfax denies their allegations, adamantly so*." (emphasis added)).

[8] *See* Kelley Decl. Ex. 9 at 5 (Fairfax statement that "[W]hile the evidence will continue to demonstrate the truth that I never assaulted either Dr. Tyson or Ms. Watson, I am able to hear the pain they have expressed; a pain I hope they are able to resolve and heal from."); *id*. Ex. 28 (Fairfax Feb. 6, 2019, statement: "I would like to encourage the media, my supporters and others to treat both the woman who made this allegation and my family with respect for how painful this situation can be for everyone involved.").

should be dismissed because the broadcasts do not convey a defamatory meaning.

## II.  FAIRFAX HAS NOT, AND CANNOT, ADEQUATELY PLEAD ACTUAL MALICE

Fairfax's defamation claim also fails as a matter of law for a second, independent reason. It is an essential element of his claim that he prove that CBS broadcast the interviews with the requisite degree of fault.  *See Spirito*, 350 F. Supp. 3d at 480.  In this regard, a public official such as Fairfax must prove, by clear and convincing evidence, that the allegedly actionable statements were published with constitutional "actual malice."  *E.g.*, *Carr*, 259 F.3d at 282-83; *Reuber*, 925 F.2d at 708.  Actual malice in this context does not mean ill will or spite; rather, a public official must show that the defendant subjectively believed at the time of publication that the challenged statements were false or that it reported them despite having a "high degree of awareness of their probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

As the Fourth Circuit has observed, this "is a subjective standard," *Reuber*, 925 F.2d at 714, and, thus, "[m]ere negligence does not suffice," *Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991).  Actual malice "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 730-31. Indeed, neither a "departure from accepted standards," *Reuber*, 925 F.2d at 711-12, nor a "failure to investigate" standing alone constitutes actual malice, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).  Further, a plaintiff cannot show actual malice by pleading a combination of allegations that themselves do not individually amount to knowledge of probable falsity.  *See, e.g.*, *Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277, 294-95, 362 S.E.2d 32, 41-42 (1987); *see also, e.g.*, *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (court considered plaintiff's 24 theories alleging actual malice and "rejected all of them").

The Fourth Circuit has held that the pleading standards adopted in *Iqbal* and *Twombly* apply in defamation actions, including specifically to the pleading of "actual malice." *See, e.g.*, *Mayfield v. NASCAR*, 674 F.3d 369, 377-78 (4th Cir. 2012). Therefore, Fairfax is required to plead facts that, taken as true, would be sufficient for a finding of actual malice. *Id.* at 378. And, he must plausibly plead actual malice both as to each challenged statement, *see Horne v. WTVR, LLC*, 893 F.3d 201, 211 (4th Cir. 2018), and as to each named defendant, *AdvanFort Co. v. Mar. Exec., LLC*, No. 1:15-cv-220, 2015 U.S. Dist. LEXIS 99208, at *16-17 (E.D. Va. July 28, 2015).

To be sure, plaintiffs are "entitled to prove the defendant's state of mind through circumstantial evidence," *Spirito*, 350 F. Supp. 3d at 481, and they may plead on information and belief "when essential information lies uniquely within another party's control," *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330-31 (Fed. Cir. 2009). But, as this Court recently noted, "'information and belief' is typically an "inadequate basis for an allegation." *Atkins Nuclear Secured, LLC v. Aptim Fed. Servs., LLC*, No. 1:18-cv-1112 (AJT/JFA), 2019 U.S. Dist. LEXIS 69920, at *16-19 (E.D. Va. Apr. 24, 2019) (Trenga, J.). This approach is consistent with Supreme Court precedent. *See Twombly*, 550 U.S. at 551 (declining to accept as true conclusory allegation "upon information and belief that [the companies] have entered into a contract, combination or conspiracy to prevent competitive entry"); *see also Smith v. City of Sumiton*, 578 F. App'x 933, 935 n.4 (11th Cir. 2014) ("for purposes of a Rule 12(b)(6) motion to dismiss, we do not have to take as true allegations based merely 'upon information and belief'" (citations omitted)).

Fairfax's Amended Complaint does not, and cannot, state a claim for defamation because it does not plausibly plead facts that, if proven, would establish that CBS broadcast information it knew to be false or probably false.

### A.    CBS's Alleged Duty to Investigate

Fairfax premises his Amended Complaint on allegations, made mostly in conclusory terms, that CBS failed to investigate the allegations of sexual assault and that this is proof of deliberate falsification.  Specifically, he alleges that CBS "failed to separately investigate" the women's claims and "instead only spoke to Watson, Tyson and their representatives," and he contends that, "[h]ad CBS investigated the allegations, they would have learned that each woman's account was false and motivated by political and personal animus against Fairfax." Am. Comp. ¶ 137.  Even accepting these allegations as true (they are not—CBS did investigate, as discussed below), they cannot establish actual malice as a matter of law:  A failure to investigate, absent obvious reason to doubt the accuracy of the source, does not constitute actual malice.

