## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| JUSTIN E. FAIRFAX | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-01176-AJT-MSN |
| | ) | |
| CBS CORPORATION, and | ) | |
| CBS BROADCASTING INC. | ) | |
| | ) | |
| *Defendants.* | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Sara E. Kropf (VSB #84931)
Daniel M. Portnov (*admitted pro hac vice*)
KROPF MOSELEY PLLC
1100 H Street, NW, Suite 1220
Washington, DC 20005
(202) 627-6900
sara@kmlawfirm.com
dan@kmlawfirm.com

*Counsel for Plaintiff Justin E. Fairfax*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………… iii

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ........................................................................................................3

I.    THE STATEMENTS MADE IN WATSON'S AND TYSON'S
      INTERVIEWS ON *CBS THIS MORNING* CONVEY A
      DEFAMATORY MEANING AND ARE DEFAMATORY
      *PER SE* AND BY IMPLICATION.......................................................3

      **A.** Fairfax Has Sufficiently Alleged That Statements Published by
      Defendants Actually Defame Him ................................................3

      **B.** Virginia Has Never Adopted the Neutral Reportage Doctrine and,
      In Any Event, It Cannot Protect Defendants' Conduct Here....................7

II.   FAIRFAX HAS ADEQUATELY PLED ACTUAL MALICE ........................10

      *A.* The Actual Malice Pleading Standard.........................................10

      B.  Contrary to Defendants' Argument, Actual Malice Can Be Pled
      Through "Cumulation" ...............................................................11

      C.  Taken as A Whole, Fairfax Adequately Pleads Actual Malice ...............16

          *1.* Defendants' Duty to Investigate ...........................................16

          *2.* Defendants' Reliance on a Sole, Unreliable Source ............................17

          *3.* Defendants' Violation of Journalistic Standards..................................19

          *4.* Defendants Had a Public Relations Motive ...........................................20

          *5.* Defendants Had a Preconceived Narrative ...........................................21

          *6.* Defendants' Post Publication Conduct is Relevant and
          Supports a Claim of Actual Malice .......................................................22

III.  DEFENDANTS IMPROPERLY OFFER FACTS AND EXHIBITS
      OUTSIDE OF THE COMPLAINT'S ALLEGATIONS ..................................24

IV.    **THERE IS NO IMMUNITY UNDER VIRGINIA STATUTORY LAW FOR DEFENDANTS' PUBLICATIONS**...............................................28

V.    **FAIRFAX HAS SUFFICIENTLY PLED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**....................28

VI.    **CBS CORPORATION IS A PROPER DEFENDANT IN THIS ACTION**...............................................................................................32

**CONCLUSION** ............................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Advanfort Co. v. International Registries, Inc.,* No. 1:15-cv-220, 2015 WL 2238076
(E.D. Va. May 12, 2015)..................................................................................................27, 28

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015)..................................................................14, 17

*Carwile v. Richmond Newspapers, Inc.,* 196 Va. 1 (1954).....................................................4, 5, 6

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)....................................................3, 8

*Cianci v. New Times Pub. Co.*, 639 F.2d 54 (2d Cir. 1980) .........................................................8, 9

*Corinthian Mortgage Corp v. ChoicePoint Precision*, No. 1:07cv832 (JCC),
2008 WL 11374386 (E.D. Va. April 4, 2008) ..................................................................26

*Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882 (Ky. 1981).......................................8

*Daniczek v. Spencer*, 156 F. Supp. 3d 739 (E.D. Va. 2016)....................................................30, 31

*E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435 (4th Cir. 2011)...........26

*Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862 (W.D. Va. 2016).................................. passim

*Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009) ...................................21

*Fields v. Sprint Corp.*, No.3:16-cv-905 (MHL), 2017 WL 4053761,
(E.D. Va. May 11, 2017)..............................................................................................31, 32

*Food Lion, Inc.* v. *Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999) ...........................28, 29

*Gasner v. County of Dinwiddie*, 162 F.R.D. 280 (E.D. Va. 1995) ...............................................26

*Gilmore v. Jones*, 370 F. Supp. 3d 630 (W.D. Va. 2019)...........................................14, 15, 16, 21

*Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2nd 944
(5th Cir. 1983)..................................................................................................................23

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969)..................................................................15

*Harris v. Kreutzer*, 271 Va. 188 (2006)................................................................................29, 30

*Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657 (1989) ...............8, 12, 15, 20

*Hatfill v. New York Times Co.*, 416 F.3d 320 (4th Cir. 2005) ..................................................4, 10

*Herbert v. Lando*, 441 U.S. 153 (1979) ..........................................................................................12

*Horne v. WTVR, LLC*, Civ. No. 3:16-cv-000092-JAG, 2017 WL 1330200
(E.D. Va. Apr. 6, 2017)......................................................................................................................6

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) .........................................................................29

*Kostenko v. CBS Evening News, et. al.*, Civ. No. 5:16-cv-05326 (S.D.W.Va.)............................32

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369 (4th Cir. 2012)...............10

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)....................................................................22, 23

*Norton v. Glenn*, 580 Pa. 212 (2004) ...............................................................................................7

*Ocean State Seafood, Inc. v. Capital Newspaper, Div. of Hearst Corp.*,
492 N.Y.S.2d 175 (1985) ..................................................................................................................9

*Pendleton v. Newsome*, 290 Va. 162 (2015) ................................................................................4, 5

*Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408 (6th Cir. 1991) ...............................................12

*Phi Kappa Psi v. Rolling Stone, et al.*, No. CL 15-479, 2016 WL 11575140
(Va. Cir. Ct. Aug. 31, 2016) ..............................................................................................................4

*Reuber v. Food Chem. News, Inc.*, 925 F.2d 703 (4th Cir. 1991)...................................................19

*Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277 (1987) .....................................................11

*Schaecher v. Bouffault*, 290 Va. 83 (2015) ......................................................................................4

*Spirito v. Peninsula Airport Commission*, 350 F.3d 471 (E.D. Va. 2018) ......................12, 21, 27

*Tavoulareas v. Piro*, 763 F.2d 1472 (D.C. Cir. 1985) .........................................12, 15, 20, 22, 23

*Tharpe v. Lawidjaja*, 8 F.Supp.3d 743 (W.D. Va. 2014)...............................................................30

*Tucker v. Fischbein*, 237 F.3d 275 (3d Cir. 2001) .........................................................................11

*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996)....................................................................12

*Weaver v. Beneficial Finance Co.*, 199 Va. 196 (1957) .................................................................22

*Webb v. Virginian-Pilot Media Companies, LLC*, 287 Va. 84 (2014)................................3, 4, 6, 7

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999)...............................................................................18

*Womack v. Eldridge*, 215 Va. 338 (1974)...................................................................................30

**Statutes**

Va. Code § 8.01-223.2 ...............................................................................................................28

**Treatises**

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* (5th Ed. 2017)........6

## PRELIMINARY STATEMENT

CBS aired two interviews in April 2019 accusing Justin Fairfax of committing sexual assault and rape. Apart from conducting a pre-interview of the accusers themselves, CBS conducted little or no investigation of these allegations of serious crimes that supposedly occurred 15 and 19 years ago, respectively. CBS chose instead to air the interviews at the precise moment that Fairfax's accusers were seeking to block him from potentially being elevated to Virginia's governorship and force him to resign as Lieutenant Governor by pressuring the Virginia General Assembly to hold public hearings about their allegations – public hearings that would have amounted to political theater and served as a very poor substitute for impartial legal proceedings through investigations by prosecutors or before courts of law.

Nor did CBS simply air the accusations dispassionately. As alleged in the complaint, CBS' news anchors vouched for the truthfulness of the stories, calling them "disturbing" and "real" and describing the encounters as "forced."

