IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JUSTIN FAIRFAX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-01176 (AJT/MSN) |
| | ) | |
| CBS BROADCASTING INC., *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On April 1, 2019 and April 2, 2019, CBS *This Morning*, a morning news program, broadcast to a national audience interviews of two women who accused Plaintiff Justin Fairfax ("Fairfax") of separate sexual assaults, one in 2000 and the other in 2004. Based on these broadcasts, Fairfax, the currently serving Lieutenant Governor of Virginia, has sued Defendants CBS Corporation and CBS Broadcasting Inc. (collectively, "CBS") for defamation and intentional infliction of emotional distress.

In response to the Amended Complaint,[1] Defendants have filed the pending Motion to Dismiss [Doc. 16] (the "Motion to Dismiss") and Motion for Attorney's Fees and Costs [Doc. 19] (the "Motion for Fees").  As discussed below, Fairfax has not plausibly alleged that CBS engaged in actionable defamation or published the challenged broadcasts with "actual malice" or that CBS intentionally inflicted emotional distress. The Motion to Dismiss is therefore **GRANTED**; and this action is **DISMISSED.**  The Motion for Fees pursuant to Va. Code Ann. § 8.01-223.2 is **DENIED**.

---

[1] On September 12, 2019, Fairfax filed this action and on October 3, 2019, he filed the Amended Complaint [Doc. 9].

# I. BACKGROUND

The following facts, taken from the Amended Complaint and the referenced broadcasts, are assumed true for purposes of this Order.[2]  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

On February 1, 2019, a photograph from Virginia Governor Ralph Northam's medical school yearbook page surfaced, purportedly showing Governor Northam dressed as either a white man in blackface or as a Ku Klux Klansman.  Am. Compl. ¶ 54. Immediately after the photo's release, national attention turned to Justin Fairfax, who, as the sitting Lt. Governor of Virginia, elected to that statewide office in November 2017, is the next in line to ascend to the governorship should Governor Northam resign, thereby becoming only the second African-American governor in state history. *Id.* ¶¶ 50, 58-59.

On the Sunday immediately after the yearbook picture surfaced, a conservative news website, "Big League Politics," published a private Facebook message, purportedly written by Vanessa Tyson ("Tyson"), in which Tyson states that someone poised to receive a "VERY BIG promotion" in Virginia had assaulted her at the 2004 Democratic National Convention in Boston. *Id.* ¶ 60. The following Monday, *The Washington Post* first reported the allegation, although the *Post* noted at that time that it "could not find anyone who could corroborate" Tyson's allegations.[3]  *Id.* ¶ 61.

---

[2] Because the Amended Complaint references and cites from the broadcasts, which have been submitted to the Court in their entirety, the record for purposes of the Motion includes, in addition to the allegations of the Amended Complaint, the entire contents of these broadcasts. *See Schneider v. Donaldson Funeral Home, P.A.*, 733 F. App'x 641, 645 (4th Cir. 2018) (court may take judicial notice of and consider at the motion to dismiss stage materials incorporated by reference in a complaint).

[3] Fairfax also alleges that Tyson had previously presented her false allegation against him to *The Washington Post* in the Fall of 2017 after Fairfax's victory in the November 7, 2017 general election, but the *Post*, after several months of investigation, made the decision in March 2018 not to publish her story because it lacked corroboration. *See id.* ¶¶ 80-81.

Three days later, on Wednesday, February 6, 2019, Tyson publicly stated that Fairfax sexually assaulted her in 2004. In a statement published through her lawyer, Tyson wrote that the encounter involved "consensual kissing" and that Fairfax's advances were, at first, "not unwelcome." *Id.* ¶ 71. But in that same statement, Tyson added:

> What began as consensual kissing quickly turned into a sexual assault. Mr. Fairfax put his hand behind my neck and forcefully pushed my head towards his crotch. Only then did I realize that he had unbuckled his belt, unzipped his pants, and taken out his penis. He then forced his penis into my mouth. Utterly shocked and terrified, I tried to move my head away, but could not because his hand was holding down my neck and he was much stronger than me. As I cried and gagged, Mr. Fairfax forced me to perform oral sex on him. I cannot believe, given my obvious distress, that Mr. Fairfax thought this forced sexual act was consensual. To be very clear, I did not want to engage in oral sex with Mr. Fairfax and I never gave any form of consent.

*Id.* ¶ 72.

Fairfax does not dispute that he had a sexual encounter with Tyson at the 2004 Democratic National Convention. Instead, Fairfax alleges that on July 28, 2004, after knowing each other for less than 24 hours, Tyson agreed to join Fairfax in his hotel room at the Democratic National Convention; on that evening, Tyson and Fairfax engaged in consensual sexual activity in Fairfax's hotel room; throughout that encounter, Tyson unambiguously manifested her consent to engage in consensual sexual activity; Fairfax did not force Tyson to do anything; Tyson did not indicate that Fairfax forced her to do anything; Tyson did not cry, gag, or choke while in Fairfax's hotel room, as Tyson alleged in her interview broadcasted by CBS; Tyson stayed in Fairfax's hotel room following the sexual encounter; and, contrary to Tyson's statements in her CBS interview, Tyson and Fairfax remained in touch in the weeks following their consensual sexual encounter and never indicated to Fairfax that the sexual encounter on July 28 was not consensual. *Id.* ¶¶ 38, 40-44, 46, 84d.-h.

Days after the Tyson story broke, Meredith Watson ("Watson"), through her attorney, sent a letter to Fairfax's legal counsel alleging that Fairfax had raped Watson in 2000 while both were undergraduate students at Duke University. *Id*. ¶ 85. In that letter, dated February 8, 2019, Watson's attorney called for Fairfax's resignation as Lt. Governor of Virginia and demanded that Fairfax respond by 3:00 p.m. that same day, implying that she would go public with her allegation unless Fairfax formally resigned as Lt. Governor. *Id*. Fairfax's counsel did not respond to the letter and Fairfax did not resign; and later that afternoon, Watson publicly announced that she had been raped by Fairfax in 2000 while both were Duke University undergraduate students. *Id*. ¶ 86. In that account, Watson alleged that in the spring 2000 at the Alpha Phi Alpha fraternity house on Duke's campus, Watson was sexual assaulted by Fairfax. *Id*. ¶ 87. Watson did not mention that anyone else was in the room. *Id*. ¶ 88. Watson later supplemented the statement by indicating that, at a later encounter with Fairfax in 2000, Fairfax stated that he knew he could assault her without risk because he knew that she had been raped the previous year by a Duke athlete. *Id*. ¶¶ 89-90.

Fairfax does not dispute that he and Watson had a sexual encounter in 2000 at Duke University. *Id*. ¶ 26. Instead, Fairfax claims that Watson initiated the sexual encounter with him in 2000; there was an eyewitness in the room during the entire encounter, which Watson omitted in her interview broadcasted by CBS; throughout the entire sexual encounter, Watson "unambiguously" manifested her consent to the sexual activity; afterwards, Fairfax left the room, with Watson remaining in the room with the eyewitness; Watson never indicated to Fairfax at any time that the spring 2000 encounter was not consensual; the alleged conversation between Watson and Fairfax, at a unspecified campus party later that semester, never occurred; and an eyewitness, who remains friends both with Fairfax, as well as a current lawyer for CBS,

discussed the encounter with Fairfax after Watson's initial February 2019 statements. *Id*. ¶¶ 22-34, 93.