The Virginia Supreme Court has explained that "a duty to investigate the accuracy of one's statements does not arise until the publisher of those statements has a high degree of subjective awareness of their probable falsity."  *Jackson v. Hartig*, 274 Va. 219, 229-30, 645 S.E.2d 303, 309 (2007).  As another judge of this Court has previously made clear, "if the sources of the fodder for the defamatory statements appeared reliable and defendant did not seriously doubt the veracity of the information, the actual malice standard would not be satisfied."  *Hatfill v. N.Y. Times Co.*, 488 F. Supp. 2d 522, 531 (E.D.Va. 2007), *aff'd*, 532 F.3d 312 (4th Cir. 2008).  Simply put, "[f]ailure to investigate does not in itself establish bad faith," *St. Amant*, 390 U.S. at 733, and Fairfax does not allege—nor could he—that the persons responsible for the challenged broadcast had any "apparent reason to question the truthfulness" of the accusations apart from Fairfax's own denials.  *See Reuber*, 925. F.2d at 716.

The Court could stop here, but, if it continued to the next step in a plausibility analysis, it would find that many of Fairfax's allegations regarding a failure to investigate are deficient and

may be ignored because they are conclusory or alleged only upon information and belief—and some are both conclusory *and* only upon information and belief, Am. Comp. ¶¶ 123, 137, 181.

### 1.   Allegations specific to Tyson

As to Tyson, Fairfax alleges "[u]pon information and belief" that CBS failed to "seek to interview relevant witnesses," *id.* ¶ 166, and that "[u]pon information and belief," CBS was aware that the *Washington Post* had previously investigated her claim and initially decided not to publish her allegations, *id.* ¶ 167.   But even crediting these "information and belief" allegations, Fairfax cannot meet his burden of plausibly pleading actual malice.   Knowledge of the prior *Post* article does not demonstrate actual malice.   For one thing, one reason given by the *Post* for initially declining to publish Tyson's allegations was that its reporter at that time had "found no similar complaints of sexual misconduct against him."   Kelley Decl. Ex. 23 at 5.   That changed, however, when Watson made her allegations—long before CBS aired the challenged interviews. For another, the *Post* itself has put the lie to Fairfax's contention that it found inconsistencies in Tyson's account, and it did so months before the broadcasts at issue.   *Id.* at 4.

In an attempt to show CBS had good reason to doubt Tyson's veracity, Fairfax alleges that CBS failed to take notice of "important inconsistencies" between Tyson's interview with CBS and her other public statements.   Am. Comp. ¶¶ 171-76.   But for the Court to properly draw this inference, it must be reasonable, *see Iqbal*, 556 U.S. at 678, and the examples Fairfax cites are neither important nor inconsistencies.   For example, Fairfax makes much of the fact that Tyson variously described his either "pulling" or "guiding" her to the bed, Am. Comp. ¶ 173, a subjective choice of adjectives that, even if it were relevant, is not so glaring as to trigger any duty to investigate further.   More deceptively, Fairfax points to Tyson's statements in the interview that "my neck didn't work" as indicating she had a physical problem with her neck, which he says is inconsistent with her earlier claim that he had used his strength to shove her

head toward his crotch.  *Id.* ¶ 174.  This contention elides both the fact that Tyson said "it was *like* my neck didn't work," and the fact that, as Tyson is describing this, she grabs the back of her neck with her hand, demonstrating her contention that the reason she felt like her neck didn't work was because Fairfax was forcing her head down with his hand.  Kelley Decl. Ex. 3. Further, the *Post* had reported that, in her 2017 interviews with the newspaper, she similarly described feeling like her neck didn't work.  *Id.* Ex. 23 at 4.

Fairfax also contends it was inconsistent for Tyson to have said she would only make one public statement and that she wanted to "return to her private life," but then to grant an interview to CBS.  Am. Comp. ¶¶ 175-76.  But all it takes is common sense to understand that she might change her mind about giving interviews when she is caught up in a public controversy in which she is personally attacked, and certainly such a change of heart is no reason for a journalist to suspect that a source intends to lie.

Given Fairfax's failure to allege any facts that plausibly would support a finding, by clear and convincing evidence, that CBS had any specific reason other than his own denials to doubt Tyson's veracity, whether CBS did or did not interview "relevant witnesses" (whomever that may be) cannot serve as proof of actual malice.  And, with respect to Tyson, Fairfax fails to identify any such "witnesses," other than, "[u]pon information and belief, a fellow campaign staffer" who shared the room but "was not present during this sexual encounter," *id.* ¶ 39, and "[u]pon information and belief" "campaign staff and security personnel" who would have been on the same floor as Fairfax's hotel room on the night of the incident.  *Id*. ¶ 45.  Fairfax never alleges on what basis the responsible CBS personnel would have been aware of these "witnesses," although it is also self-evident that none could have firsthand knowledge of the encounter in any event.  In short, these allegations do not come close to a plausible suggestion that CBS published "material of obviously doubtful veracity."  *See Ryan v. Brooks*, 634 F.2d

726, 733 (4th Cir. 1980).