In its motion to dismiss, CBS does not contend that the stories it aired were true. Instead, it claims that the broadcasts accusing Fairfax of violent criminal conduct have no defamatory meaning. But the statements are defamatory *per se* since they accuse Fairfax of a crime. CBS also improperly seeks refuge in the neutral reportage doctrine, which has never been adopted by Virginia or the Fourth Circuit. Even if adopted here, that doctrine does not protect CBS' conduct because its presentation of the allegations by Watson and Tyson was not neutral, balanced or unbiased. CBS also contends that the Amended Complaint fails to allege sufficient facts showing actual malice, claiming that the Court should carve out each allegation to determine if it stands or falls on its own to support the claim. That piecemeal approach is contrary to well-established law and improperly places the burden on Fairfax to prove CBS' subjective state of mind without the

1

benefit of any discovery. The appropriate analysis requires the Court to consider all of the allegations of actual malice in the Amended Complaint, in the light most favorable to Fairfax, to determine if they set forth a plausible claim against CBS.

The Amended Complaint alleges multiple facts showing actual malice, including CBS' failure to investigate known facts, sharp deviation from journalistic standards, reliance on a single unreliable source, failure to question its own associate general counsel with highly relevant information, and motivation to support a preconceived narrative to benefit CBS' bona fides with the #MeToo movement following its own scandals.

CBS' post-publication conduct—notably its conspicuous refusal to report on an exculpatory eyewitness to one of these sexual encounters—adds additional support to the allegations of actual malice.

Taken together, these allegations satisfy the Rule 9(b) standard to allege intent "generally" and the governing standards for a motion to dismiss. Contrary to CBS' position, they are not entitled to a higher pleading standard simply because they are accused of defamation here.

Perhaps implicitly acknowledging that the Amended Complaint properly states a claim, CBS asks the Court to consider 46 additional exhibits in support of its defenses, even though only a handful of them are referenced in the Amended Complaint. CBS will have adequate opportunity to adduce evidence in support of its defense at the summary judgment stage, once Fairfax has likewise had the opportunity to obtain discovery regarding CBS' actions, communications and state of mind.

The Court should deny Defendants' Motion to Dismiss and permit Fairfax to proceed with his claims for three primary reasons:

*First*, the statements made by Watson and Tyson, and aired and endorsed by CBS, convey a clear defamatory meaning.

*Second*, Fairfax has more than adequately pled "actual malice" to support a claim of defamation, particularly at the motion to dismiss stage.

*Third*, as Defendants concede, there is no legal immunity in Virginia regarding a defamation claim where, as here, a Plaintiff has adequately pled "actual malice."

## ARGUMENT

I.  **THE STATEMENTS MADE IN WATSON'S AND TYSON'S INTERVIEWS ON**
    ***CBS THIS MORNING* CONVEY A DEFAMATORY MEANING AND ARE**
    **DEFAMATORY *PER SE* AND BY IMPLICATION**

Defendants first argue that the Watson and Tyson interviews on *CBS This Morning* do not reasonably convey a defamatory meaning. Mot. at 17. The Court should reject this argument for two reasons. First, the statements of Watson and Tyson, as published by Defendants, convey a defamatory meaning because they are both defamatory *per se* and defamatory by implication. Second, Defendants improperly rely on the "neutral reportage doctrine" as a defense when that doctrine has never been recognized by Virginia or the Fourth Circuit. *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097 (4th Cir. 1993).

### A. Fairfax Has Sufficiently Alleged That Statements Published by Defendants Actually Defame Him

The threshold question of whether these statement actually defame Fairfax falls within the Court's gatekeeping function. *Webb v. Virginian-Pilot Media Companies, LLC*, 287 Va. 84, 90 (2014). Statements are defamation *per se* if they (1) "impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished," (2) impute an "unfitness to perform the duties of an office," or (3)

"prejudice such person in his or her profession or trade." *Hatfill v. New York Times Co.*, 416 F.3d 320, 330-31 (4th Cir. 2005) (citing *Carwile v. Richmond Newspapers, Inc.,* 196 Va. 1 (1954)). Direct accusations of sexual assault and rape "when uttered in the same breath" as the name of the alleged actor "are clearly capable of and susceptible to defamatory meaning." *Phi Kappa Psi v. Rolling Stone, et al.*, No. CL 15-479, 2016 WL 11575140, at *8 (Va. Cir. Ct. Aug. 31, 2016) (denying demurrer where fraternity brought defamation suit against magazine for publishing article about an alleged rape that never occurred). Defendants' broadcasts impute to Fairfax an unfitness to perform the duties of his office—in line with the accusers' stated intent to force Fairfax from office. Moreover, the broadcasts have had a direct and negative impact on Fairfax's profession as an attorney.

Because the stories broadcast by Defendants accuse Fairfax, by name, of committing sexual assault and rape (*See* Am. Compl. ¶¶ 115-125), they are defamatory *per se* and the Court should reject Defendants' first argument that there is no defamatory meaning to these news stories.

The Court should reject Defendants' argument for a second independent reason. The Amended Complaint alleges sufficient facts to show that Defendants' broadcast of Watson's and Tyson's interviews are defamatory by implication. This doctrine imposes liability when the statements are "calculated to render him infamous [and] odious" by "implication or insinuation." *Schaecher v. Bouffault*, 290 Va. 83, 92 (2015) (citation omitted); *Pendleton v. Newsome*, 290 Va. 162, 172 (2015) (citation omitted). The Court must take every inference in the pleadings in favor of Fairfax and evaluate whether the statements published by Defendants "contain sufficient innuendo to imply defamatory meaning." *Schaecher*, 290 Va. at 93 (citing *Webb*, 287 Va. at 89). Where a statement's defamatory meaning is not apparent on its face, a court may consider the

"circumstances surrounding the making and publication of the statement which would reasonably cause the statement to convey a defamatory meaning." *Pendleton*, 290 Va. at 172. Allegations explaining such circumstances and the resulting defamatory meaning "will suffice to survive [a motion to dismiss]." *Id.* (noting that a review of the circumstances and determining whether a plaintiff was actually defamed should be left for the fact-finder).

In *Carwile*, for example, a lawyer (Carwile) accused the Richmond City Police Department of corruption. 196 Va. at 3. Based on those allegations, a grand jury investigated but ultimately did not return an indictment. The *Richmond Times-Dispatch* published an article about Carwile's allegations and the grand jury's decision. *Id.* The article did not state directly that Carwile had violated the rules of ethics; instead, it highlighted that Richmond officials "evaded a direct answer" to the question of whether they would recommend Carwile to the Virginia State Bar as a consequence of his fruitless allegations and described the process by which the bar could discipline an attorney for ethical violations. *Id.* Carwile sued for defamation, claiming that the article falsely implied that he "was guilty of unethical and unprofessional conduct for which he should be subjected to a disbarment proceeding." *Id.* at 4. The Supreme Court of Virginia held that the newspaper article defamed Carwile even though it did not expressly allege an ethics breach, because it "suggested in a veiled but pointed way that [Carwile] could and should be subjected to disbarment proceedings." *Id.* at 9.

The allegations in the Amended Complaint meet the standard for defamation by implication. Fairfax has alleged false statements by Tyson and Watson during their *CBS This Morning* interviews that depict Fairfax committing sexual assault (Tyson) and rape and sexual assault (Watson). Am. Compl. ¶¶ 84, 93, 153, 163. Fairfax also alleged the circumstances by which Defendants' publication of the interviews caused these statements to further convey a

defamatory meaning. First, *CBS This Morning*'s Gayle King prefaced the Watson interview by calling some of the upcoming details "disturbing" and later all three co-anchors summarized the segment with erroneous factual statements that vouched for Watson's credibility. *Id*. ¶¶ 159-60 ("we have now seen example after example of how it is as real (snaps fingers) as if it happened yesterday."). Neither King nor any of the anchors questioned the veracity of Watson's statements; all of their statements suggested that her claims were true. Second, during the Tyson interview segment, the *CBS This Morning* anchors made inaccurate factual assertions and vouched for the credibility of Tyson's allegations. *Id*. ¶¶ 169 ("it feels like she was forced") and 173-74 (*CBS This Morning*'s King failed to probe inconsistencies in Tyson's story).

      In sum, the false statements by the *CBS This Morning* news anchors convey a defamatory meaning and, when taken in light of the circumstances in which they were made, also defame Fairfax by implication or innuendo. *Cf. Carwile*, 196 Va. at 9; *Webb*, 287 Va. at 90; *Horne v. WTVR, LLC*, Civ. No. 3:16-cv-000092-JAG, 2017 WL 1330200, at *3 (E.D. Va. Apr. 6, 2017) (presentation of news segment "Felon Hired, Then Fired," taken in context, gave rise to defamatory implication).