On February 8, 2019, the day the Watson story broke, Ed O'Keefe, a CBS News Political Correspondent investigating the Fairfax allegations, was in contact with Fairfax's spokesperson, who had sent him a list of names and phone numbers, saying, "Please Ed call these Duke grads." *Id*. ¶ 107. The spokesperson also urged O'Keefe to "Please [d]o reporting and don't rush it" (sic). *Id*. O'Keefe was unable to make contact with the named persons on that list and urged Fairfax, and his team, to ask these individuals to return his calls. *Id*.

On April 1, 2019 and April 2, 2019, nearly two months after both women's allegations first surfaced, CBS, during it morning news program CBS *This Morning*, broadcast segments of its interviews with Tyson and Watson to a national audience. *Id*. ¶ 1. During these separate interviews, both women, both interviewed by CBS *This Morning* host Gayle King, accused Fairfax of sexual assaults against them. *Id*. Fairfax declined CBS' requests for a similar interview with him. *See* [Doc. 17, Ex. 6 at 3].

In its April 1, 2019 broadcast with Tyson, Tyson recalls in detail what she claims happened to her in Fairfax's hotel room in 2004. *See* [Doc. 17, Exs. 3, 5, 7]. She states, in relevant part:

| | |
|---|---|
| Tyson: | We're kissing lying down. And we're kissing, like, so our heads are level with each other. And then it was like my neck didn't work. |
| King: | What do you mean? |
| Tyson: | It was like I couldn't – I couldn't feel my neck. I couldn't hold my head up. He's using his hand on the back of my neck. [Tyson puts her right hand on the back of her neck and leans forward.] And I still didn't know what was going wrong. I thought there was something wrong with my neck and he's pushing down and pushing down and I couldn't hold my neck up. . . . And then the |

next thing I know, like, my head is like literally in his crotch. And I'm choking and gagging. . . .

*Id.*, Ex. 4 at 4. After this segment of the recorded interview, King states on air from the studio:

Now, Lt. Gov. Fairfax responded to the accusations. In a statement to CBS News, he says this: "I feel so strongly regarding my innocence that I submitted myself to polygraph tests for each of the accusations against me. I passed these tests because, as I have maintained from the very beginning, I did not assault either of my accusers."

*Id.*, Ex. 4 at 7. Thereafter, King and her CBS *This Morning* co-hosts shared their reactions:

| King: | It was fascinating talking to her because I felt, at some point, it's almost like she's going back to the moment that she believed – |
| Norah O'Donnell: | Yeah, of course. |
| Bianna Golodryga: | You could see that. |
| King: | You could really see that in her eyes. And people would say, "Yeah, but she went to the hotel room, yeah, she agreed to the kissing, isn't that on her?" But I could see, as a young person, you have a mutual friend, and you think this guy is safe, and kissing doesn't necessarily have to lead to what she says happened after that. So – |
| Golodryga: | Something clearly changed when she was talking – |
| King: | Yes. |
| Golodryga: | – through what transpired, and you could see where she got very emotional and went to that dark place. |
| O'Donnell: | Feels like she was forced. |
| King: | Yeah. |

*Id.*, Ex. 4 at 7-8.

Segments of CBS' interview with Watson were broadcast on both April 1, 2019 and April 2, 2019. *Id.* Exs. 5, 10, 12. In these interview segments, Watson recounted how, on a spring night in 2000, Fairfax invited her to "hang out" at a fraternity house located on campus. *Id.*, Ex. 11 at 1. Watson then said that, at a certain point, Fairfax had left the room and when he returned, moments later, the door shut with a "click like locking the door" and "the light went off." *Id.*, Ex. 11 at 2. She then added:

| | |
|---|---|
| Watson: | And he did things that you shouldn't do to someone without their permission. And I tried several times to get up and leave, and was pushed back down. |
| King: | And what happened? |
| Watson: | He forcibly sexually assaulted and raped me. I was not on the bed initially. There was a couch and he pulled me over, and I tried several times to get up, and was pushed back down, held down. |
| King: | And you made it clear, "This is not what I want." |
| Watson: | It was very clear. |
| King: | Because, you know, he is saying this night was consensual. |
| Watson: | If you have to hold someone down, it's not consensual. |

*Id.*, Ex. 11 at 2-3.

Following this, King prodded Watson about her allegation that she had been raped during

the previous school year, and how that experience related to her allegations against Fairfax:

| | |
|---|---|
| Watson: | One night after it [her alleged attack by Fairfax] happened, I was at a party on campus, and he came, and so I went to leave, like I left, and he followed me out, and was sort of following after me, calling after me, and I was just running, trying to get away. And then I finally stopped, and I turned around, and all I said to him was, "Why? Why would you do that to me?" And he said, "I knew, because of what happened to you last year, that if I got you in the right situation you would be too afraid to say or do anything about it." |
| King: | Meredith, you hear that, and you think what? |
| Watson: | [crying] He knew what he was going to do that night when he asked me to come over. |

*Id.*, Ex. 11 at 5. Immediately after concluding the interview segment, King, on air, again

remarked that Fairfax, through his spokesperson, denied sexually assaulting Watson, stating:

In response to Watson's allegations, a spokesperson says Fairfax took a polygraph test, and it supports his denials. . . . His spokesperson says the tests show that Fairfax was truthful when he answered that he never had that conversation with Meredith Watson where she implied his sexual contact with her was non-consensual. This spokesperson also says that Fairfax denies ever holding her down or preventing her from getting up during the alleged incident.

*Id.*, Ex. 11 at 6.  Later in the segment, King's co-hosts shared on air their reactions to Watson's interview, stating:

| | |
|---|---|
| O'Donnell: | There's an incredible amount of pain there. [referring to Watson's interview]. |
| King: | Yes. All these years later. |
| O'Donnell: | All these years later, that pain has stuck with them about how they felt in that moment, and how it has affected them for decades. |
| John Dickerson: | Think about the learning we've done. There was a period, half a year ago, when people said, "You know these people are coming forward after so many years." |
| King: | Why? |
| Dickerson: | Why are they coming forward? How can it really be so real? And, we have now seen example after example of how it is as real [snaps fingers] as if it happened yesterday. |
| King: | Exactly right, John. |

*Id.*, Ex. 11 at 3-4.

Fairfax alleges that CBS' publication of the Watson interview needs to be considered in light of its employment since 2010 of an associate general counsel who focuses on litigation, including defamation matters, and who is a former boyfriend of Watson and a fraternity brother of both Fairfax and the alleged eyewitness.  *Id.* ¶¶ 97-99, 107.  Since Watson went public with her accusation against Fairfax in February 2019, Fairfax and this CBS lawyer exchanged numerous text messages and had several conversations regarding the allegations made by Watson *before* CBS published its interview with Watson in April 2019.  *Id.* ¶¶ 103, 104, 106. According to Fairfax, the lawyer knew that an eyewitness was in the room throughout the encounter; the encounter between Fairfax and Watson was consensual; and he could testify as to the veracity of Watson's allegations. *Id.* ¶ 105.  Nevertheless, this CBS lawyer was unable to prevent CBS from airing the Watson interview or did not take steps to prevent CBS from airing

the Watson interview. *Id.* ¶ 109. He further alleges that before King interviewed Watson in April, his spokesperson urged CBS to ask certain questions of Watson and the CBS lawyer and the eyewitness, both of whom were on a list Fairfax provided to CBS, and to fully investigate her claims, including the date of the alleged assault, in which room it occurred, and whether Watson "encountered anyone other than Fairfax upon entering or exiting the room or building," but that CBS conducted no such investigation. *Id.* ¶¶ 1, 139, 140.