### 2.   Allegations specific to Watson

As to Watson, although CBS assumed no duty to investigate her allegations, the Amended Complaint itself demonstrates that CBS *did*, in fact, investigate.  Fairfax pleads that his spokeswoman contacted CBS reporter Ed O'Keefe on February 8, 2019 – nearly two months before CBS aired the interviews – and urged him to contact four people who attended Duke, presumably at the same time as Fairfax and Watson.  Am. Comp. ¶ 107.

Included in the list of potential sources in the exchange of text messages was the CBS Corporation lawyer referenced in the Amended Complaint.  *Id*.  Fairfax attempts to make much of this connection in a series of conclusory allegations about the CBS Corporation lawyer's purported status within CBS, the purported ability of the personnel responsible for the challenged interviews to contact him, the knowledge of the incident purportedly possessed by the CBS Corporation lawyer, and the purported significance of any failure by CBS News reporters to speak with him.  *Id*. ¶¶ 110-112; 138.  None of these conclusory assertions survive reasonable scrutiny.

First, as is evident on the face of the Amended Complaint, O'Keefe and his reporting team *did* contact the people listed by the spokeswoman; they did not respond; and O'Keefe encouraged the spokeswoman to "[u]rge them to call back."  *Id*. ¶ 107.  As the Fourth Circuit has held, contacting potential witnesses constitutes a further investigation that *negates* an inference of actual malice, whether or not such witnesses respond.  *Hugger v. Rutherford Inst.*, 94 F. App'x 162, 167 (4th Cir. 2004).  CBS's actions are "not those of one acting with reckless disregard for the truth."  *Id*.  Fairfax's attempt to hold CBS liable for the failure of potential sources to respond to reporters' questions turns the concept of actual malice on its head.

Second, Fairfax concedes, as he must, that the CBS Corporation lawyer graduated one

year *before* the alleged rape occurred, meaning he had no firsthand information about the incident.  Am. Comp. ¶ 98.

Third, Fairfax does not even attempt to allege that the CBS Corporation lawyer was in any way involved with producing the interview with Watson, reviewed the broadcast before it aired, or even that he is an employee of CBS News (nor could Fairfax so allege—indeed, he correctly pleads that CBS News is a division of CBS Broadcasting Inc., *id.* ¶ 17).  Rather, Fairfax alleges only generally that the CBS Corporation lawyer "focuses on litigation matters, including defamation."  *Id.* ¶ 97.  That attorney, as is the case with any potential source, was not obligated to speak to the CBS News reporters responsible for the story, and based on O'Keefe's text message as pleaded by Fairfax, chose not to do so.  *Id.*  ¶ 107.

Fourth, even assuming the CBS Corporation lawyer possessed any secondhand knowledge of the alleged rape, such knowledge cannot be imputed to those CBS News employees responsible for the challenged broadcasts as a matter of law.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 287 (1964).

Finally, and most importantly, Fairfax's contentions regarding the CBS Corporation lawyer all depend on his assertion that the lawyer had knowledge of the "eyewitness" allegedly present during Fairfax's sexual encounter with Watson.  *Id.* ¶¶ 110-12, 127, 138-39, 147-48.  But Fairfax himself obviously was aware of the alleged presence of the eyewitness and he concedes that neither he nor his spokeswoman told CBS about the eyewitness prior to the challenged broadcasts.  Indeed, in Fairfax's Amended Complaint, he calls Watson's failure to mention the "eyewitness" a "lie[] by omission."  *Id.* ¶ 93.  At the very least, this characterization reflects directly on Fairfax as it begs the question why he did not mention the "eyewitness" in any of his many public statements about the allegations between February and the CBS broadcasts in April, including during his 11-minute press conference allegedly setting out *all* the relevant facts

surrounding his encounter with Watson, which CBS News made available to the public in its

entirety.  Kelley Decl. Ex. 37.  Indeed, at no time prior to the release of his lawyer's letter on

July 9, Am. Comp. ¶¶ 127, 183, did Fairfax either publicly, or directly to CBS, divulge the

presence of an alleged "eyewitness," and to date, Fairfax has yet to disclose publicly or to CBS

this person's name.  Simply put, no duty to investigate can attach to an alleged "eyewitness" the

existence of whom Fairfax *himself* actively withheld from CBS and the public.  Such behavior,

in Fairfax's own words, constitutes a "lie[] by omission," a lie that CBS had no duty, let alone

ability, to investigate.  Am. Comp. ¶ 93.[9]