      The allegations about the *CBS This Morning* anchors' statements contrast sharply against those at issue in *Webb v. Virginian-Pilot Media Companies.* In *Webb*, a high school vice principal sued a newspaper, alleging defamation from statements implying that he played a role in preferential treatment for his son in a school disciplinary matter. 287 Va. at 89. The vice principal alleged that the defamatory implication was created by "juxtaposing an insinuation of special treatment with the reported facts that he was an assistant principal at another school in the same school system and that he had been a successful coach [at the same school where his sons were] successful [student athletes]." *Id*. The Virginia Supreme Court rejected the vice principal's

claims, finding that the article was not capable of a defamatory meaning because, despite the insinuation of special treatment, the "reasonable implication" was not necessarily that Webb's position was its cause. *See id*.

In contrast to *Webb*, the *CBS This Morning* news anchors' own assertions—aired immediately after the interviews—implied that what Watson and Tyson said was true and that Fairfax had committed these crimes. Otherwise, the anchors would not have referred to the accusers' stories as "disturbing" or "real" or suggested that Fairfax had "forced" the accusers to engage in sexual contact.

### B.  Virginia Has Never Adopted the Neutral Reportage Doctrine and, In Any Event, It Cannot Protect Defendants' Conduct Here

Defendants attempt to rely on the neutral reportage doctrine to avoid liability and cite four out-of-jurisdiction cases in support of this argument. Mot. at 19-20 (citing cases from Ohio, Illinois, and the Sixth, Seventh and Eighth Circuits). Under this doctrine, the press may be protected from defamation liability when it republishes statements involving public officials or matters of public controversy that are newsworthy simply because they are made. *See* Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 7:3.5[D] (5th Ed. 2017).

Virginia does not recognize the neutral reportage defense. Defendants misstate the law when they say that Virginia has adopted the doctrine but "unlike some other jurisdictions, the Virginia Supreme Court has not to date adopted particular nomenclature to describe this principle." Mot. at 19. It is not that Virginia has described and adopted the doctrine but has a different name for it. Virginia has not adopted it at all. Defendants cannot rely upon a doctrine that has no basis in the law here to defend against these claims. *See*, *e.g.*, *Norton v. Glenn*, 580 Pa. 212, 226 (2004) (declining to adopt neutral reportage principle in Pennsylvania, concluding that existing case law from U.S. Supreme Court suggests it would not adopt neutral reportage

over current actual malice standard); *McCall v. Courier-Journal and Louisville Times Co*., 623 S.W.2d 882 (Ky. 1981) (Kentucky Supreme Court rejected the neutral reportage doctrine).

In *Chapin v. Knight-Ridder, Inc.*, the Fourth Circuit applied Virginia law to a defamation claim. 993 F.2d at 1097. The Court of Appeals explained that it has "never adopted or rejected the 'neutral reportage' privilege," relying on the fact that "the Supreme Court specifically reserved the issue" when it arose in a case. *Id.* at 1097 (citing *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 660–661 n. 1 (1989)). In the twenty years since *Harte-Hanks*, the Supreme Court has not adopted the privilege and this Court should decline to adopt a new defamation defense in this case.

Even if the Court adopts it, the neutral reportage doctrine is sharply limited and would not apply on the facts of this case. *See, e.g.*, *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 68 (2d Cir. 1980) ("the privilege [is] limited in scope and require[s] careful examination of the facts in each case"). In the Second Circuit, for example, the privilege requires that the article or report in question be fair, accurate and dispassionate. *See id*. Where, as here, the reporting not only cites charges against a public figure but appears to "espouse[] or concur[]" in them and fails to present a balanced approach, the neutral reportage privilege does not apply. *Cianci*, 639 F.2d at 69. The Second Circuit warned in *Cianci* that without the limits to the neutral reportage principle, "all elements of the media would have absolute immunity to espouse and concur in the most unwarranted attacks, at least upon any public official or figure, based on episodes long in the past and made by persons known to be of scant reliability." *Id*. at 69-70. Here, Fairfax alleges that Gayle King did not ask obvious difficult or probing questions of Watson or Tyson (Am. Compl. ¶¶ 122, 124, 140, 149) and, following each interview segment, appears to vouch for their accounts (Am. Compl. ¶¶ 160, 169). Nor did King or her co-anchors note that no law

enforcement investigation had been commenced, that Fairfax was afforded a presumption of innocence or that Tyson's allegation previously had been investigated by a major national media outlet that decided not to publish her story because it was determined to be uncorroborated. Even if Virginia recognized neutral reportage as a defense, Defendants' biased presentation of Watson's and Tyson's accusations would abrogate it.

Also, the accusations against Fairfax were first made public in early February 2019 when it appeared that Fairfax might be elevated to Virginia's governorship. *CBS This Morning*'s interviews of Watson and Tyson occurred in early April 2019, nearly two months later. At that point, the accusations were no longer hot news or of broad public interest. They were not newsworthy simply because they existed. Rather, they played into the efforts of the accusers to pressure the Virginia General Assembly to take action and to force Fairfax from elective office. Defendants breathed new life and purported credibility into Watson's and Tyson's false accusations by airing them with great fanfare to a new national audience.

At a minimum, the allegations in the Amended Complaint give rise to a factual question as to whether Defendants' reporting was neutral. That is a question for a jury, not for the Court on a motion to dismiss. As the Second Circuit explained in *Cianci* as part of it reasoning to reverse the dismissal of a complaint, "a jury could well find that the New Times did not simply report the charges but espoused or concurred in them." 639 F.2d at 69; *see also Ocean State Seafood, Inc. v. Capital Newspaper, Div. of Hearst Corp.*, 492 N.Y.S.2d 175, 179 (1985) (finding there to be "a jury question" as to the neutral reportage defense).

## II.   FAIRFAX HAS ADEQUATELY PLED ACTUAL MALICE

### A.  The Actual Malice Pleading Standard

Defendants' contention that Fairfax has not sufficiently pled actual malice begins with a recitation of the essential elements and standard of pleading for this legal term of art. Notably, however, they do not cite Federal Rule of Civil Procedure 9(b), which provides that "[m]alice, ***intent***, knowledge, and other conditions of a person's mind ***may be alleged generally***," nor do they cite any case law for the proposition that Virginia recognizes an exception to Rule 9(b) for defamation cases. Fed. R. Civ. P. 9 (emphasis added).

In fact, the Fourth Circuit expressly has rejected the argument that defamation cases are subject to a special pleading standard. In *Hatfill*, the Court of Appeals held that it is "error" to apply a "stricter standard . . . than the ordinary standards under Rule 12(b)(6)" to a defamation complaint. 416 F.3d at 329-30. Instead, "a defamation complaint, like any other civil complaint in federal court, must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id*. (citing Fed. R. Civ. P. 8(a)(2)). The "usual standards of notice pleading apply in defamation cases." *Id.* Relevant here, the Fourth Circuit highlighted Rule 9(b) when it held that "[w]hile the Federal Rules of Civil Procedure require more specific pleading in certain cases, defamation cases are not among them." *Id*. In another defamation case, the Fourth Circuit has amplified its *Hatfill* holding, explaining that "Rule 9(b) ensures there is no heightened pleading standard for malice" and noting that "malice must still be alleged in accordance with Rule 8—a 'plausible' claim for relief must be articulated." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc*., 674 F.3d 369, 377 (4th Cir. 2012).

Fairfax's complaint goes well beyond Rule 9(b)'s requirement that he allege actual malice "generally" and Rule 8's requirement that he allege a "plausible" claim. Fairfax alleges

malice generally (Am. Compl. ¶¶ 181, 188, 219), and then goes on to allege numerous specific facts in support of these general allegations of intent, as discussed below. The Court should reject Defendants' argument that the Court should impose a higher pleading standard for intent because that position is clearly contradicted by binding precedent, as discussed below.