Fairfax also alleges that CBS, the only news network to air interviews with Watson and Tyson, made the decision to publish these interviews in order to improve its image following the #MeToo movement and embarrassing workplace sexual misconduct scandals involving former CBS employees Charlie Rose and Les Moonves. *Id.* ¶¶ 113, 114. In a similar vein, Fairfax alleges that CBS had a preconceived narrative in pursuing the interviews and the allegations against him, pointing to (1) CBS' failure to ask basic questions of Watson and Tyson; (2) its failure to separately investigate in advance of the airing date and only speaking to Watson and Tyson directly, as well as their representatives; (3) its decision to conduct an unusual pre-interview of Watson (and perhaps of Tyson as well); (4) its editing interviews in such a way to ensure that the final, published, and distributed versions fit CBS's preconceived narrative; and (5) its failure to update its story once Fairfax identified an exculpating eyewitness, present in the room during the 2000 encounter with Watson, in July 2019, months after the interview with Watson initially aired.

Fairfax further alleges that CBS' animus towards him continued, even after the April broadcasts, as reflected in a CBS reporter's asking Fairfax at an April 3, 2019 press conference, "At what point do you just resign?" *id.* ¶¶ 122-125, 132, and also CBS' failure to retract, or at the least correct, the stories after evidence emerged which he claims contradicted their contents. In

particular, Fairfax alleges that CBS failed to report on (1) the letters he sent to the relevant local prosecutors in the summer of 2019, in the jurisdictions where the alleged assaults occurred, asking these prosecutors to investigate the allegations; (2) Fairfax's July 10, 2019 revelation of the exculpatory eyewitness, whose role in the 2000 alleged assault was previously undisclosed; and (3) CBS employees' continually exchanged messages with Fairfax's spokesperson who asked questions and noted inconsistencies in the stories of the two women. *Id*. ¶¶ 184-190. Fairfax notes in this regard that the exchanged messages inexplicably stopped once Fairfax publicly stated that, according to the eyewitness, Watson's allegations against Fairfax were false, *id.* ¶ 189; and CBS never revised its reporting in its initial broadcasts in light of this new evidence, despite other news networks doing the same, nor did it investigate this new evidence further, particularly evidence that may conflict with statements made in the initial broadcasts, *id*. ¶¶ 190-191.

Fairfax also alleges in detail the effects that CBS' broadcasts of the Tyson and Watson interviews had on him politically, professionally, and personally. Before CBS published the allegedly false and defamatory allegations against him, Fairfax had served as a member of the Duke University Board of Trustees, the Duke University Sanford School of Public Policy Board of Visitors, Chair of the Democratic Lieutenant Governors Association, and a partner at the law firm Morrison and Foerster LLP in Washington, D.C. *Id*. ¶ 15. Upon publication of the CBS broadcasts, he was asked to resign or voluntarily resigned from each of those positions. *Id*. ¶¶ 205-207.

Based on the above allegations, Fairfax asserts two causes of action against CBS. In Count I, Fairfax alleges that CBS defamed him based on its initial broadcasts of King's interviews with Tyson and Watson, and the further dissemination of those broadcasts on the CBS

website, CBSNews.com, and other social media platforms. *Id*. ¶¶ 210-228. In particular, he alleges that CBS, in airing the accusations, "have falsely portrayed [him] as a rapist, sexual abuser, and a predator," and that these accusations are defamatory *per se*. *Id*. ¶¶ 220-221. In Count II, Fairfax asserts an intentional infliction of emotional distress ("IIED") claim against CBS, alleging that through its publication of the two interviews, CBS intentionally and falsely labeled Fairfax a criminal, causing him severe emotional distress. *Id*. ¶¶ 227-28. As relief, Fairfax seeks an award of compensatory damages of not less than $400,000,000, punitive damages, attorney's fees and costs, and an injunction prohibiting CBS from disseminating, distributing, or publishing any footage or statements that are judicially determined to be defamatory. *Id*. at 56 ("Prayer for Relief").

## II. LEGAL STANDARD

Under Rule 12(b)(6), a complaint "must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted." *Adams v. NaphCare, Inc.*, 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). To survive a motion to dismiss, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted).

In addressing a Rule 12(b)(6) motion, a court must assume the truth of all facts alleged in the complaint and construe the factual allegations in favor of the plaintiff, *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009); however, a court "is not bound by the complaint's legal conclusions." *Id*. Without converting a Rule 12(b)(6) motion into one for

summary judgment, a court may consider the complaint's attachments, documents incorporated by reference into the complaint, and documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *see also Healey v. Abadie*, 143 F. Supp. 3d 397, 401 (E.D. Va. 2015). A court may also take judicial notice of items in the public record. *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

## III.   ANALYSIS

### A.   Defamation

Under Virginia law, the elements of common law defamation are the "(1) publication of (2) an actionable statement with (3) the requisite intent." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (applying Virginia law).  A statement is actionable if it contains a false assertion of fact that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id*. Actionable defamation can be based on a statement that is either defamatory *per se* or defamatory by implication. Whether a statement is actionable is a threshold question of law for courts to decide.  *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 294 (4th Cir. 2008).

"[A] statement is defamatory *per se* if it, among other circumstances, . . . impute[s] to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment.'" *CACI*, 536 F.3d at 292-93  (quoting *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E.2d 588, 591-92 (Va. 1954)). A statement is defamatory by implication if "(1) the defendants made the statements alleged in the complaint, (2) the statements, even if facially true, were designed and intended by the defendants to imply [the defamatory meaning], (3) in the light of the circumstances

prevailing at the time they were made, the statements conveyed that defamatory implication to those who heard or read them, and (4) the plaintiff suffered harm as a result." *Pendleton v. Newsome*, 290 Va. 162, 175, 772 S.E.2d 759, 765 (Va. 2015). However, in assessing whether the alleged defamatory meaning can be understood by implication, language cannot, by innuendo, be extended beyond its ordinary and common meaning, *Carwile*, 82 S.E.2d at 591-92*,* and courts consider the "'general tenor of the [publication],'" *id.* (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990)); *see also Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (in determining whether a statement can be reasonably interpreted as stating actual facts about an individual, courts look to the circumstances in which the statement is made). Thus, where a plaintiff alleges that he has been defamed by implication, the alleged implication must be reasonably drawn from the words actually used. *Chapin*, 993 F.2d 1087, 1092-93 (4th Cir. 1993); *see also Pendleton*, 772 S.E.2d at 763 (defamation by implication actions may proceed only upon words actually stated); *Hyland v. Raytheon Tech. Servs. Co.*, 277 Va. 40, 48, 670 S.E.2d 746, 751 (Va. 2009) (stating that a plaintiff may bring an action for defamation for "any implications, inferences, or insinuations that reasonably could be interpreted to impute a false fact about him").