### 3. The effect of having two sources

CBS had even less reason to doubt the veracity of either Tyson's or Watson's claims

precisely because two sources had publicly made similar allegations against Fairfax.  *See CACI

Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 295-96 (4th Cir. 2008) (talk show host's reliance on

military investigations and media reports detailing similar allegations of misconduct negated

inference of actual malice).  Fairfax pleads no facts to suggest that Tyson and Watson know each

other or coordinated disclosing their allegations of sexual assault, and they both told King they

had never met.  *See* Kelley Decl. Exs. 6 at 2 & 13 at 1.  Rather, each woman's story begins with

a seemingly friendly invitation to join Fairfax in a private room and progresses to descriptions of

what even Fairfax admits were specific sexual acts that took place, but which each of the two

women allege became non-consensual assaults.  Both women also said they had told Fairfax that

---

[9] Fairfax also alleges that CBS had a duty to investigate Watson's story because Watson had previously accused a Duke athlete of raping her and, despite her claim to the contrary, Duke University allegedly "denied knowing about the supposed rape."  Am. Comp. ¶¶ 150-51.  Such allegations are entirely irrelevant to whether CBS had reason to doubt Ms. Watson's allegations *against Fairfax*, and in no case does this assertion come close to establishing actual malice.  Moreover, there is an obvious alternative explanation for the supposed lack of any record of a 20-year-old rape claim: that the Duke official to whom Watson complained either never made any record of her complaint or made a record that no longer exists.

they were survivors of previous sexual assaults.  Kelley Decl. Exs. 4 at 6 & 11 at 4.  These

similarities lend credibility to both women's allegations. And, in any event, CBS was not

obligated to accept Fairfax's denials as "the truth."  "Of course, the press need not accept

'denials, however vehement; such denials are so commonplace in the world of polemical charge

and countercharge that, in themselves, they hardly alert the conscientious reporter to the

likelihood of error.'" *Harte-Hanks*, 491 U.S. at 691 n.37 (citation omitted).

### B.      Other Alleged Indicia Of Actual Malice

Beyond his demonstrably flawed premise that CBS's purported "failure to investigate"

constitutes a plausible allegation of actual malice, Fairfax intones a familiar litany of conclusory

and legally insufficient "circumstantial" allegations that he claims support his contention that

CBS broadcast information it knew to be probably false—specifically, that it failed to follow

basic journalistic standards, that it had a political of economic motive to fabricate, that it

followed a pre-conceived narrative, and that it failed to retract its false allegations.  None of

these contentions, either individually or collectively, survive reasonable scrutiny.

### 1.      CBS's purported violation of journalistic standards

In another version of his argument that actual malice can be proven by showing that CBS

failed to investigate, Fairfax alleges in conclusory fashion that CBS violated "basic journalistic

standards," asserting that, because of "the sensational and highly damaging accusations made by

Tyson and Watson against Fairfax, basic journalistic standards required CBS to investigate these

serious allegations before airing them," and that this "breach of standards" is evidence of actual

malice.  *Id*. ¶ 135.  Fairfax is once again wrong on both the law, and on whether he has alleged

"facts" that would support his contention in any event.

First, it is well settled that, while a failure to meet journalistic standards can serve as

"supportive evidence" in a public-figure defamation case, such cases are nevertheless controlled

by *Sullivan*'s subjective standard and, as a result, a "departure from accepted [journalistic] standards alone does not constitute actual malice." *Reuber*, 925 F.2d at 711-12 (citing *Harte-Hanks*, 491 U.S. at 665 ("a public figure plaintiff must prove more than an extreme departure from professional standards")).

Second, it is equally well settled that "the falsity of charges cannot be equated with their seriousness," and "the *New York Times* rule is not to be suddenly suspended for a news organization whenever the stakes run high.  If that were the case, the vitality of debate would suffer at the point when the need for information and illumination was uppermost." *Reuber*, 925 F.2d at 715.  In other words, an alleged "failure to protect reputation cannot alone constitute actual malice, for indeed it is inescapable to public controversy that reputations are at risk." *Id.*

Third, the few additional "facts" Fairfax alleges to support this variation on his theory also fail to establish any departure from journalistic standards – and in significant respects, the "facts" are undermined by additional material in the Amended Complaint.  For example, Fairfax alleges that CBS failed to alert him that it was interviewing Tyson and Watson and "failed to ask basic questions" of the women.  Am. Comp. ¶¶ 118, 122, 136.  Regardless of whether CBS alerted Fairfax to the interviews, declining to contact the subject of a story is not evidence of actual malice. *See, e.g.*, *MacFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510-11 (D.C. Cir. 1996) (no actual malice where defendant "fail[ed] to contact [plaintiff] himself about allegations).  More to the point, CBS in fact provided to Fairfax ample opportunity to share his side of the story:  Each of the challenged broadcasts detailed his denials; CBS covered his press conferences and public statements; and CBS even asked to interview Fairfax—a request that he declined.  As his own pleading also makes clear, "CBS reporting staff . . . were in regular touch with Fairfax's spokesperson and were highly responsive to her outreach."  Am. Comp. ¶ 189.