## B. Contrary to Defendants' Argument, Actual Malice Can Be Pled Through "Cumulation"

In accordance with binding legal precedent, Fairfax asks the Court to evaluate his allegations of actual malice as a whole, particularly at this pre-discovery stage of the litigation. Defendants claim that "a plaintiff cannot show actual malice by pleading a combination of allegations that themselves do not individually amount to knowledge of probably falsity." Mot. at 22 (citing *Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277 (1987), and *Tucker v. Fischbein*, 237 F.3d 275 (3d Cir. 2001)). First, the two cases cited by Defendants do not support that statement. Second, Defendants' contention is clearly an incorrect statement of the law.

In *Richmond Newspapers, Inc.*, the Virginia Supreme Court did not reject evaluation of actual malice allegations in a combination; it expressly considered the six charged elements of actual malice "as a group" in its review of a jury finding of actual malice. 234 Va. at 295 ("We equally are convinced that a consideration of all these elements as a group demonstrates the same inadequacy."). Similarly, the Third Circuit in *Tucker* considered plaintiff's 24 different theories of defendants' alleged actual malice, but said nothing that, as a matter of law, ruled out consideration of a combination of factors establishing a defendant's reckless disregard for the falsity of its statement. 237 F.3d at 287. Neither *Richmond Newspapers* nor *Tucker* discussed a plaintiff's burden of pleading at the motion to dismiss, and thus cannot stand for the proposition that is inappropriate to look at allegations of actual malice as a group at this early stage of litigation.

The United States Supreme Court and other Courts of Appeals have established the principle that actual malice can properly be pled and proven by a combination of factors that, standing alone, might not be sufficient. *See Harte-Hanks* 491 U.S. at 667-68 (affirming the court of appeals' conclusion of actual malice based on "the newspaper's departure from accepted standards and the evidence of motive…"); *see also Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991) (citing *Harte-Hanks* when noting that a plaintiff "can present proof of malice in the form of cumulative circumstantial evidence, which is often the only way to prove malice in libel cases"); *Tavoulareas v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985) ("According to petitioners, the evidence of actual malice does not gain probative force through 'cumulation.' This is an unreasonable view and is simply not the law."). "There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, *by cummulation* [sic] *and by appropriate inferences,* the fact of a defendant's recklessness or of his knowledge of falsity." *Tavoulareas*, 763 F.2d at 1478 (emphasis in original, citation omitted).

Defendants concede, as they must, that "plaintiffs are 'entitled to prove the defendant's state of mind through circumstantial evidence.'" Mot. at 23 (citing *Spirito v. Peninsula Airport Commission*, 350 F.3d 471, 481 (E.D. Va. 2018)); *see Herbert v. Lando*, 441 U.S. 153, 170 (1979). The principle that the accumulation of circumstantial evidence is sufficient to prove intent is not limited to defamation. For example, in the conspiracy context, "[c]ircumstantial evidence tending to prove a conspiracy may consist of a defendant's 'relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy'" and a conspiracy "may be inferred from a 'development and collocation of circumstances'." *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996).

*Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862 (W.D. Va. 2016), is instructive as to how the cumulation principle works in a defamation case under Virginia law. *Eramo* was filed by the Associate Dean of Students at the University of Virginia against *Rolling Stone* magazine. She sued *Rolling Stone* for defamation resulting from an article it published about an alleged rape on campus that ultimately proved to be false. *See id*. Plaintiff Eramo alleged that the article "destroyed [her] reputation as an advocate and supporter of victims of sexual assault" and caused her to be "attacked by individuals on television and the internet." *Id*. at 868. The district court denied *Rolling Stone's* motion for summary judgment, and the case proceeded to trial.

Finding Eramo to be a limited-purpose public figure, the court set about determining whether *Rolling Stone* acted with actual malice. *Id*. at 871. First, the *Eramo* court noted that "as in most similar cases, plaintiff largely relies on circumstantial evidence." *Id*. at 872 (citing *Lando*, 441 U.S. at 170). Eramo claimed that *Rolling Stone* failed to adequately investigate, had departed from journalistic standards, and had "ill will or intent to injure." *Id*. at 872. Although each allegation individually would not suffice to show actual malice, "proof of all three is sufficient to create a genuine issue of material fact." *Id*. To make her showing, Eramo offered the *Rolling Stone* reporter's notes (uncovered during discovery), which the court found "could lead a reasonable jury to find that [the reporter] had 'obvious reasons to doubt [the alleged victim's] veracity' or 'entertained serious doubts as to the truth of [her publication.'" *Id*. (citation omitted). Indeed, the reporter's notes showed evidence of a preconceived story line—that UVA failed to act appropriately in instances of sexual assault—that would also support a showing of actual malice. *Id*. The *Rolling Stone* reporter also failed to contact an eyewitness to the aftermath of the alleged sexual assault, despite knowing the eyewitness' identity. *Id*. (with an inference that others at the magazine knew of the reporter's failure to corroborate the alleged victim's story).

Even at the summary judgment stage—where the burden is higher—the *Eramo* court refused to evaluate and reject each category of actual malice evidence in a vacuum. Instead, as Fairfax asks the Court to do here, it considered whether the evidence as a whole was sufficient to create a genuine issue of material fact.

*Gilmore v. Jones*, another recent case in this circuit applying Virginia law, provides guidance as well. 370 F. Supp. 3d 630 (W.D. Va. 2019). There, a diplomat sued radio show host Alex Jones for defamation and intentional infliction of emotional distress for publishing articles and videos falsely calling him a "deep state" operative who may have been responsible for the violence in Charlottesville on August 12, 2017 (where a car drove into the group of protesters, killing one). *Id*. at 641-42. Because of his participation in the public controversy—the infamous Charlottesville protest—the court found Gilmore to be a limited purpose public figure and required him to satisfy the actual malice standard. *Id*. at 669 (ultimately denying the motion to dismiss as to plaintiff's defamation claim). On what allegations might be adequate to plead actual malice, the *Gilmore* court wrote:

- A defendant's "failure to investigate" or observe journalistic standards, although not determinative, is relevant to the actual malice inquiry. *Id*. at 671 (citing *Eramo* 209 F. Supp. 3d at 871-72);

- "[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice." *Gilmore*, 370 F. Supp. 3d at 671 (citing *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015));

- The "defendant's '[r]epetition of another's words' that the 'repeater knows' are 'false or inherently improbable' is similarly non-dispositive but relevant, as is 'evidence that a defendant conceived a story line in advance' and then 'set out to

14

make the evidence conform' to that story. *Gilmore*, 370 F. Supp. 3d at 671 (citing

*Eramo*, 209 F.Supp.3d at 872); and

- "[A]lthough 'courts must be careful not to place too much reliance on such

  factors,' it 'cannot be said that evidence concerning motive or care never bears

  any relation to the actual malice inquiry.'" *Gilmore*, 370 F. Supp. 3d at 671 (citing

  *Harte-Hanks Commc'ns., Inc.*, 491 U.S. at 668).

Thus, even if allegations of negligence, failure to investigate, reliance on a sole source, reliance on an unreliable source, departure from journalistic standards, and motive, are each insufficient alone to plead actual malice, together they combine to satisfy the pleading standard for actual malice at the motion to dismiss stage. *See Tavoulareas*, 763 F.2d at 1478 (reaffirming the "accumulation" principle of actual malice following a jury verdict in favor of plaintiff); *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969) (same); *Eramo*, 209 F. Supp. 3d at 872 ("Arguably, a reasonable jury could find that none of the evidence presented independently supports a finding of actual malice by clear and convincing evidence. Taken as a whole, however, a jury could conclude otherwise.").

The Amended Complaint contains many allegations that, when viewed together, sufficiently plead actual malice to survive a motion to dismiss under *Eramo* and *Gilmore*. For example, Fairfax alleges that Defendants had a preconceived narrative; had a public relations motive; failed to adequately investigate; failed to seek corroboration from the most obvious sources; purposely avoided learning the truth of the matter; relied on sole, unreliable sources; vouched for their credibility; and departed from basic journalistic standards. In support of these categories of allegations, Fairfax makes specific factual allegations—for example, that Defendants ignored inconsistencies between Tyson's statements and their interviews (Am.