In addition to the above requirements, there are also "constitutional limits on the *type* of speech" that is subject to a defamation action. *Milkovich*, 497 U.S. at 16 (emphasis in original). If a statement "cannot reasonably be interpreted as stating actual facts about an individual," it cannot be the subject of a defamation suit. *Id.* at 20 (internal quotation marks and citations omitted); *see also WJLA-TV v. Levin*, 264 Va. 140, 152, 564 S.E. 2d 383, 390 (Va. 2002); *Yeagle v. Collegiate Times*, 255 Va. 293, 297, 497 S.E. 2d 136, 138-39 (Va. 1998). There are also constitutional limits, anchored in the First Amendment, pertaining to defamation claims made by

a "public figure." *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). In that regard, a public figure must allege that a challenged statement was made with actual malice—that is, with knowledge that the statement made was false or made with reckless disregard as to its falsity. *Id*. And importantly, at the pleading stage, "conclusory allegations" and "mere recitation[s]" of the actual malice standard—which is ultimately a subjective inquiry—are insufficient. *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc*., 674 F.3d 369, 378 (4th Cir. 2012). Instead, a plaintiff must plead facts that, if proven, create a "plausible inference" of actual malice. *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp.3d 471, 481 (E.D. Va. 2018). To do so, a plaintiff may refer to certain aspects surrounding a challenged statement deemed probative of malice, such as a defendant's failure to adequately investigate or observe journalistic standards; a narrative and story line unmoored in the facts; or other circumstantial evidence that, taken together, evidences that the defendant acted with knowledge of the statement's falsity or that it "entertained serious doubts as to the truth of [its] publication." *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968). Fairfax does not dispute that he is a public figure, *see* Am. Compl. ¶ 211.

Applying the above principles of law to Fairfax's defamation claims against CBS, the issue is whether the Amended Complaint alleges facts that make plausible that a reasonable listener would understand CBS to be presenting the substance of Tyson's and Watson's statements as actual facts that were either defamatory *per se* or defamatory by implication, and if so, whether CBS made the defamatory statement either with knowledge that the defamatory meaning was false or with a reckless disregard as to whether it was true or false.

i.  Defamatory Meaning

The content of Tyson's and Watson's on air statements, as related by them directly, is clearly defamatory *per se*, as it not only describes serious criminal conduct but also conduct that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  Restatement (Second) of Torts § 559.  Whether the broadcasts constitute actionable defamation against CBS, however, depends on whether a reasonable viewer would understand that CBS was presenting or implying either accusers' statements as factually true.  For this reason, CBS contends that the challenged broadcasts are not actionable because, as a matter of law, it merely presented "competing allegations of Tyson and Watson on the one hand, and of Fairfax's version of those same events on the other," and thus cannot convey any defamatory meaning on the part of CBS. [Doc. 17 at 20].

Central to Fairfax's position are the comments of the CBS *This Morning* co-hosts before and after the broadcasted interviews of Tyson and Watson, in which they react to aspects of what both women said.  Specifically, before Tyson's interview, King noted that the details of Tyson's claims are "very disturbing;" and following Tyson's interview, King remarked that "it was fascinating talking to her [Tyson] because I felt, at some point, it's almost like she's going back to the moment that she believed," to which fellow co-host Bianna Golodryga added: "You could see that . . . Something clearly changed when she was talking through what transpired, and you could see where she got very emotional and went to that dark place." [Doc. 17, Ex. 4 at 7-8].  Seconds later, fellow co-host Norah O'Donnell remarked that it "Feels like she was forced." *Id*.  Similarly, following Watson's interview, O'Donnell, referring to Watson's interview, remarked: "There's an incredible amount of pain there . . . All these years later, that pain has stuck with

them about how they felt in that moment, and how it has affected them for decades." *Id.*, Ex. 11 at 3-4. Fairfax contends that through these and other statements, CBS *This Morning* co-hosts created at least the defamatory implication that he in fact committed the two sexual assaults, as related by his accusers, largely because these statements essentially vouched for both Watson's and Tyson's credibility and, with respect to Tyson, CBS failed to probe inconsistencies in Tyson's interview. [Doc. 35 ("Opp.") at 3-7].

Although, when taken in isolation, these relied upon comments could arguably cause a reasonable viewer to infer that the CBS co-hosts believed to some extent certain aspects of these accusers' stories, neither the April 1, 2019 nor April 2, 2019 broadcasts contains, as to CBS, actionable defamation as a matter of law when the relied upon statements are considered within the context of the broadcasts in their entirety. *See Va. Citizens Def. League v. Couric*, 910 F.3d 780, 786 (4th Cir. 2018) (applying Virginia law) (finding challenged film not to have a defamatory meaning once the Court reviewed the film, not a particular twelve-second clip, in its entirety). Most basically, none of the CBS *This Morning* co-hosts state that Fairfax did in fact commit the alleged sexual assaults or that they believed he committed the assaults. In fact, at the conclusion of each interview, King, in studio and surrounded by her co-hosts, promptly announces Fairfax's assertions of innocence, including that he passed a polygraph exam as to both of his accusers' allegations.[4] Further, CBS, contrary to Fairfax's contentions, probed

---

[4] *See* [Doc. 17, Ex. 4 at 7 (King: "Now Lieutenant Governor Fairfax responded to the accusations. In a statement to CBS News he says this: 'I feel so strongly regarding my innocence that I submitted myself to a polygraph test for each of the accusations against me . . . I passed these tests because as I've maintained from the very beginning I did not assault either of my accusers.'")]; *id.*, Ex. 11 at 6 (King: "In response to Watson's allegations a spokesperson says Fairfax took a polygraph test and it supports his denials. That's according to information released by his team characterizing, rather, the results. His spokesperson says the tests show that Fairfax was truthful when he answered that he never had a conversation with Meredith Watson where she implied his sexual contact with her was nonconsensual. This spokesperson also says that Fairfax denies ever holding her down or preventing her from getting up during the alleged incident."); *id.*, Ex. 13 at 3 (King: "Now, Lieutenant Governor Fairfax categorically denies Vanessa Tyson and Meredith Watson's allegations against him. In a statement to CBS News he says this: 'I

inconsistencies and shortcomings in both women's statements.  For example, King pressed both

women about their background, their stories, and motivations in coming forward for the first

time just as Fairfax was on the cusp of rising to the Virginia's highest elected office.[5]  King

questioned Tyson about how her story compared to Fairfax's own recollection and confronts

Tyson with Fairfax's differing recollections of the events she alleges.  *See* [Doc. 17, Ex. 4 at 5-6

(King questioning Tyson regarding her claim that she did not contact Fairfax after their 2004

encounter)].  And while interviewing Watson, King asks about other incidents involving

relationships that might bear on her credibility. *See* [Doc. 17, Ex. 14] (where King asks: "[T]here

have been published reports about an ex-boyfriend who took out a peace order, which is a form

of a restraining order in the state of Maryland. He claims you damaged his car, that you

threatened to commit suicide, that you held him hostage. . . How do you respond to those

allegations?").