Finally, Fairfax's contention that CBS failed to put "basic questions" to the women is

31

undercut by his own admission that he does not know whether or not CBS asked such questions, *id.* ¶ 143, and is belied both by the broadcast interviews themselves, which reveal that King in fact asked probing and often difficult questions of both of them, *see, e.g., supra* at 7, 11 (citing broadcasts), and, in Watson's case, by Fairfax's own failure to alert CBS to the alleged "eyewitness," knowledge of whose existence is the basis for his contention that King failed to ask her "basic" questions and is a substantial basis for this lawsuit. Am. Comp. ¶¶ 140-46. Once again, CBS cannot be held to have violated "basic journalistic standards" when Fairfax himself affirmatively withheld from its journalists information he now faults them for failing to discover.

### 2. CBS's alleged political or economic motives

Fairfax alleges that CBS chose to promote and broadcast its interviews of Tyson and Watson in order to "establish its #MeToo bona fides and to derive corporate profits at Fairfax's expense," Am. Comp. ¶ 114; *see also id.* ¶¶ 179, 180; to "maximize ratings for CBS;" and to ensure "considerable" damage to Fairfax, *id*. ¶ 177, *see also id.* ¶¶ 119, 177-80, 188.

First, the Court should disregard all of Fairfax's allegations regarding CBS's motives because, as the Supreme Court has made clear, a news organization's "motive in publishing a story – whether to promote an opponent's candidacy or to increase its circulation – cannot provide a sufficient basis for finding actual malice." *Harte-Hanks*, 491 U.S. at 665; *see also Reuber*, 925 F.2d at 716 ("[E]vidence of a defendant [publishing] material to increase its profits does not suffice to prove actual malice.").

Second, even if allegations regarding motive could establish actual malice, Fairfax fails plausibly to plead any. His allegations in this regard are not entitled to the assumption of truth because they are conclusory assertions rather than properly pleaded facts. *Iqbal*, 556 U.S. at 679. For example, the *sole* fact offered to support the otherwise wholly conclusory contention that CBS was trying to burnish its #MeToo credentials by reporting on these issues is that two high-

profile men at CBS lost their jobs due to misconduct.  Am. Comp. ¶¶ 113-14.

Third, Fairfax does not allege any facts that would establish that those persons actually *responsible for* reporting and producing the broadcasts had any such motive.  *See id.* ¶¶ 8, 113-114.  As courts have repeatedly held, the relevant inquiry must focus on the subjective belief of those specific persons *responsible* for the challenged story at the time of its publication.  *See, e.g.*, *Sullivan*, 376 U.S. at 287 ("the state of mind required for actual malice would have been brought home to the persons in the Times' organization having responsibility for the publication").  Any alleged motives of CBS Broadcasting Inc. as a corporate entity – or of any its employees other than those responsible for the interviews as broadcast – are legally irrelevant.  And Fairfax does not even attempt to allege that any CBS News employee responsible for the broadcast harbored any improper motive.

Finally, all apart from these other flaws, Fairfax's arguments regarding motive fail because there is an obvious alternative explanation as to why CBS would air these interviews.  *See Iqbal*, 556 U.S. at 681 (when allegations are subject to "more likely explanations, they do not plausibly establish" state of mind).  The allegations against Fairfax had for two months been the subject of extensive, national debate and even the Virginia legislature was wrestling with how to respond to those allegations.  Put simply, CBS is in the business of reporting such news to the public.  The fact that CBS promoted the interviews before they aired proves nothing other than the fact that CBS considered the interviews highly newsworthy.

### 3.  CBS's alleged preconceived narrative

Fairfax also alleges that CBS embraced a preconceived narrative that he was guilty of assaulting Tyson and Watson and that CBS News shaped its reporting and interviews to fit that narrative.  Am. Comp. ¶¶ 121-34.  Again, his allegations fail at the first step of the required analysis because "allegedly having a pre-conceived story line is not sufficient to demonstrate

actual malice." *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 312 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016).

Even if a preconceived narrative could demonstrate actual malice, Fairfax's allegations still fall short because he relies on conclusory assertions made "on information and belief." *See, e.g.*, Am. Comp. ¶ 121 (pleading "[u]pon information and belief," CBS intended to convey that "Fairfax had sexually assaulted Tyson and Watson," and "upon information and belief, the CBS team took steps to ensure that the interviews that were aired fit that preconceived narrative in several ways."). The "naked assertions" Fairfax has offered to support his contention cannot suffice plausibly to plead this element of his claim. *Iqbal*, 556 U.S. at 678.