Compl. ¶ 172), and that they aired Watson's interview despite knowing the identity of an eyewitness to Fairfax's college encounter with Watson—who had spoken directly with Defendants' assistant general counsel about the allegation, and other corroborating witnesses. *Id.* ¶¶ 109, 139. Tellingly, Defendants' motion does not address the cumulative effect of Fairfax's allegations regarding actual malice.

Where Defendants do challenge individual allegations, they rely on cases at a different stage—either at the summary judgment stage or following a jury verdict—when the burden is considerably higher than at the motion to dismiss stage. *See, e.g.* Mot. at 24 (citing *Jackson v. Hartig*, 274 Va. 219 (2007) (affirming the grant of a summary judgment motion)). This case law is not dispositive for the Court in weighing the sufficiency of Fairfax's pleadings.

### C. Taken as a Whole, Fairfax Adequately Pleads Actual Malice

The allegations here meet the standard articulated in *Gilmore* and *Eramo*. Each of the categories of allegations in the Amended Complaint has been recognized by courts as relevant to pleading or proving actual malice.

#### 1. Defendants' Duty to Investigate

One of the more significant indicia of Defendants' reckless disregard for the truth is their failure to investigate the accusations of Watson and Tyson despite having prior knowledge of relevant witnesses and having objective reasons to doubt the veracity of their stories.

As to Watson, Fairfax's spokesperson provided Ed O'Keefe, the CBS News Political Correspondent working on these broadcasts, with names and phone numbers of potential fact witnesses on February 8, 2019, the day the story broke and several months before the interviews aired in April 2019. Am. Comp. ¶¶ 107, 138. One of these witnesses was the eyewitness to Fairfax's and Watson's Spring 2000 sexual encounter, which occurred in the eyewitness's dorm room. *Id.* ¶ 107. From that date until Watson's interview aired on April 2, Defendants failed to

16

separately investigate the allegations, speaking only to Watson and her counsel. *Id*. ¶¶ 123, 138. Further, an assistant general counsel for Defendants was a mutual friend of Watson, Fairfax and the eyewitness. *Id*. ¶ 96. The assistant general counsel had information relevant to Watson's accusations and Defendants knew this prior to the airing of the Watson interview. *Id*. ¶¶ 105-107.

Regarding Tyson, Defendants had a duty to investigate because the accusations came from politically-oriented websites and politically-motivated actors clearly employing the most opportune timing to harm Fairfax. *See id.* ¶¶ 60, 82. Nevertheless, in the leadup to the interview, Defendants did not speak with anyone save for Tyson and her lawyers. *Id*. ¶ 123.

Fairfax's allegations of failure to investigate Watson's and Tyson's accusations hew closely to those in *Eramo*, where the reporter "knew the identity of at least one of the individuals who found [the alleged victim] the night of her alleged rape . . . . [but] did not seek to contact this individual." 209 F. Supp. 3d at 872; *see also Biro*, 807 F.3d at 546 (in certain circumstances, failure to investigate will support a finding of actual malice). Here, like *Eramo*, Defendants had obvious reason to doubt the accuracy and credibility of both Watson and Tyson, and their failures to investigate further contribute to the Fairfax's sufficient pleading of actual malice.

## 2.  Defendants' Reliance on a Sole, Unreliable Source

Defendants argue that they had "two sources . . . publicly ma[ke] similar allegations against Fairfax," thus, in their view, they had less reason to doubt the veracity of Fairfax's accusers. Mot. at 29. However, this might be the case if the two sources spoke of *one* specific event, not two different, totally unrelated alleged acts separated by a significant amount of time. Instead, Watson and Tyson serve as the sole sources for their separate, respective allegations. *See* Am. Compl. ¶ 123. Defendants themselves point out that the two women claim not to know each other. Mot. at 29. For different reasons, each is unreliable. *See, e.g.,* Am. Compl. ¶¶ 82, 150, 181.

Allegations that the specific defamatory content had only one, unreliable source may be sufficient to plead actual malice. *See Wells v. Liddy*, 186 F.3d 505, 542 (4th Cir. 1999) (finding genuine issue of material fact where plaintiff adduced evidence that there was one source for the specific defamatory content, and that source was found unreliable). In *Wells*, the sole source for the defamatory suggestions that plaintiff was operating prostitution rings was "a disbarred attorney and convicted felon with a long history of substance abuse and mental illness, [and] had changed his story about the prostitution ring several times." *Id*. at 542.

Although Watson and Tyson may not be at the level of disrepute of *Wells'* sole, unreliable source, Fairfax has alleged noteworthy red flags about the stories told by each woman. First, Tyson shopped her story to *The Washington Post* in 2017-2018—right after Fairfax's election as Lieutenant Governor and more than 13 years after the alleged incident—and the newspaper investigated, but could not corroborate her story. Am. Compl. ¶¶ 81, 167. Tyson also went public with her story at the precise moment in February 2019 when it appeared Fairfax might ascend to the governorship and only after prodding from politically-connected rivals of Fairfax in Virginia who had obvious political motivations to harm him. Further, Tyson's story was published on a right-wing website hostile to Fairfax. *Id*. ¶¶ 60, 62-68.

Tyson, a longtime and outspoken public advocate regarding issues of sexual assault, also had numerous opportunities to share her "story" previously, as Fairfax ran for and was elected to the Lieutenant Governorship of Virginia in 2016-18, but conspicuously failed to do so. *Id*. ¶¶ 74-79. She also continued to side-step Fairfax's responses that contradicted her story, including whether she continued to contact him and wanted to meet up again after their encounter in Boston. *Id*. ¶ 47.

In Watson's case, she only came forward after Tyson did—and nearly 20 years after the encounter occurred. *Id*. ¶¶ 85-86. Immediately after she came forward, Fairfax's spokesperson issued a public statement calling Watson's allegation "demonstrably false" and urged Defendants' correspondents to call certain Duke graduates to get pertinent information about Watson's allegation and not to rush the story. *Id*. ¶ 107. Later, Fairfax's spokesperson texted Gayle King with questions that should have put King on notice that there were significant problems with Watson's story. *See id*. ¶¶ 141-42.

Further, Watson claimed that she had accused a Duke athlete of raping her the prior school year and had reported that alleged rape "to an official at the university." *Id*. ¶ 150. However, the university denied any knowledge of that alleged rape when it stated in February 2019 "that it first learned of the allegation when it appeared in the press that month." *Id*. Defendants had substantial reason to doubt Watson's credibility based on this significant inconsistency alone.

In sum, Fairfax alleges that Defendants published two defamatory interviews by single, unreliable sources; and not one story with two sources, as Defendants would have this Court believe.

### 3.  Defendants' Violation of Journalistic Standards

Defendants concede that a departure from journalistic standards can serve as "supportive evidence" of actual malice. Mot. at 30-31; *see Reuber v. Food Chem. News, Inc*., 925 F.2d 703, 711-12 (4th Cir. 1991). The Amended Complaint contains numerous allegations where Defendants abrogated their journalistic duties.

For example, despite their self-serving statement that Defendants would present both sides, they did not attempt to alert or contact Fairfax for his statement until the interviews nearly aired, Am. Compl. ¶ 118, effectively denying him time to adequately present his response.

During the interviews, King never challenged Tyson or Watson on basic facts that would have contradicted their stories. *Id*. ¶ 122. And, as alleged earlier, Defendants simply failed to investigate Watson's and Tyson's accounts in the most basic of ways and merely relied on their uncorroborated interviews. *Id*. ¶¶ 135-36.

Taken in the context of the other allegations of Defendants' errors and omissions, Fairfax's allegations that Defendants breached journalistic standards help sustain his burden of pleading on actual malice. *See Eramo*, 209 F. Supp. 3d at 872.

### 4.  Defendants Had a Public Relations Motive

Defendants attempt to lump Fairfax's legitimate allegations of Defendants' public relations motive—to "establish [Defendants] #MeToo bona fides"—with generic allegations that Defendants sought a commercial (ratings) boost. Mot. at 32. However, "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Harte-Hanks*, 491 U.S. at 668. Thus, allegations regarding Defendants' motives are relevant to the actual malice calculus. *Tavoulareas*, 817 F.2d at 833 ("evidence that a newspaper or a reporter followed a sensationalistic policy, or possessed ill-will toward the plaintiff, is evidence of actual malice").