　　　Moreover, the relied upon commentary, when read in context, does not ascribe to any

particular view of the underlying events, but rather on how persons who believe they are victims

of sexual abuse are affected.[6]  Similarly, King calling Watson's allegations "disturbing" is a

description of the allegations' content, not her veracity or the factual accuracy of the allegations

---

am able to hear the pain they have expressed, a pain I hope they are able to resolve and heal from.  However, because I never assaulted either Dr. Tyson or Ms. Watson I know that my actions cannot be the source of that pain.' Both Watson and Tyson are calling for a public hearing into the allegations.").

[5] *See id*., Ex. 6 at 2 (King asking Tyson to respond to Fairfax's statement that these allegations are intended to smear him); *id*., Ex. 11 at 4 (King (to Watson): "I think people looking at you would say well, how could it happen to her twice in the same place at the same school. What do you say to that?"); *id*., Ex. 13 at 2 (King (to Watson): "You know, the thing you keep hearing from most men certainly after the Me Too movement is that a woman can make a charge and a man has no defense, and when we get into your word against his, why are you more credible than he is?").

[6] *See, e.g.*, *id*., Ex. 6 at 3-4 (CBS *This Morning* co-host Dickerson: "You know, and think about the learning we have done. There was a period half a year ago where people said, you know, these people are coming forward – after so many  years -- Why are they coming forward, how can it really be so real, and we have now seen example after example of how it is as real as if it happened yesterday.") (emphasis added).

themselves, and essentially served as a forewarning to viewers of the nature of Watson's allegations. [Doc. 17, Ex. 11 at 2]. Overall, CBS' statements and presentations, when viewed in context and in conjunction with other statements pertaining to Fairfax's denials and other possible versions of what happened,[7] are not defamatory *per se* and do not sufficiently imply that the accusations as true or accurate or that CBS endorsed the veracity of Fairfax's accusers. *See Webb v. Virginian-Pilot Media Co., LLC,* 287 Va. 84, 90, 752 S.E.2d 808, 812 (Va. 2014) (noting, in part, that because a newspaper article disclaimed any preferential treatment, a defamatory inference could not be reasonably drawn, even though witnesses, at trial, testified that they drew a defamatory inference or implication).[8]

### ii. Actual Malice

Fairfax's defamation claim also fails because he has not sufficiently alleged facts that make plausible that CBS broadcasted the interviews with the requisite degree of fault, *viz.*, actual malice, based on either actual knowledge or a reckless disregard for the truth.

Fairfax contends that, when taken together,[9] the following makes plausible his claim of actual malice: (1) CBS failed to investigate Tyson's and Watson's allegations; (2) CBS relied on

---

[7] *See id.*, Ex. 4 at 7 (King: "[K]issing doesn't necessarily have to lead *to what she says happened* after that." (emphasis added)); *id.* Ex. 13 at 1 (King: "We have more now of our interview with Meredith Watson telling *the story she revealed* after Vanessa Tyson publicly alleged that Virginia Lt. Gov. Justin Fairfax sexually assaulted her. Watson *claims* that Fairfax raped her in 2000 when they were both students at Duke University . . . Justin Fairfax denies their allegations, adamantly so.") (emphasis added)).

[8] In support his position, Fairfax cites *Phi Kappa Psi v. Rolling Stone et al.*, 94 Va. Cir. 214, 216 (Va. Cir. Ct. Aug. 31, 2016). In that case, a Virginia circuit court refused to dismiss on demurrer a defamation suit brought by a fraternity against *Rolling Stone* Magazine based on an article recounting in detail a violent rape on the grounds that the article did not solicit the fraternity's response and made repeated references to a vicious "gang rape" that, when taken together, were capable and susceptible to a defamatory meaning or implication. Unlike *Phi Kappa Psi,* CBS solicited Fairfax to appear and respond, repeatedly referenced Fairfax's denials throughout the challenged broadcasts, and asked questions of both women that challenged their accusations.

[9] Federal cases applying Virginia law recognize the cumulation theory to prove actual malice. *See Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991) (en banc), *cert. denied*, 501 U.S. 1212 (1991) (applying Virginia law) (noting that departure from journalistic standards is not, standing alone, a determinant of actual malice, but such action might serve as supportive evidence when combined with other evidence); *Gilmore v. Jones,*

a single, unreliable source for each interview (namely, Tyson and Watson); (3) CBS violated

applicable journalistic standards; (4) CBS was motivated by its desire to respond publicly and

aggressively to the #MeToo movement in light of certain internal controversies at CBS; (5) CBS

had a  preconceived narrative that Fairfax committed the alleged sexual assaults; (6) CBS failed

to challenge Tyson or Watson on basic facts of their stories during the interview itself; and (7)

CBS engaged in certain post-publication conduct probative of actual malice.  Opp. at 16-24.

"[F]ailure to investigate will not alone support a finding of actual malice." *Harte-Hanks*

*Communications v. Connaughton*, 491 U.S. 657, 688 (1989).  However, there is a duty to

investigate where there is reason to doubt the veracity of a source or the publisher "has a high

degree of subjective awareness of their probable falsity, *Jackson v. Harting,* 274 Va. 219, 229-

30, 645 S.E.2d 303, 309 (Va. 2007); and the failure to do so can be probative of actual malice.

*Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("We recognize that although failure to

investigate does not in itself establish bad faith, reliance on anonymous or unreliable sources

without further investigation may support an inference of actual malice.").

In support of its claim that CBS had a duty to investigate more than it did, Fairfax

essentially claims CBS had either reasons to doubt his accusers' veracity or, at least, deliberately

shielded itself from the truth.[10]  But Fairfax has failed to allege facts that make plausible either of

---

370 F. Supp. 3d 630, 673 (W.D. Va. 2019) ("Although neither the pursuit of a preconceived narrative nor a failure to observe journalistic standards is alone ultimately enough to establish actual malice, Gilmore's factual allegations, taken together, are sufficiently plausible to support an inference that Creighton published statements about him with actual malice."); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) ("Although failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact.").  *See also Tavoulareas v. Piro*, 817 F.2d 762, 790 (D.C. Cir. 1987), *cert. denied*, 484 U.S. 870 (1987) ("[A] plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence.").

[10] In support of this contention, Fairfax points to (1) CBS' knowledge of certain witnesses, as identified by a Fairfax's spokesperson prior to publication, including a CBS in-house lawyer with relevant knowledge and an eyewitness to the 2000 incident with Watson; (2) CBS' awareness that *The Washington Post* refused to run the story

these contentions.  Both women came forward and disclosed sexual encounters that Fairfax admits occurred, albeit consensually.  *See CACI*, 536 F.3d at 295-96 (finding two independent reports provided defendant reasonable grounds to make claims about the subject of the reports without raising inference of actual malice). Other news organizations had aired and reported both woman's stories months before the April 2019 broadcasts and CBS attempted to contact those individuals Fairfax had identified as persons with relevant information; and when unsuccessful, requested Fairfax, and his personal team, to encourage those individuals to speak with them, including an individual that Fairfax latter explicitly identified as the eyewitness to his encounter with Watson. *See* Am. Compl. ¶¶ 11, 25-29, 107; Opp. at 16 (stating that "[o]ne of the witnesses [in the list of four names provided to CBS in February 2019] was the eyewitness); *see also Hugger v. Rutherford Inst.*, 94 Fed. Appx. 162, 167 (4th Cir. 2004) (per curiam) ("TRI's actions are not those of one acting with reckless disregard for the truth. Although a reasonable person may have waited to hear from one of the corroborating witnesses before issuing the press release," that does not arise to actual malice involving a matter of public concern).