Indeed, the only non-conclusory "fact" Fairfax alleges to establish that CBS acted on the basis of a preconceived narrative with respect to broadcasting Tyson's interview is that CBS "edited" it. Am. Comp. ¶125. But in the same paragraph, Fairfax concedes that "[i]t is not yet known" whether the editing was used to fit the alleged preconceived narrative. *Id.* Speculation is not fact. And the fact that an interview was edited, which is a necessary staple of television broadcasting, is not evidence of actual malice. *Masson*, 501 U.S. at 515 (noting "practical necessity to edit and make intelligible" speaker's comments).

Nor does Fairfax fare better when attempting to allege a preconceived narrative as to Watson. Fairfax alleges not only that CBS edited her interview, which for the reason just noted is not evidence of actual malice, but also that it conducted a "pre-interview" of her, which Fairfax speculates was done to ensure that her answers would fit the preconceived narrative. Am. Comp. ¶¶ 124-25. Although Fairfax characterizes this pre-interview as "unusual," it is in fact a common practice in broadcast journalism, which allows journalists to gain insight into the interview subject, gauge her credibility, and uncover inconsistencies in her account of events. *See, e.g.*, *Fox Entm't Grp., Inc. v. Abdel-Hafiz*, 240 S.W.3d 524, 545-46 (Tex. App. 2007) (Fox

News journalist described his duties: "You'd look for stories, get them approved, find the appropriate guest, do a pre interview, get pertinent background information, factual information."); Bram Weinstein, *The Gift of the Pre-Interview*, REEL MEDIA GRP. (Mar. 14, 2016), https://reelmediagroup.com/the-gift-of-the-pre-interview/ (advising broadcast journalists that pre-interview "is your opportunity to vet the right information").  In the upside-down world Fairfax envisions, an interview would be recorded without the reporter first speaking with the subject and assessing their credibility, and no interview could be edited for length or relevancy.

### 4.      CBS's alleged post-broadcast conduct

Fairfax devotes significant effort to pleading purported post-broadcast conduct by CBS that he alleges establishes actual malice.  But it is black-letter law that actual malice is measured at the time of publication, *see Horne*, 893 F.3d at 211, and post-publication events are therefore irrelevant to the inquiry.  Thus, failing to retract an allegedly defamatory publication is not probative of actual malice.  *See Sullivan*, 376 U.S. at 286.  Further, it is well settled that, under the "single publication rule" followed in Virginia for mass media publications such as the challenged broadcasts, *see Semida v. Rice*, 863 F.2d 1156, 1161 & n.2 (4th Cir. 1988), a defamation claim (and thus the point at which to assess actual malice) is complete on the day of first publication and is not re-triggered by continuing to make it available online, *see, e.g.*, *Pippen v. NBCUniversal Media, LLC*, 734, F.3d 610, 614-15 (7th Cir. 2013) (failing to remove allegedly defamatory articles from website is not evidence of actual malice); *see also Klayman v. City Pages*, 650 F. App'x 744, 751 (11th Cir. 2016) (*per curiam*) (unpublished) ("mere refusal to correct [an internet] publication falls short" of actual malice (citing *Sullivan*, 376 U.S. at 286)).

Fairfax attempts to evade this settled principle by pleading that CBS's use of an "embed code" on the website versions of the interviews means that CBS "explicitly authorizes the republication of its stories on third-party websites." Am. Comp. ¶ 200.  But all an embed code

does is provide to a third-party website a way to act as a conduit for its audience to see content actually located on the servers for the original website. *See, e.g. Flava Works, Inc. v. Gunter*, 689 F.3d 754, 756 (7th Cir. 2012) (explaining how embed codes work). In other words, an embed code is simply an additional way to *distribute* existing online content; use of such a code does not constitute a new publication of that content. Thus, the Seventh Circuit has held that a service allowing users to view pirated videos via the use of embed codes did not infringe the distribution rights of the videos' copyright holders. *Id.* at 757-58. Fairfax concedes that the other "sharing buttons" on CBS News's website simply allow users to share CBS content via Twitter, Facebook and email, Am. Comp. ¶ 193, which are similarly technological means of distribution that courts have uniformly held do not constitute republications. *See, e.g.*, *In re Phila. Newspapers, LLC*, 690 F.3d 161, 174-75 (3d Cir. 2012) (collecting cases).