The Amended Complaint contains two key allegations concerning Defendants' motives. Defendants recently had experienced their share of highly-publicized sexual misconduct scandals—sexual harassment allegations against Charlie Rose and former CEO Les Moonves— and therefore made a conscious decision to align themselves with alleged #MeToo victims with the publication of the Watson and Tyson interviews. Am. Compl. ¶¶ 113-14. Defendants' motive is therefore one of the types of allegations that in combination adequately allege actual malice.

### 5.  Defendants Had a Preconceived Narrative

Fairfax also pleads actual malice based on Defendants' preconceived narrative that he was guilty of the sexual assault allegations leveled by Watson and Tyson supposedly based on events of 19 and 15 years ago, respectively. In their reporting, Defendants made sure to prepare Watson and Tyson for their respective interviews (*Id*. ¶ 124) and then purposely did not ask probative or challenging questions. *Id*. ¶ 122. Defendants also consciously avoided investigating the facts and circumstances diligently, even where Fairfax provided names and contact information for witnesses. *Id*. ¶¶ 107, 123. Finally, Defendants edited the interviews to ensure a seamless story and promoted the interviews by repeatedly teasing the most salacious parts. *Id*. ¶¶ 108, 110, 114, 119, 125, 179.

As the district courts found in *Spirito*, *Eramo* and *Gilmore*, preconceived narrative, when taken together with other allegations, may be sufficient to support the pleading of actual malice. *See, e.g., Spirito*, 350 F. Supp. 3d at 481, *Eramo*, 209 F. Supp. 3d at 871, *Gilmore*, 370 F. Supp. 3d at 673. Each of these allegations is more than "conclusory" or a "mere recitation" of actual malice—they point to a specific fact that, when taken together with the other allegations of actual malice and the attendant circumstances, satisfies the notice pleading standard and survives a motion to dismiss.

Finally, Defendants acknowledge that Fairfax may plead on information and belief "when essential information lies uniquely within another party's control." Mot. at 23 (citing *Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1330-31 (Fed. Cir. 2009). The *Exergen* Court goes on to say that a party may base its allegations on information and belief "if it can demonstrate [] that essential information is uniquely within another party's control." *Id*. at 1330. Here, where many of the facts lie solely within Defendants' control, such as why and how Defendants failed to investigate by questioning their own associate general counsel about the

Watson allegations, Fairfax should be permitted to take discovery as to his well-pleaded claims of actual malice.

### 6. Defendants' Post-Publication Conduct is Relevant and Supports a Claim of Actual Malice[1]

Defendants' post-publication conduct, especially its failure to correct or retract the stories despite having knowledge of critical information that establishes the high probability of their falsity, provides further evidence of Defendants' past and ongoing reckless disregard for the truth.

In their Motion to Dismiss, Defendants incorrectly state the law when they contend that "post-publication events are therefore irrelevant to the inquiry [of actual malice]" and that "failing to retract an allegedly defamatory publication is not probative of actual malice." Mot. at 35 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)). First, *Sullivan*, which Defendants cite for this proposition, did not hold that post-publication conduct was irrelevant to an inquiry of actual malice and, in fact, expressly left open the question of whether a failure to retract a publication later shown to be false could sustain a finding of actual malice. 376 U.S. at 286 ("Whether or not a failure to retract may ever constitute such evidence [of actual malice], there are two reasons why it does not here."); *see also Tavoulareas*, 763 F.2d at 1477 ("[*Sullivan*] decided not to rely on evidence of a failure to retract as proof of actual malice. But that was a fact-specific conclusion, far from enunciating a general rule.").

---

[1] Under Virginia law, Defendants are also liable for any republication by third parties of defamatory statements when that republication is a "natural and probable consequence" of Defendants' original publication, or they have "presumptively or actually authorized or directed its republication." *Weaver v. Beneficial Finance Co.*, 199 Va. 196, 199 (1957). The Amended Complaint alleges that third parties have republished Defendants' defamatory and uncorrected interviews of both Watson and Tyson with Defendants' implicit and explicit permission. Am. Compl. ¶¶ 158, 192-201. Defendants are independently liable for those third-party republications as well.

Second, numerous courts, while citing *Sullivan*, have held that post-publication conduct, such as a failure to retract a false story despite being aware of evidence of its falsity or demands by the defamed party to retract or correct the story, is relevant to an inquiry of actual malice. *See, e.g.*, *Tavoulareas*, 763 F.2d at 1477 (considering the *Washington Post*'s "steadfast refusal to retract . . . as bearing on the issue of actual malice"); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2nd 944, 950 (5th Cir. 1983) ("Moreover, after the article came out, Golden Bear of Texas contacted Entrepreneur, offering to prove that it was innocent of any wrongdoing, and asking that Entrepreneur print a retraction.  Entrepreneur refused.  'Under certain circumstances evidence [of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory] … might be relevant in showing recklessness at the time the statement was published' … We conclude that the evidence supports the jury finding that Entrepreneur published the article with reckless disregard of the truth.").

In this case, since at least July 9, 2019, Defendants have been aware, both through public media reporting and information provided directly to it by Fairfax, that there was an exculpatory eyewitness present during Plaintiff's encounter with Watson in spring 2000 in the eyewitness's dorm room. Am. Compl. ¶¶ 183-189. Defendants also have known that the eyewitness independently and unequivocally told multiple people—including their own assistant general counsel with responsibility for defamation litigation at the company—that no rape or sexual assault occurred. *Id*. While other major media outlets, including *The Washington Post*, *The New York Times*, *Associated Press* and CBS affiliates in Virginia, immediately reported the information regarding the existence of this exculpatory information, Defendants have conspicuously refused to update their reporting or report on this crucial information for over four months and counting.  *Id*. ¶¶ 190-191.

23

Further, Plaintiff repeatedly has requested a retraction or, at a minimum, an update to Defendants' reporting regarding Watson's allegation—in which she described a sexual encounter without mentioning that someone else was present—and Defendants have repeatedly refused to correct or retract their reporting. *Id.* ¶¶ 183-188. This refusal is strong evidence of actual malice, particularly when combined with the lack of a denial of the eyewitnesses' presence by Watson or her attorney since July 9, 2019, and the knowledge of Defendants' associate general counsel of the exculpatory eyewitness. *Id.* ¶¶ 181, 186-190. In addition, as alleged in the Amended Complaint, *CBS This Morning*'s reporting staff abruptly and conspicuously stopped responding to calls by Fairfax's team for corrections after the exculpatory evidence was made public on July 9. *Id.* ¶ 189. When a *CBS This Morning* reporting team member reached out for contact information for the eyewitness in August 2019, Fairfax's team provided it. *Id.* However, Defendants apparently never followed up on that information or never reported on it. Instead of asking basic questions to get to the truth, Defendants came to Watson's defense in a communication with Fairfax's team, making it clear that Defendants refused to "brand Ms. Watson as a liar." *Id.* ¶ 127.

Defendants' post-publication conduct is telling and properly part of the Court's evaluation at this stage, as it puts forth additional allegations to support the proper denial of Defendants' motion to dismiss.

## III. DEFENDANTS IMPROPERLY OFFER FACTS AND EXHIBITS OUTSIDE OF THE COMPLAINT'S ALLEGATIONS[2]

Defendants improperly rely on facts that are outside of the Amended Complaint and anything referenced in it, in direct contradiction to well-settled law that this is not permitted.

---

[2] Although this Court has granted Defendants' Motion for Leave to File Exhibits (ECF No. 29), this Court nevertheless should strike the outside exhibits and facts from Defendants' Motion to Dismiss pursuant to the Federal Rules of Civil Procedure.

Here are some examples of the facts Defendants ask the Court to consider on this motion to

dismiss:

- "Fairfax also spoke directly to journalists that day. The *Richmond Times-Dispatch*, for
  example, reported that Fairfax called the woman's allegations an "uncorroborated smear"
  and "a totally fabricated story out of the blue that's meant to attack me because of where
  I am in politics." *Id.* Ex. 24. Fairfax's office also released a statement attacking the *Post*,
  saying that it "just smeared an elected official," and again threatening to sue "people who
  continue to spread these false allegations." *Id.* Ex. 26 (copy of statement)." Mot. at 3.