Similarly, Fairfax does not plausibly allege that CBS, in publishing "sensational and highly damaging accusations made by Tyson and Watson" against him, violated "basic journalistic standards." Am. Compl. ¶ 135.  As reflected in the Amended Complaint itself, CBS personnel appeared to be in constant contact with Fairfax's spokesperson and in fact, "were highly responsive to her outreach" and provided Fairfax an opportunity to respond to the interviews, which he declined.  *Id*. ¶ 189.  *See Reuber*, 925 F.2d at 718 (finding actual malice interview with one side when publishing matters of public concern, while the other side declines

---

because it could not corroborate Tyson's story; (3) CBS' failure to interview anyone other than Tyson, Watson and their respective representatives in order to corroborate their stories; (4) CBS's failure to reach out to Fairfax sufficiently in advance of when the interviews first aired.  Am. Compl. at 25-39.

to be interviewed, "would transform the *New York Times* standard for actual malice into one far less protective of the purposes of free expression."). Nor can the Court find any obligation on the part of CBS, legal or otherwise, to disclose to Fairfax in advance of the broadcasts the fact or substance of the interviews, as Fairfax insists CBS should have. And as reflected in those portions of the broadcasted interviews, CBS asked questions of both women that raised issues as to their veracity and motivations. *See supra* 17.

Fairfax's contentions about CBS' pre-determined animus, motive and intent—namely, CBS' own desire to respond to internal #MeToo allegations—also fails to adequately support his claim of actual malice. Fairfax makes only conclusory statements about a perceived need for CBS, amidst damaging reports of sexual misconduct by its employees, to publish the challenged interviews; and the Amended Complaint lacks any detail about how this background motivated, or was related to, the publication of the challenged broadcasts, which occurred two months after the initial allegations became public and once CBS was able to obtain the exclusive interviews of the two women at the center of the matter.

As a general proposition, actual malice *cannot* be inferred from having a political or ideological animus towards a plaintiff, standing alone, *see Tavoulareas,* 817 F.2d at 795; *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 597 (D.C. Cir. 2016) (holding that the assertion a writer had "concocted a pre-conceived storyline . . . fails to establish actual malice"); *Westmoreland v. CBS, Inc.*, 596 F. Supp. 1170, 1174 (S.D.N.Y. 1984) (an adversarial stance is certainly not indicative of actual malice under the circumstances where the reporter conducted a detailed investigation), and in any event, even assuming some pre-existing ill will or animus on the part of CBS, Fairfax fails to allege facts that, when combined with any such presumed animus, would allow a plausible inference of malice.

Nor is CBS' alleged post-publication conduct sufficient to make plausible the required showing of actual malice at the time of publication.[11]  *See Horne v. WTVR, LLC*, 893 F.3d 201, 211 (4th Cir. 2018) (applying Virginia law) ("Under the actual malice standard, a plaintiff must prove that the defendant had a particular, subjective state of mind at the time the statements were made.") (citations omitted); *see also Secord v. Cockburn*, 747 F. Supp. 779, 792-793 (D. D.C. 1990) ("post-publication events have no impact whatever on actual malice as it bears on this lawsuit since the existence or non-existence of such malice must be determined as of the date of publication.") (citing *Sullivan*, 376 U.S. at 286 (malice must be shown "at the time of publication")). While post-publication conduct can conceivably in some circumstances be probative of actual malice at the time of publication, the Amended Complaint fails to allege any such post-publication conduct by CBS.[12]

For the above reasons, Fairfax has failed to allege facts sufficient to make plausible that CBS acted with actual malice.

---

[11] In determining the "time of publication, the Court is mindful of the "single publication rule," under which the mass distribution of defamatory communications, such as internet posts, are not deemed to be republished each time the communication is re-posted or repeated. Although the Supreme Court of Virginia has not formally addressed the issue, the Fourth Circuit has repeatedly held that Virginia would follow "[t]he great majority of states" that now follow the "single publication rule," *Morrissey v. William Morrow Co.,* 739 F.2d 962, 967 (4th Cir.1984); *see also Semida v. Rice*, 863 F.2d 1156, 1161 (4th Cir. 1988); *Eramo*, 209 F. Supp. 3d at 879; *Doe v. Roe*, 295 F. Supp. 3d 664, 671 (E.D. Va. 2018) ("a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience"). For this reason, the only relevant date in assessing CBS' actual malice would appear to be the dates of the initial broadcasts, April 1, 2019 and April 2, 2019.

[12] Fairfax contends in this regard that CBS obtained information after the April 2019 broadcasts that would have exculpated Fairfax but CBS refused to follow up on such information. Specifically, Fairfax points to his own public announcement in July 2019 that there exists an exculpating eyewitness who was present during his encounter with Watson in 2000 and that CBS refused to revise its reporting in light of this "crucial information." Opp. at 23; *see also* Am. Compl. ¶¶ 127, 189-191. Fairfax also alleges that he and the unnamed CBS in-house lawyer, who was included on this list of potential witnesses, had exchanged messages concerning that eyewitness before April 2019. *See* Am. Compl. ¶¶ 181, 186-190.  Putting aside the probative value of post-publication information generally, CBS' failure to report on this eyewitness does not plausibly allege actual malice.  Although, according to Fairfax, the eyewitness was included in the initial list provided to CBS correspondent Ed O'Keefe in February 2019, *see* Opp. at 16, Fairfax never specifically identified to CBS before his announcement in July 2019 that one of the persons on that list was an eyewitness.  As to his communications with the CBS in-house lawyer, Fairfax does not allege the actual contents of those communications and has not placed in the record those relied upon communications.

### B.  Intentional Infliction of Emotional Distress (IIED)

Fairfax acknowledges that to the extent the defamation claim fails, so too must the IIED claim.  Opp. at 28-29.  The Court accordingly dismisses Count II.[13]

### C.  Motion for Attorney's Fees

CBS also moves for an award of attorney's fees and costs in this action pursuant to Va. Code Ann. § 8.01-223.2, otherwise known as Virginia's anti-SLAPP statute.

Va. Code Ann. § 8.01-223.2(A) provides immunity from civil liability for any claim of defamation based solely on statements "regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party," provided that such statements are not made with "actual or constructive knowledge that they are false or with reckless disregard for whether they are false." That same section also provides that "[a]ny person who has a suit against him dismissed pursuant to the immunity provided by this section *may* be awarded reasonable attorney fees and costs." Va. Code Ann. § 8.01-223.2(B) (emphasis added).

As discussed *supra*, the statements at issue concern "matters of public concern that would be protected under the First Amendment to the United States Constitution"[14] and Fairfax has

---

[13] For a plaintiff to recover for intentional infliction of emotional distress in the absence of any accompanying physical injury, he must allege that (1) the defendant's conduct was intentional and reckless; (2) the conduct was outrageous and intolerable such that it "offends against generally accepted standards of decency and morality;" (3) the conduct caused the plaintiff's emotional distress; and (4) the plaintiff's emotional distress was severe. *Russo v. White,* 241 Va. 23, 25, 400 S.E. 2d 160, 162 (Va. 1991).  Although it is not necessary for the Court to decide the sufficiency of Count II, separate and apart from Count I, it appears doubtful that the Amended Complaint alleges facts that make plausible some or all of the elements of an IIED claim.  *See, e.g.*, *Harris v. Kreutzer,* 271 Va. 188, 205, 624 S.E.2d 24, 34 (Va. 2006) (finding symptoms including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression," "psychological treatment and counseling," "mortification, humiliation, shame, disgrace, and injury to reputation" as insufficient to state a claim for IIED under Virginia law).