Fairfax's other allegations regarding post-broadcast conduct are either conclusory, demonstrably false, or both. For example, Fairfax alleges that evidence of actual malice includes CBS's alleged failure to report on his June 12 call for criminal investigations into Tyson's and Watson's allegations. Am. Comp. ¶¶ 182, 185. But the Court may take judicial notice that this allegation is false: CBS reported his call for a criminal investigation the very next day. Kelley Decl. Ex. 40 (copy of report). He also alleges that CBS's failure to update its reporting to include Fairfax's July 9 disclosure of an alleged "eyewitness" to the Watson incident is evidence of actual malice, Am. Comp. ¶¶ 183-91, but to this day Fairfax has not identified any such person.[10]

---

[10] It appears that Fairfax also is attempting to allege that the comments made by CBS journalists on-air to each other following broadcast of the interviews is evidence that these journalists knew Tyson and Watson were lying. *See* Am. Comp. ¶¶ 159-61, 169-70. Fairfax, for example, alleges that King's description of Watson's allegations as "disturbing" was "vouching for the truthfulness of them" and that CBS journalists further "improperly vouched for the credibility of Watson's story" and "were intending to corroborate the truth of Watson's allegation against

\*       \*       \*

CBS began reporting this story nearly two months before it broadcast the interviews with Tyson and Watson that form the basis of this Complaint.  During those months, CBS repeatedly offered to Fairfax a platform on which to tell his side of the story and made efforts throughout this time to interview him regarding the allegations, as well as reaching out to other potential sources, including those actually identified by Fairfax, regarding Tyson's and Watson's allegations.  This journalistic effort is the antithesis of actual malice.  The Amended Complaint fails to establish "more than [at best] a sheer possibility that" CBS broadcast the interviews either knowing or believing it likely that the accusations were false.  *Iqbal*, 556 U.S. at 678.  Because Fairfax has "not nudged [his] claims across the line from conceivable to plausible" as to this essential element, and it is clear that no amendment would cure this defect, the Court should dismiss Count I of the Amended Complaint with prejudice.  *See Twombly*, 550 U.S. at 570.

## III.   CBS IS IMMUNE FROM LIABILITY FOR DEFAMATION FOR THE BROADCASTS UNDER VIRGINIA'S IMMUNITY STATUTE

Virginia's anti-SLAPP statute provides immunity to those exercising their right to speak on matters of public concern in circumstances like those presented here:

---

Fairfax."  *Id.*  Fairfax alleges that CBS journalists similarly vouched for Tyson's credibility.  *Id.* ¶¶ 169-70.  For the reasons set forth in Section I *supra*, these sympathetic comments cannot reasonably be understood as the journalists endorsing the truth of the allegations that Fairfax forcibly committed sodomy and intercourse with the two women.  But, at a minimum, it is the epitome of illogic to contend that a profession of sympathy for the accusers is evidence that the journalist *believes the accusers are lying*.  Had King instead said, "You know, I don't believe Ms. Watson," Fairfax might have a point about actual malice.  In this regard, it bears emphasis that Fairfax, in his February 6 statement regarding Tyson's accusations, acknowledged her pain, and "encourage[d] the media … to treat both the woman who made this allegation and [his] family with respect for how painful this situation can be for everyone involved," and stated that he did not "seek to denigrate her or diminish her voice."  Kelley Decl. Ex. 28.  And in his April 3 press conference about both women's allegations, Fairfax again emphasized that "anyone willing to come forward with allegations of sexual misconduct should be heard fairly and fully, taken seriously, and treated respectfully."  Kelley Decl. Ex. 37.  Fairfax cannot be heard to complain that CBS did precisely what he asked the media to do.

> A.      A person shall be immune from civil liability for . . . a
> claim of defamation based solely on statements . . . regarding
> matters of public concern that would be protected under the First
> Amendment to the United States Constitution made by that person
> that are communicated to a third party . . . . The immunity
> provided by this section shall not apply to any statements made
> with actual or constructive knowledge that they are false or with
> reckless disregard for whether they are false.

Va. Code § 8.01-223.2 (2017).  The statute reflects the General Assembly's strong support for

free speech on matters of public concern.  It also reflects the sound public policy that the courts

should dismiss baseless lawsuits attacking freedom of expression—such as this one—swiftly.

It is beyond question that the broadcasts at issue relate to a "matter of public concern"

and were communicated by CBS to third parties.  For the reasons set forth above in Sections I

and II, the broadcasts at issue are protected by the First Amendment.  CBS therefore is immune

from liability at the outset unless Fairfax has alleged facts that, if proven, would establish that the

statements were "made with actual or constructive knowledge that they are false or with reckless

disregard for whether they are false," Va. Code § 8.01-223.2(A)—that is, unless Fairfax has

adequately pleaded "actual malice," *Sullivan*, 376 U.S. at 280 (defining "actual malice" as

publishing with "knowledge that [the publication] was false or with reckless disregard of

whether it was false or not").  For the reasons stated in Section II above, Fairfax has failed to and

cannot adequately plead actual malice.  Therefore, CBS also is immune from his defamation

claim pursuant to Section 223.2, and the Court should dismiss Count I of the Amended

Complaint for this additional and independent substantive reason.[11]

## IV.     FAIRFAX'S IIED CLAIM ALSO FAILS AS A MATTER OF LAW

Fairfax's tag-along claim in Count II for intentional infliction of emotional distress also

---

[11] CBS has filed a separate motion for an award of its attorney's fees under the statute. Va. Code
§ 8.01-223.2(B).

should be dismissed with prejudice, for at least three reasons.  First, it is black-letter law that a public official cannot evade the strictures of the First Amendment by dressing up a defamation claim as some other tort.  *E.g.*, *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (plaintiff cannot "recover defamation-type damages under non-reputational tort claims, without satisfying the stricter [First Amendment] standards of a defamation claim").  Specifically, a public official or public figure cannot make out an IIED claim based on speech without proving a false statement of fact made with constitutional actual malice.  *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).  Fairfax cannot clear this hurdle for all of the reasons set forth above.