- "The *Washington Post* subsequently quoted one of the friends, attorney Kaneedreck
  Adams, as recalling that, in the spring of 2000, Watson came to her in tears: "She told me
  she had been raped, and she named Justin. She said she couldn't speak, but she was
  trying to get up and he kept pushing her down." *Id.* Ex. 32 at 7." Mot. at 5.

- "Amid calls for legislative hearings into the women's allegations, Fairfax took the floor
  of the Senate on February 24 and compared himself to lynching victims:

  > [W]e talk about hundreds, at least 100, terror lynchings that
  > happened in the Commonwealth of Virginia . . . and yet we stand
  > here, in a rush to judgment, with nothing but accusations, and no
  > facts. And we decide that we are willing to do the same thing.

  Kelley Decl. Ex. 34 (AP article quoting floor speech)." Mot. at 5.

These are from just the first five pages of the statement of facts. Later in the Argument section,

Defendants attempt to argue that Fairfax has not adequately pled actual malice by offering the

following factual assertion:

> CBS began reporting this story nearly two months before it broadcast the
> interviews with Tyson and Watson that form the basis of this Complaint. During
> those months, CBS repeatedly offered to Fairfax a platform on which to tell his
> side of the story and made efforts throughout this time to interview him regarding
> the allegations, as well as reaching out to other potential sources, including those
> actually identified by Fairfax, regarding Tyson's and Watson's allegations. This
> journalistic effort is the antithesis of actual malice.

Mot. at 37.

In a passing, one-paragraph footnote, Defendants attempt to justify the introduction of a

massive amount of evidence outside of the Amended Complaint. Mot. at 2, n.1. Indeed,

Defendants propose that the Court turn the general rule against such extrinsic evidence on its

head and consider forty-six of its own exhibits in a motion to dismiss without providing case-specific reasons for doing so. Despite Defendants' conclusory statement that each of the forty-six exhibits are "quoted, referred to," "otherwise incorporated" or merely "relevant to" Fairfax's well-pled allegations, at least thirty-nine of the exhibits should not be considered by this Court at all.[3] *Id*. Defendants imply that a *relevancy* standard exists for the consideration of extrinsic exhibits at a motion to dismiss stage without citation to any caselaw supporting this novel proposition. Defendants even ask the Court to consider documents that they *admit* are not incorporated by reference in the Amended Complaint. *See id*.

"In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc*., 637 F.3d 435, 448-49 (4th Cir. 2011) (citing *Sec'y of State for Defence v. Trimble Navigation Ltd.,* 484 F.3d 700, 705 (4th Cir.2007)). A district court cannot go beyond these documents on a Rule 12(b)(6) motion; if it does, it converts the motion into one for summary judgment. *E.I. du Pont de Nemours and Co*., 637 F.3d at 448-49; Fed. R. Civ. P. 12(b), 12(d), 56. "Generally, a 'motion to dismiss for failure to state a claim does not permit the Court to look outside the complaint.'" *Corinthian Mortgage Corp v. ChoicePoint Precision*, No. 1:07cv832 (JCC), 2008 WL 11374386, at *6, (E.D. Va. April 4, 2008) (citing *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 281 (E.D. Va. 1995)). Notwithstanding the general rule, the Court may, in its discretion, consider outside documents that are "quoted, relied upon, or incorporated by reference in the complaint, [and] also official public records pertinent to the plaintiffs' claims," if the document is "one of unquestioned authenticity." *Id*. (citing *Gasner*, 162 F.R.D. at 282).

---

[3] In Matthew E. Kelley's declaration, ECF 17-1, the seven paragraphs containing arguably acceptable exhibits are ¶2 through ¶7, and ¶22.

The Defendants cite *Spirito v. Peninsula Airport Comm'n*, to correctly point out that a court may, on a motion to dismiss, decide to consider documents quoted, relied upon or incorporated by reference in the complaint. 350 F. Supp. 3d at 486. However, in doing so, the Defendants fail to apply the ruling in that case to the facts here. That case involved litigation surrounding several text and Facebook messages about plaintiff Spirito that were exchanged among certain defendants, then reported to the Virginia Department of Transportation ("VDOT"), and ultimately published by the *Daily Press*. The court ruled that it needed to compare the *Daily Press* article with the VDOT report, both explicitly referenced as the basis for the defamation claim in the complaint, to rule on the motion to dismiss. The *Spirito* case, while distinguishable on its facts is, at best, justification for the Court's consideration of Defendants' Exhibits 2-7 and 22. The rationale of *Spirito* and principle articulated in *Gasner* strongly advise against this Court considering the remaining 39 exhibits offered by Defendants.[4]

Defendants also cite *Advanfort Co. v. International Registries, Inc.*, in support of their request to employ extrinsic evidence. No. 1:15-cv-220, 2015 WL 2238076 (E.D. Va. May 12, 2015). The *Advanfort* decision, in a footnote, stated that a court may take judicial notice of newspaper articles at the motion to dismiss stage when the articles discuss the subject matter of the case. *See id*. at 10 n.10. There, the crucial issue was whether the plaintiffs were in fact limited-purpose public figures. *Advanfort Co. v. Int'l Registries, Inc.*, 2015 WL 2238076, at *9-

---

[4] Defendants ask that the Court's consideration of these exhibits should not convert the motion to dismiss into a motion for summary judgment, and Fairfax agrees. A premature conversion of a 12(b)(6) motion into a motion for summary judgment, through the introduction of impermissible extrinsic evidence, is not appropriate where the parties have not had an opportunity for reasonable discovery. *E.I. du Pont de Nemours and Co.*, 637 F.3d at 448-49, citing *Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985). Yet the Court's taking judicial notice by itself creates new facts that are outside the scope of the Amended Complaint's allegations. Defendants cannot have it both ways—having the Court take judicial notice of independent factual events while maintaining the instant motion as a motion to dismiss.

10. The Court in that case relied on the numerous news articles appended as exhibits to defendants' motion to dismiss to settle the question of law. *Id.* (finding that plaintiffs were limited purpose public figures). In contrast, it is uncontested that Fairfax is a public figure and the scads of exhibits that Defendants ask the Court to consider only to prove that "the cited reports were published" do not resolve a question of law related to the motion to dismiss.

## IV.    THERE IS NO IMMUNITY UNDER VIRGINIA STATUTORY LAW FOR DEFENDANTS' PUBLICATIONS

Defendants concede that, should this Court find that Fairfax has properly pled that Defendants acted with actual malice in publishing the Watson and Tyson interviews, they would lose immunity from this defamation claim under Virginia Code § 8.01-223.2. *See* Mot. at 37-38. Because Fairfax has properly pled actual malice (**Section II**, *supra*), Defendants are not immune from liability for defamation.

## V.    FAIRFAX HAS SUFFICIENTLY PLED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Amended Complaint adequately alleges that Defendants' specified conduct resulted in Fairfax being labeled a rapist, sexual abuser and predator – effectively a criminal. Fairfax alleges that such categorizations are false, extreme, outrageous and intolerable and, as a result of the Defendants' targeting of Fairfax, he has suffered severe emotional distress. Additionally, Fairfax alleges multiple facts amounting to actual malice on the part of the Defendants. *See, e.g.*, Am. Compl. ¶¶ 156, 181, 209, 217-20, 227-28.

Defendants offer three reasons for dismissal of this intentional infliction of emotional distress (IIED) claim at this early, pre-discovery stage. First, the Defendants cite *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999). This case provides zero guidance to the Court at the motion to dismiss stage, where actual malice *has* been alleged by Fairfax. In *Food Lion*, two ABC News reporters misrepresented their identities in order to obtain jobs in the

deli department at Food Lion. The reporters secretly recorded videos which were then broadcast by ABC News. Food Lion sued for fraud, claiming that the reporters' fraud had caused damages to its reputation and lost profits. The jury found for Food Lion on the fraud claim, but the district court set it aside as to Defendant ABC News on proximate cause grounds. On appeal, the court did not reach the proximate cause question because Food Lion did not even allege actual malice and did not attempt to satisfy First Amendment related burdens set forth in *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988). Further, Food Lion openly acknowledged that it purposefully did not sue for defamation in order to avoid having to prove actual malice. *Food Lion, Inc.,* 194 F.3d at 522.