[14] Va. Code Ann. § 8.01-223.2 does not define what qualifies as a "public concern."  Other States, applying their own anti-SLAPP statutes, have essentially regarded any issue pertaining to a public official to be a matter of public concern.  *See, e.g.*, *Healthsmart Pacific, Inc. v. Kabateck,* 7 Cal. App. 5th 416, 430 (Cal. Dist. Ct. App. 2d Dec. 19, 2016) ("Bribery of a senator and its connection with health care legislation is undeniably a matter of public

23

failed to adequately allege that CBS published the challenged publications with actual malice. CBS has therefore sufficiently established the statutory immunity under § 8.01-223.2(A) that places it within the class of litigants that may recover attorney's fee and costs under § 8.01-223.2(B). At issue, however, is whether this Court should award fees under § 8.01-223.2(B). CBS, though noting the absence of a controlling interpretation from either the Supreme Court of Virginia or the Fourth Circuit, contends that the statute presumptively requires this Court to award CBS its attorney's fees and costs, [Doc. 20 at 4-5], and Fairfax has not sufficiently shown why fees should not be awarded, [Doc. 38 at 3].

In support of its position, CBS cites the District of Columbia's anti-SLAPP statute,[15] which the D.C. Court of Appeals has interpreted as presumptive, notwithstanding that statute's use of the word "may." *See Doe v. Burke*, 133 A.3d 569, 575 (D.C. 2016). At issue in *Burke* was whether a trial court, who had granted a defendant's special motion to quash a defamation lawsuit pertaining to issues of public interest, erred when it held that an award of reasonable attorney's fees was discretionary under D.C.'s anti-SLAPP statute. There, the D.C. Court of Appeals, reversing the trial court, held that, with respect to an award of attorney's fees, the D.C. statute implicitly "rejects any additional showing of frivolousness or wrongful motivation . . . before a party who files a special motion to quash and prevails" because the same statute also expressly indicates when a showing of frivolousness or improper motive is required—*i.e.*, when "the court finds that a motion brought under § 16-5502 or § 16-5503 is frivolous or is solely intended to cause unnecessary delay." *Burke*, 133 A.3d at 575 ("Unlike the 'moving party who

---

concern."); *Deaver v. Desai,* 483 S.W.3d 668, 672 (Tex. Ct. App., 14th Dist. Dec. 3, 2015) (applying Texas anti-SLAPP statute which expressly defines "matter of public concern" to include an issue related to "(D) a public official or public figure"). Here, Fairfax does not contend that the challenged broadcasts are not related to a matter of public concern.

[15] In relevant part, that D.C. statute reads: the "court *may* award a moving party who prevails, in whole or in part . . . the costs of litigation, including reasonable attorney fees." D.C. Code § 16-5504(a) (emphasis added).

prevails . . . on a motion,' 'the responding party'— the original plaintiff—may be awarded fees

only if the court finds a complete lack of merit or improper motivation in the special motion to

quash. This distinction between what the Council required in one of two companion provisions

but not the other must be assumed to be deliberate . . .") (citing D.C. Code § 16-5504(b)).

Unlike the D.C. anti-SLAPP statute, § 8.01-223.2(B) does not limit an award of fees to

those instances where a defendant has prevailed on a preliminary motion to dismiss or quash.

Indeed, § 8.01-223.2(B) is applicable to *all* instances where a party is entitled to statutory

immunity and makes no distinction regarding *when* the case is resolved—whether at the motion

to dismiss, summary judgment, or trial stage—and it does not allow under any circumstances an

award of attorney's fees to a plaintiff who successfully opposes a motion to dismiss. For these

reasons, the Court finds the D.C. anti-SLAPP statute to be materially different from Virginia's

and those cases interpreting that statute provide little guidance in interpreting § 8.01-223.2(B).

The Supreme Court of Virginia, as other courts, has made it clear that, when interpreting

a statute, courts should "ascertain and give effect to the intention of the legislature," and that

intent is usually self-evident from the words used in the statute. *Chase v. DaimlerChrysler

Corp.*, 266 Va. 544, 547, 587 S.E. 2d 521, 522 (2003). Consequently, Virginia courts apply

the plain language of a statute unless the terms are ambiguous, *Tiller v. Commonwealth*, 193 Va.

418, 420, 69 S.E. 2d 441, 442 (1952), or applying the plain language would lead to an absurd

result, *Cummings v. Fulghum*, 261 Va. 73, 77, 540 S.E. 2d 494, 496 (2001). Here, § 8.01-

223.2(B) clearly states that "any person who has a suit against him dismissed pursuant to the

immunity provided in this section *may* be awarded reasonable attorney fees and costs."[16] The

---

[16] The Virginia legislature also enacted § 8.01-223.2(B) against the backdrop of other States' anti-SLAPP statutes, some of which used "shall" and others, "may." *Compare, e.g.*, Cal. Civ. Proc. Code § 425.16(c); Fla. Stat. Ann. § 768.295(4); and 735 Ill. Comp. Stat. Ann. § 110/25, which prescribes that a court "shall" make fee awards, *with*, Del. Code Ann. Tit. 10, § 8138(a); NY CLS Civ. R. § 70-a, as well as their judicial interpretations that emphasized

Virginia legislature has also demonstrated that it knows how to make an attorney's fee award mandatory to prevailing parties through the use of the word "shall." *See, e.g.*, Va. Code Ann. §§ 2.2-4030(A) (pertaining to civil actions regarding state administrative decisions); 9.1-704(B) (pertaining to actions to recover unpaid overtime compensation by state fire protection and law enforcement personnel).[17]  The Court therefore gives the permissive "may" its plain meaning and effect and concludes that § 8.01-223.2(B) is permissive, not mandatory or presumptive, and thereby authorizes the Court to award fees in its discretion.

Other than its use of the word "may," Section 8.01-223.2(B) provides no additional guidance concerning the circumstances under which the Court should exercise that discretion; and in assessing whether to award fees under § 8.01-223.2(B), the Court has considered how courts have exercised their discretion in favor of prevailing defendants under other discretionary fee-shifting statutes. For example, within the context of Title VII's authorization to award fees to a prevailing defendant, courts consider whether the action is frivolous, unreasonable, or without foundation. *See E.E.O.C. v. Propak Logistics, Inc.*, 746 F.3d 145, 151 (4th Cir. 2014) ( an award of fees to a prevailing defendant in a Title VII case is  a "conservative tool, to be used sparingly" in cases in which the plaintiff initiated or continued to litigate a claim that the plaintiff "knew or

---

the significance of that choice of words in determining whether a statute was mandatory, presumptive, or permissive. *See, e.g.*, *Nichols v. Lewis*, 2008 WL 2253192, 2008 Del. Ch. LEXIS 66, at *31-34, (Del. Ch. Ct. 2008); *Matter of West Branch Conservation Ass'n. v. Planning Bd. of Town of Clarkstown*, 222 A.D.2d 513, 514, 636 N.Y.S.2d 61 (N.Y. App. Div. 2d Dep't 1995) (determining that use of the word "may" in the "may be recovered" language in New York's anti-SLAPP statute "makes the decision to award attorney's fees and costs discretionary rather than mandatory").