But, even if the First Amendment did not bar the claim, Fairfax has failed adequately to plead two of the common-law elements of the claim—that CBS's conduct was "outrageous and intolerable," and that it caused the plaintiff to suffer "severe" emotional distress.  *Harris v. Kreutzer*, 271 Va. 188, 203, 624 S.E.2d 24, 33 (2006).  For the Court to make the required threshold determination that the alleged conduct is sufficiently "outrageous," it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* 271 Va. at 204, 624 S.E.2d at 33-34 (citation omitted).  Broadcasting newsworthy allegations of wrongdoing by an elected official is a far cry from utterly intolerable.  *See Fields v. Sprint Corp.*, No. 3:16cv905 (MHL), 2017 U.S. Dist. LEXIS 147654, at *11-12 (E.D. Va. May 11, 2017) (false accusation of theft does not constitute "outrageous" conduct); *see also, e.g.*, *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1222-23 (10th Cir. 2007) (holding – and citing other cases so holding – that news reporting generally "does not give rise to a cause of action for intentional infliction of emotional distress" (citation omitted)).

Regarding emotional harm, Fairfax pleads only that "[a]s a result of Defendants' making

and airing false allegations, Fairfax has suffered severe emotional distress."  Am. Comp. ¶ 228.
Such boilerplate is the kind of conclusory pleading foreclosed by *Iqbal* and *Twombly*, as well as
Virginia law, which requires a showing of distress "so severe that no reasonable person could be
expected to endure it."  *Harris*, 271 Va. at 204-05, 624 S.E.2d at 34 (citation omitted).

Accordingly, Count II of the Amended Complaint for IIED also should be dismissed.

## V.      CBS CORPORATION IS NOT A PROPER DEFENDANT IN ANY EVENT

Even if the Court were to disagree with all of the foregoing, CBS Corporation should be
dismissed with prejudice as a defendant for either of two additional reasons:  First, Fairfax fails
to plead a single purported fact that would indicate it is liable for the content of the broadcasts at
issue (nor could he).  To the contrary, Fairfax concedes, as he must, that CBS Corporation
neither owns nor operates the CBS Television Network, which broadcasts *CBS This Morning*.
Am. Comp. ¶ 17.  Instead, he correctly pleads that *CBS This Morning* is "produced by CBS
News, a division of CBS Broadcasting Inc." *Id*.  He does not event attempt to plead facts that
would permit "piercing the corporate veil" to hold the parent corporation liable for acts of its
wholly-owned subsidiary. *See, e.g.*, *Hamilton v. Boddie-Noell Enters.*, 88 F. Supp. 3d 588, 591
(W.D. Va. 2015).  Second, and not surprisingly, Fairfax has failed to plead any facts (conclusory
of otherwise) that would support a finding that CBS Corporation acted with actual malice. *E.g.*,
*AdvanFort*, 2015 U.S. Dist. LEXIS 99208, at *16-17 (actual malice state of mind "cannot be
imputed from one defendant to another absent an employer-employee relationship" (citation
omitted)).  Fairfax for these reasons cannot pursue any claim against CBS Corporation.

## CONCLUSION

WHEREFORE, Defendants respectfully request that the Court grant this motion and
enter an order dismissing Plaintiff's Amended Complaint with prejudice.

Dated:  November 1, 2019

Respectfully submitted,

BALLARD SPAHR LLP


By  /s/ Matthew E. Kelley
    Jay Ward Brown, Va. Bar No. 34355
    Matthew E. Kelley, Va. Bar No. 84045
1909 K Street NW, 12th Floor
Washington, DC  20006-1157
Phone: 202-661-2200; Fax: 202-661-2299
brownjay@ballardspahr.com
kelleym@ballardspahr.com

*Counsel for Defendants CBS Corporation
and CBS Broadcasting Inc.*

## CERTIFICATE OF SERVICE

I certify that on November 1, 2019, I caused a true and correct copy of the foregoing to be filed electronically with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all interested parties.

 /s/ Matthew E. Kelley
Matthew E. Kelley, Va. Bar No. 84045
Ballard Spahr LLP
1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Phone: 202-661-2200
Fax: 202-661-2299
kelleym@ballardspahr.com

*Counsel for Defendants CBS Corporation
and CBS Broadcasting Inc.*