Unlike *Food Lion*, Fairfax has pleaded a defamation claim and actual malice. *Hustler Magazine* and *Food Lion, Inc.* do not stand for the proposition that a public figure can never, as a matter of law, obtain a judgment against a media outlet for IIED. The Defendants' motion to dismiss argument that Fairfax will not be able to clear the actual malice hurdle down the road does not address or resolve the fact that the IIED claim is sufficiently pleaded for purposes of Rule 12(b)(6).

Next, Defendants incorrectly assert that Fairfax did not plead that Defendants' conduct was "outrageous and intolerable" or that it caused Fairfax to suffer "severe" emotional distress consistent with the holding in *Harris v. Kreutzer,* 271 Va. 188 (2006). Fairfax has adequately pleaded both elements in the Amended Complaint. Am. Comp. ¶¶ 224-28.

In *Harris*, the Plaintiff alleged that the Defendant, Dr. Kreutzer, "verbally abused [her], raised his voice to her, caused her to break down into tears[,] . . . . stated she was 'putting on a show,' and accused her of being a faker and malingerer." *Harris*, 271 Va. at 204. The Supreme Court of Virginia observed in *Harris* that "[i]nsensitive and demeaning conduct does not equate

to outrageous behavior as set by our caselaw." *Id.* at 204. *Harris* emphasized that the outrageousness requirement "is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Id.* at 204 (citing *Womack v. Eldridge*, 215 Va. 338, 342 (1974)). Fairfax's factual allegations far exceed allegations amounting to bad manners or mere hurt feelings. The Amended Complaint sets forth that because of Defendants' conduct, Fairfax is now falsely labeled a "rapist," "predator" and "sexual abuser." Defendants accused him, in no uncertain terms, of committing a violent felony. Defendants' actions have exposed millions of people to lies that have done extraordinary damage to him emotionally.[5] If taken as true, there is little doubt that Defendants' actions are substantially worse than mere "bad manners" and well beyond any common standards of decency or tolerability.

Indeed, exacerbating factors can make non-outrageous actions outrageous. *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 760 (E.D. Va. 2016). For example, the method or the duration and cumulative nature of misconduct can make non-outrageous actions become outrageous.  *Id.* The conduct, manner, or means associated with undermining a plaintiff's employment may create outrageousness. *See, e.g.*, *Tharpe v. Lawidjaja*, 8 F.Supp.3d 743, 783 (W.D. Va. 2014). Standing alone, Defendants' conduct is sufficiently pleaded as outrageous and intolerable, but considering the method, duration and cumulative nature of Defendants' conduct, plus the fact that this conduct undermined Fairfax's legal career and political career, Fairfax has cleared this pleading hurdle. Am. Comp. ¶¶ 205-09.

Third, in the analysis of the severity of injury alleged, the *Harris* facts stand in stark contrast to Fairfax's well-pled allegations of severe emotional distress. The plaintiff in *Harris*

---

[5] *CBS This Morning* is estimated to have had 3,090,000 total viewers for the week of April 1. https://www.adweek.com/tvnewser/morning-show-ratings-week-of-april-1-2/399029/

broadly recited symptoms such as loss of sleep, nervousness, loss of self-esteem, depression and stress in her state court claim of IIED. *Harris,* at 205. Of course, this level of [lack of] severity of emotional distress was inadequate in the context of the allegation that the Defendant had been verbally abusive to Harris, called her a malingerer, and so forth. *Id.* Fairfax's severe emotional distress goes well beyond hurt feelings from a limited interaction with a single individual akin to the plaintiff in *Harris*. Fairfax's distress comes from the invasion of his and his family's privacy, threats to his safety and to that of his family, being called a criminal, a rapist and a sexual predator, watching his wife and children face questions and verbal abuse about his sexual encounters and the extreme loss of financial resources and the loss of an extremely positive reputation that he built over a lifetime. *See* Am. Compl. ¶¶ 205-209. There is nothing boilerplate about the description in over 55 pages of facts about how the Defendants' actions, aimed specifically at Fairfax, led to severe and specific emotional trauma to Fairfax that no reasonable person should expect to endure.

"Although Virginia law sets a high bar for the severity of emotional distress that a plaintiff must show, this Court has not required plaintiffs to clear that bar at the pleading stage in federal court." *Fields v. Sprint Corp.*, No.3:16-cv-905 (MHL), 2017 U.S. Dist., Westlaw 2017 WL 4053761, at *4 (E.D. Va. May 11, 2017) (comparing *Harris,* 271 Va. at 204-205 with *Daniczek v. Spencer*, 156 F. Supp. 3d at 758-59, which applied a relaxed standard to the analysis of the emotional distress, because the "Fourth Circuit has explicitly stated that Fed. R. Civ. P. 8 trumps Virginia's heightened pleading standards"). In *Fields*, for example, the plaintiff pleaded "financial harm, embarrassment, depression, anxiety, mental anguish, emotional pain, torment and suffering, shame, fright, mortification, humiliation and loss of dignity and pride." 2017 WL 4053761 at *4-5. The court concluded that "Fields has pled severe emotional distress with

sufficient particularity to meet this Court's pleading requirements." *Id*. Because Fairfax has similarly pled here, the Court should deny Defendants' motion to dismiss this claim.

## VI.     CBS CORPORATION IS A PROPER DEFENDANT IN THIS ACTION

Despite Defendants' argument to the contrary, CBS Corporation is properly named as a defendant in this action. First, CBS Broadcasting Inc. "is an indirect, wholly-owned subsidiary of CBS Corporation, a publicly traded company." *See, e.g., Kostenko v. CBS Evening News, et. al*., Civ. No. 5:16-cv-05326 (S.D.W.Va.), ECF No. 3 (Rule 7.1 Corporate Disclosure Statement for CBS Broadcasting Inc. and CBS Corporation); *see also* Am. Compl. ¶ 17. CBS Corporation exercised dominion and control over CBS Broadcasting for all relevant periods at issue in this action.

Moreover, CBS Corporation continues to employ the mutual friend of Fairfax, Watson and the eyewitness—a key figure in this action—as its associate general counsel. *See* Am. Compl. ¶¶ 96-100, 102-106, 109-11. At all relevant times, the associate general counsel had knowledge of key facts that could have prevented Defendants from publishing defamatory statements about Fairfax. *See id*. ¶¶ 109-11. Accordingly, CBS Corporation is a proper defendant in this lawsuit.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff Justin Fairfax respectfully requests that this Court deny Defendants' motion to dismiss.

Dated: November 18, 2019                 Respectfully submitted,


                                         */s/ Sara E. Kropf*
                                         Sara E. Kropf (VSB #84931)
                                         Daniel M. Portnov (*admitted pro hac vice*)
                                         KROPF MOSELEY PLLC
                                         1100 H Street, NW, Suite 1220
                                         Washington, DC 20005
                                         (202) 627-6900
                                         sara@kmlawfirm.com
                                         dan@kmlawfirm.com

                                         Jane M. Reynolds (VSB #71394)
                                         Law Offices of J.M. Reynolds, PLLC
                                         9238B Mosby Street
                                         Manassas, VA 20110
                                         (703) 680-2358
                                         lawoffices@jmreynoldspllc.com

                                         Kiah Spinks (VSB #83111)
                                         Spinks Law PLLC
                                         P.O. Box 393
                                         Occoquan, VA 22125
                                         (571) 247-6495
                                         kspinks@spinkslawpllc.com

                                         *Counsel for Plaintiff Justin E. Fairfax*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th of November 2019, I caused a copy of the foregoing to be filed electronically with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all interested parties.

*/s/ Sara E. Kropf*
Sara E. Kropf (VSB #84931)
KROPF MOSELEY PLLC
1100 H Street, NW, Suite 1220
Washington, DC 20005
(202) 627-6900
sara@kmlawfirm.com

*Counsel for Plaintiff Justin E. Fairfax*