[17] *Cf.* Va. Code Ann. § 8.01-223.2(A) ("A person *shall* be immune from civil liability . . .") (emphasis added).  *See also Ross v. Craw*, 231 Va. 206, 214, 343 S.E.2d 312, 317 (Va. 1986) (noting the use of "may" in state statutes to denote a permissive meaning and the use of "shall" to denote an obligation or duty); 2A Norman Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 46.6 (7th ed. 2015) ("When the legislature uses a term or phrase in one . . . provision but excludes it from another, courts do not imply an intent to include the missing term in [the] . . . provision where the term or phrase is excluded. Instead,  omission of the same provision from a similar section is significant to show different legislative intent for the two sections.").

should have known was groundless, frivolous, or unreasonable.") (citations and internal quotation marks omitted); *Brat v. Personhuballah*, 883 F.3d 475, 481 (4th Cir. 2018) (discussing standard for award of attorney's fees to a prevailing party under Title VII and 42 U.S.C. § 1988) (citations omitted). And under other permissive fee-shifting anti-SLAPP statutes, courts have considered whether there is a substantial basis in fact and in law for the non-prevailing party to pursue the action. *See Egiazaryan v. Zalmayev,* 2014 U.S. Dist. LEXIS 36285, at *17 (S.D.N.Y. Mar. 19, 2014) (discussing the permissive fee-shifting provision in New York's anti-SLAPP law); *Nichols*, 2008 Del. Ch. LEXIS 66, at * 27 (discussing the permissive fee-shifting provision in Delaware's anti-SLAPP law).

Though legally insufficient to state a claim, Fairfax's allegations are not so "groundless, frivolous, or unreasonable" or so lacking in a substantial basis in fact and law as to warrant an award of fees.[18] The content of the two women's broadcasted statements is clearly defamatory *per se*, and the accusations relate to 19 and 15 year-old events that, as far as CBS knew at the time, were uncorroborated and only recently leveled against Fairfax under circumstances that raised issues as to their timing. And despite Fairfax's detailed denials, which CBS reported on air, CBS' commentary could be viewed by a reasonable listener as placing his accusers' statements in a sympathetic light that gave them some degree of legitimacy. There is also

---

[18] *See Friends of Rockland Shelter Animals, Inc. v. Mullen*, 313 F. Supp. 2d 339, 344-45 (S.D.N.Y. 2004) ("[E]ven if [Plaintiff's] action is a SLAPP suit within the meaning of the statute, defendants are not entitled to damages. [Plaintiff's] suit was commenced under a cognizable legal theory and it presented facts that tended to show some of [defendant's] statements were misleading. [T]he arguments presented by the defendants in their twenty-five page Memorandum of Law convinced the court that their activities were protected . . . . Although we found [Plaintiff's] argument unpersuasive, it is not frivolous."); *Clemente v. Impastato*, 290 A.D.2d 864, 865 (N.Y. App. Div. 3d Dep't 2002) (declining to award attorney's fees under New York's anti-SLAPP statute's fee shifting provision after finding "that plaintiff's defamation action, although now dismissed, was commenced with a substantial basis in fact and law.").

nothing in the record that would suggest that Fairfax knew the accusations of wrongdoing were true or could be shown to be true.

Fairfax also presented, as discussed *supra*, a cogent legal theory as to CBS—defamation by implication, which, under the circumstances of this case, often turn on the resolution of complicated factual disputes whose outcome is often difficult to predict, particularly given the complexities of the law in this area. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343-46 (1974) (characterizing defamation law post-*Sullivan* as the product of "competing values" at stake in defamation suits—namely, a State's interest in compensating injury to the reputation of individuals *and* the interest of the press and media).[19]

The Court also cannot conclude that Fairfax acted out of an improper motive. Since February 2019, when the initial allegations against Fairfax first surfaced, Fairfax has continuously denied the allegations made against him by both women and identified to CBS witnesses and other information he claimed supported his position that the accusations were baseless, and themselves, politically motivated. While his status as a public figure no doubt figured into his reasons for initiating this action, the record is insufficient to conclude that Fairfax was not substantially motivated by objectives typically associated with plaintiffs in defamation actions, namely, a public vindication and restoration of his reputation. There is also no doubt that Fairfax credibly alleged that he had been seriously harmed both professionally and personally by the broadcasts.

Court have also sometimes looked to whether an award of attorney's fees is necessary to address an imbalance in resources or to protect a defendant from a plaintiff with an unfair

---

[19] These legal complexities are underscored by on-going judicial assessments pertaining to defamations claims by public figures. *See, e.g.*, *McKee v. Cosby,* 586 U.S. ____, No. 17-1542 (2019) (Thomas, J., concurring in the denial of certiorari) (questioning, as a matter of constitutional law, the "actual malice" standard to state defamation law).

financial advantage, *see, e.g., Sy v. United Parcel Serv. Gen. Servs. Co.*, 1999 U.S. Dist. LEXIS 9862, at *4 (D. Or. 1999) ("A factor considered by the court in deciding whether to deny costs [sought pursuant to 28 U.S.C. § 1920] is the relative resources of the parties.") (citing *Braxton v. United Parcel Serv.*, 148 F.R.D. 527, 528-29 (E.D. Pa. 1993)), or whether an award of fees would unfairly discourage other plaintiffs from bringing colorable claims, *see, e.g.*, *Tancredi v. Metro. Life Ins. Co.*, No. 00 Civ. 5780, 2003 WL 2299203, 2003 U.S. Dist. LEXIS 17743, at *18-20 (S.D.N.Y. Oct. 7, 2003) (noting, while assessing the amount of attorney's fees to award a prevailing defendant under 42 U.S.C. § 1988, that "the amount of the award must be sufficient to serve this purpose without being so harsh as to deter a potential plaintiff from bringing a close but not frivolous case.").  As amply demonstrated in this case, CBS is well positioned to defend itself and is not a financially-vulnerable victim, outmatched by the resources of the Plaintiff; and an award of fees under the circumstances of this case would have too high a potential to deter future litigants with colorable claims.

In light of all of these considerations, the Court concludes that an award of attorney's fees and costs to CBS is unwarranted; and the Motion for Fees is denied.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendants CBS Corporation and CBS Broadcasting Inc. Motion to Dismiss [Doc. 16] be, and the same hereby, is **GRANTED**; and it is further

ORDERED that Defendants CBS Corporation and CBS Broadcasting Inc. Motion for Attorney's Fees and Costs [Doc. 19] be, and the same hereby, is **DENIED**; and it is further

ORDERED that Plaintiff Justin Fairfax's Amended Complaint [Doc. 9] be, and the same hereby is, **DISMISSED**.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record and to the enter judgment in favor of Defendants CBS Corporation and CBS Broadcasting Inc. pursuant to Fed. R. Civ. P. 58.

/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
February 11, 2020